# EX. 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
                                                           :
**WI-LAN INC.,**                                           :
                                                           :         **10 Civ. 432 (LAK) (AJP)**
                             Plaintiff,                    :
                                                           :
v.                                                         :
                                                           :
**LG ELECTRONICS, INC. and LG**                            :
**ELECTRONICS U.S.A., INC.,**                              :
                                                           :
                             Defendants.                   :
                                                           :
------------------------------------------------------------ x

## LG ELECTRONICS U.S.A., INC.'S FIRST AMENDED ANSWER AND COUNTERCLAIMS TO PLAINTIFF'S SECOND AMENDED COMPLAINT

Defendant LG Electronics U.S.A., Inc. ("LGEUS"), by and through its undersigned counsel of record, for its First Amended Answer to Plaintiff Wi-LAN, Inc.'s ("Wi-LAN") Second Amended Complaint, states as follows:

### PRELIMINARY STATEMENT

Wi-LAN's Amended Complaint is both meritless and misleading. Wi-LAN takes a contract dispute concerning a patent license agreement and converts it into a fraud and patent infringement action for the sole purpose of extorting unjustified royalties from LGEUS. While Wi-LAN tries to cloak its rhetoric in the legitimacy of the patent laws, there is nothing legitimate about Wi-LAN's purported claims.

In apparent recognition that its claims are defective, Wi-LAN acts as if it is an enforcement agent of the Federal Communications Commission ("FCC"), devoting much of its Amended Complaint to irrelevant allegations concerning an FCC investigation of LGE initiated in August 2007 relating to LGEUS's compliance with the FCC's new DTV V-chip technology

requirements.  That matter was amicably resolved pursuant to a publicly disclosed Consent Decree entered in April 2008; the Consent Decree has since expired and is wholly unrelated to Wi-LAN's fraud and patent infringement counts.  Wi-LAN's motivation is transparent: it seeks to disguise the weakness of its claims by embarrassing LGEUS and hoping that the threat of continuing publicity about the FCC matter will spur LGEUS to pay Wi-LAN royalties that Wi-LAN knows it is not entitled to under the parties' license agreement.  Worse yet, it suggests that Wi-LAN will ignore its legal obligations in proving infringement of its patented methods and, instead, merely argue that if LGEUS complies with the FCC's regulations then it must infringe Wi-LAN's patent.

Interestingly, Wi-LAN's original complaint accused the defendants of breach of contract, fraud, and patent infringement.  Apparently realizing the inconsistency of asserting a breach of contract claim, confirming that LGEUS's accused products are licensed, while simultaneously asserting its patent infringement claim against those same products, Wi-LAN's Amended Complaint no longer includes the breach of contract claim.  Conveniently, on April 7, 2010, the day before it filed the Amended Complaint (and almost three months after filing this lawsuit and more than two and a half years after sending a notice of LGEUS's purported material breach) Wi-LAN sent LGE a letter purporting to terminate the parties' patent license agreement.  This letter was neither timely nor effective.

Wi-LAN's patent infringement claim accuses LGEUS of infringing a single U.S. patent, U.S. Pat. No. 5,828,402 (the "'402 patent" or "patent in suit"), which issued in 1996.  Wi-LAN's broad allegations of infringement amount to a claim that Wi-LAN invented parental control technology.  While Wi-LAN characterizes its invention as the "world famous V-Chip invention," parental control technology was invented more than 10 years before the inventor of the '402

patent even filed his patent application, covering what Wi-LAN characterizes as "flexible" V-chip technology.  Wi-LAN's asserted patent claims, however, only cover certain methods for updating a rating scheme used to facilitate parental control and, importantly, do not include any apparatus or device claims.  This nuance is critical in this case because of the distinctions in finding infringement between method and apparatus claims.  A method claim is only infringed if each and every step **is actually performed** by the accused method.  Thus, a device that is **capable** of performing, but never actually performs, each step of the patented method does not and cannot infringe a method claim.  While knowing and appreciating this distinction, Wi-LAN alleges infringement of method claims in its Amended Complaint anyway.

With a not so subtle twist, here, Wi-LAN alleges that for LGEUS's accused television receivers to comply with the FCC rules governing V-Chip technology requirements for digital television receivers sold in the United States, they must practice the patented method of the '402 patent, which contains solely method and not any apparatus or system claims.  Wi-LAN is wrong.  Neither LGEUS's accused television receivers, nor any other U.S. television receivers can infringe Wi-LAN's patented method for flexible V-Chip technology because, even assuming *arguendo* that they were **capable** of receiving a revised ratings table necessary to infringe the patented method, they never **actually receive** nor will they **actually receive** the "second configuration data."  The Parental Guidance Rating System that sets the ratings table data that broadcasters transmit in along with their video transmissions in the United States has never changed the ratings table and has agreed not to do so.  Thus, even assuming the accuracy of Wi-LAN's assertion that the FCC's rules require that digital television receivers sold in the United States **have the ability** to reconfigure, using remotely transmitted signals (the Parental Guidance Rating Systems used in the V-Chips of the receivers), the United States has never changed the

3

ratings table supplied to television receivers for selectively blocking video programs. Notably, the '402 patent is not directed to the mere ability of a receiver to accept a re-configured ratings table. Thus, no U.S. television receivers have ever used the patented method covering Wi-LAN's "flexible V-Chip" invention. Nevertheless, Wi-LAN has and continues to try to tax the entire U.S. television receiver market. The defendants provided information to Wi-LAN long ago that confirmed its claims are meritless.

## ANSWER

### BACKGROUND

1.      LGEUS denies that it has blatantly and willfully disregarded the FCC's regulations and Wi-LAN's rights in the patented V-Chip invention. LGEUS is without information sufficient to admit or deny the remaining allegations of this paragraph and, accordingly, denies same.

### THE PARTIES

2.      LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

3.      Admitted.

4.      Admitted.

5.      Denied.

### JURISDICTION AND VENUE

6.      To the extent the allegations of this paragraph purport to state a legal conclusion, no response is required. To the extent a response is deemed to be required, LGEUS admits that Wi-LAN's Amended Complaint purports to state causes of action under the Patent Act, 35 U.S.C. § 1, *et seq.* and under New York law, but denies that any such claims by Wi-LAN

4

are meritorious with respect to LGEUS.  LGEUS denies the remaining allegations of this paragraph.

7.        LGEUS admits that this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338 and 1367, but denies that any of Plaintiff's claims asserted against LGEUS are meritorious.  LGEUS denies the remaining allegations of this paragraph.

8.        To the extent the allegations of this paragraph purport to state a legal conclusion, no response is required.  To the extent a response is deemed required, LGEUS further states Plaintiff has not asserted any contract claims and, thus, the forum selection terms of the license agreement are irrelevant.  LGEUS denies the remaining allegations of this paragraph.

9.        To the extent the allegations of this paragraph purport to state a legal conclusion, no response is required.  To the extent a response is deemed required, LGEUS admits that venue is proper in this district pursuant to 28 U.S.C. §§1391(b) and 1400(b).  LGEUS denies the remaining allegations of this paragraph.

## PATENT-IN-SUIT

10.        LGEUS admits that the '402 patent issued on October 27, 1998 and is entitled "Method and Apparatus for Selectively Blocking Audio and Video Signal."  LGEUS further admits that the '402 patent names Tim Collings as an inventor.  LGEUS denies the remaining allegations of this paragraph.

11.        LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

12.        LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

5

13.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

14.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

15.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

16.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

17.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

18.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

19.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

20.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

## LICENSING AGREEMENT WITH LG

21.     Admitted.

22.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

23.     LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

24.      LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

25.      Denied.

26.      To the extent the allegations in this paragraph are even understood, LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

27.      LGEUS admits that it provided a signed letter of intent to Wi-LAN on or about February 28, 2006.   LGEUS denies the remaining allegations of this paragraph.

28.      LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

29.      LGEUS admits that its representatives met with representatives of Tri-Vision on or about March 21, 2006 in Toronto, Canada.   LGEUS denies the remaining allegations of this paragraph.

30.      Denied.

31.      LGEUS admits that its representatives met with representatives of Tri-Vision on or about April 25, 2006 ins Seoul, Korea.   LGEUS denies the remaining allegations of this paragraph.

32.      LGEUS admits that it executed a license agreement with Tri-Vision, which was effective as of May 17, 2006.   LGEUS denies the remaining allegations of this paragraph.

33.      LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

34.      Denied.

35.      LGEUS admits that, on or about July 2, 2006, LGEUS accurately and lawfully provided a royalty report indicating no sales of licensed products.  LGEUS denies the remaining allegations of this paragraph.

36.      Denied.

37.      Denied.

38.      LGEUS admits that LGEUS entered into a Consent Decree with the FCC on or about April 18, 2008.  LGEUS denies the remaining allegations of this paragraph.

39.      Denied.

40.      Denied.

41.      LGEUS is without information sufficient to admit or deny the remaining allegations of this paragraph and, accordingly, denies same.

42.      Denied.

43.      LGEUS is without information sufficient to admit or deny the allegations of this paragraph and, accordingly, denies same.

44.      To the extent this paragraph alleges that LGEUS has not honored its obligations under the License, such allegations are denied.  LGEUS is without information sufficient to admit or deny the remaining allegations of this paragraph and, accordingly, denies same.

45.      Denied.

46.      LGEUS admits that on or about November 26, 2007, Wi-LAN notified LGEUS of its purported material breach of the License but denies that it was ever in breach of the License or that it failed to cure any alleged breach.  LGEUS further admits that in a letter dated April 7, 2010, the day before this Amended Complaint was filed, Wi-LAN purported to

terminate the License but denies the License was lawfully terminated.  LGEUS denies the remaining allegations of this paragraph.

## COUNT 1 -- FRAUDULENT INDUCEMENT

47.     LGEUS incorporates by reference its responses to paragraphs 1-46 as if fully set forth herein.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

## COUNT 2 -- PATENT INFRINGEMENT

54.     LGEUS incorporates by reference its responses to paragraphs 1-53 as if fully set forth herein.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

## RELIEF REQUESTED

LGEUS denies that Wi-LAN is entitled to judgment in its favor, or to any other relief whatsoever.

9

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
**(Non-Infringement)**

1.      LGEUS does not infringe, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the patent in suit.

### SECOND AFFIRMATIVE DEFENSE
**(License)**

2.      LGEUS does not and cannot infringe the patent in suit, because it has, at all times relevant herein, been licensed under the patent in suit and continues to be licensed under the patent in suit.

3.      Further evidencing that LGEUS was and remains licensed under the '402 patent at all relevant times, and notwithstanding Wi-LAN's purported termination letter on April 7, 2010, Wi-LAN's website continued to advertise LGE as a licensee under its patented V-Chip technology. *See* "WiLAN – Licensing – V-Chip," http://67.192.1.247/Licensing/V-Chip/default.aspx, May 5, 2010, Exhibit 1; *see also* "WiLAN V-CHIP LICENSING," http://67.192.1.247/Theme/WiLan/files/documents_licensing/Wi-LAN%20V-chip%20-%20Companies%20Licensed%20April%2019%202010.pdf, downloaded May 28, 2010, Exhibit 2.

4.      Alternatively, LGEUS is not liable to Wi-LAN for damages for patent infringement that may have occurred prior to April 7, 2010, the date Wi-LAN purported to terminate its license to LGE of the patent in suit.

### THIRD AFFIRMATIVE DEFENSE
**(Invalidity)**

5.      The claims of the patent in suit are invalid for failure to meet the conditions of patentability set forth in 35 U.S.C. §§ 102, 103, and/or 112.

## FOURTH AFFIRMATIVE DEFENSE
### (Lack of Notice)

6.      Plaintiff's requested relief is barred or otherwise limited by 35 U.S.C. § 287, in that Plaintiff and/or one or more of its licensees failed to properly mark all articles purportedly covered by one or more claims of the patent in suit with the relevant patent number. Additionally, Plaintiff cannot recover damages from LGEUS, if any are awarded, with respect to the patent in suit, prior to the date on which LGEUS received notice of Plaintiff's infringement contentions regarding the patent in suit on January 19, 2010.

## FIFTH AFFIRMATIVE DEFENSE
### (Equitable Relief Unavailable)

7.      Plaintiff is not entitled to injunctive relief, whether preliminary or permanent, because:

(a)     Plaintiff cannot show it is likely to succeed on the merits;

(b)     Plaintiff is a non-practicing, patent licensing entity that is obligated to license the '402 on fair and non-discriminatory grounds pursuant to the policies of certain standards setting organizations to which it submitted the '402 patent, and cannot show irreparable harm if injunctive relief is not granted;

(c)     the balance of hardships between Plaintiff and LGEUS does not warrant injunctive relief; and

(d)     the public interest would not be served by granting injunctive relief against LGEUS.

## SIXTH AFFIRMATIVE DEFENSE
### (Laches)

8.      Wi-LAN's claims are barred, at least in part, with respect to Wi-LAN's claims

11

for pre-suit damages due to laches because Wi-LAN's unreasonably delayed in filing this action, and unreasonably delayed in prosecuting the asserted claims, after LGEUS had invested, and continues to invest, time and money into building its business and goodwill.

## SEVENTH AFFIRMATIVE DEFENSE
### (Innocent Intent)

9.      LGEUS has engaged in all relevant activities in good faith, thereby precluding Wi-LAN, even if it prevails, from recovering its reasonable attorneys' fees and/or costs under 35 U.S.C. § 285.

## EIGHTH AFFIRMATIVE DEFENSE
### (Prosecution History Estoppel)

10.     By reason of proceedings in the United States Patent and Trademark Office ("USPTO") during the prosecution of the applications that ultimately led to the issuance of the patent in suit, Wi-LAN is estopped from asserting that any claim of the patent in suit is infringed by LGEUS under the doctrine of equivalents.

## NINTH AFFIRMATIVE DEFENSE
### (Unenforceability Due to Inequitable Conduct Before the USPTO)

11.     The '402 Patent is unenforceable because Wi-LAN failed to comply with its duty of candor and good faith in dealing with the USPTO.

12.     The details surrounding Wi-LAN's inequitable conduct are explained in paragraphs 14-21 of LGEUS's Counterclaims below, which are incorporated by reference herein.

## TENTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

13.     Wi-LAN failed to state a claim for which relief may be provided.

14.    Wi-LAN failed to state a claim for fraud because it has not pled its fraud claim with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

15.    Wi-LAN failed to state a claim for patent infringement because it admits that LGEUS is licensed under the patent in suit and, even assuming *arguendo* that the License Agreement was terminated by notice sent on April 7, 2010, Wi-LAN had no standing to assert its patent infringement claim on the date this lawsuit was filed.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Patent Misuse)

16.    Wi-LAN's patent infringement claims are barred under the doctrine of patent misuse.

17.    The details surrounding Wi-LAN's patent misuse are explained in paragraphs 22-24 of LGEUS's Counterclaims below, which are incorporated by reference herein.

## TWELFTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

18.    Wi-LAN's claims are barred by the doctrine of unclean hands rendering the '402 patent unenforceable in this action.

19.    The details surrounding Wi-LAN's unclean hands are explained in paragraph 25 of LGEUS's Counterclaim below, which is incorporated by reference herein.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate Damages)

20.    Plaintiff's requested relief is barred or otherwise limited due to its failure to mitigate its damages.

21.    Plaintiff alleges that it suffered special damages, including the reduction of revenue resulting from the most favored nation clause requirement in existing licensees'

agreements to receive any royalty reduction offered to subsequent licensees and to future licensees from royalty rate erosion.

22.     Plaintiff purportedly terminated its license to LGE by a letter dated April 7, 2010.  To the extent the April 7, 2010 letter actually terminated LGE's license, Plaintiff was no longer obligated to offer reduced royalty rates to its other licensees pursuant to the most favored nation clause as of that date.

23.     Plaintiff also alleges that the May 2006 license with LGE is void *ab initio*.  To the extent the May 2006 license is void *ab initio*, Plaintiff was never obligated to offer reduced royalty rates to its other licensees pursuant to the most favored nation clause.

24.     Plaintiff has represented in open court that, regardless of whether a license between Plaintiff and LGE ever existed or continues to exist, it does not intend to unwind the most favored nations clause vis-à-vis its other licensees.  Plaintiff's refusal to unwind the most favored nations clause constitutes failure on Plaintiff's part to mitigate its damages.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Unenforceability Based on Waiver, Estoppel, Implied License, Implied Waiver, and/or Unclean Hands for Failure to Disclose)

25.     As set forth with particularity in paragraphs 22-41 inclusive of Count IV of the Counterclaims set forth below, which LGEUS hereby incorporates as if set forth herein verbatim, the '402 Patent is invalid and unenforceable because of Wi-LANs predecessor, Tri-Vision Electronics Inc.'s failure to disclose the '402 to the applicable standards-setting organizations prior to the voting, approval, and/or publication dates of the applicable standards.

## COUNTERCLAIMS

Counterclaim-Plaintiff LGEUS alleges as follows on information and belief for its Counterclaims against Plaintiff and Counterclaim-Defendant Wi-LAN.

## NATURE OF THE LAWSUIT

1.     These Counterclaims are for declarations of patent non-infringement and patent invalidity and unenforceability arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 et seq., and the patent laws of the United States, 35 U.S.C. § 1, et seq.  In addition, LGEUS seeks a declaration that the License Agreement is valid, enforceable and not terminated.  LGEUS further asserts a counterclaim for breach of contract associated with Wi-LAN's unlawful and unjustified attempt to terminate the License Agreement, as well as a counterclaim for unjust enrichment for advertising that LGEUS was a licensee of the patent in suit, in order to encourage other potential licensees to take licenses, even though LGEUS purportedly was not a licensee.  LGEUS also asserts counterclaims of Federal trademark infringement, false designation of origin, false advertising and unfair competition under the Lanham Act and deceptive acts and practices under New York General Business Law. Finally, LGEUS asserts claims of attempted monopolization, monopolization, and combination or conspiracy in restraint of trade under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

## THE PARTIES

2.     Counterclaim-Plaintiff LGEUS is a corporation formed under the laws of the State of Delaware with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632..  LGEUS is a national leader in the field of electronics and consumer appliances, including television receivers.

15

3. On information and belief, Counterclaim-Defendant Wi-LAN is a Canadian company with its principal place of business at 11 Holland Avenue, Ottawa, Ontario, Canada K1Y 4S1.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over these counterclaims under 28 U.S.C. §§ 1331, 1367, 1338, and 2201-02.

5. Venue is proper in this judicial district under 28 U.S.C. §§ 1367, 1391(b), and 1400(b).

6. By virtue of the Complaint filed by Wi-LAN in this action, there is an actual and justiciable controversy between LGEUS and Wi-LAN, concerning non-infringement, invalidity and unenforceability with respect to the '402 patent. In addition, there is an actual and justiciable controversy between LGEUS and Wi-LAN, concerning the existence, status and enforceability of a license agreement between the parties under the '402 patent. A judicial declaration is necessary and appropriate to resolve this controversy.

## COUNT I
## Declaratory Judgment of Noninfringement

7. LGEUS repeats and realleges the allegations set forth in paragraphs 1-6, above, as if set forth fully herein.

8. LGEUS has not in the past, and does not now make, use, sell, offer to sell, or import any products that infringe any valid claim of the '402 Patent, either directly or indirectly, and LGEUS does not and has not infringed, contributed to the infringement of, or induced infringement of any valid claim of the '402 Patent either directly or under the doctrine of equivalents.

16

9.      Additionally, LGEUS does not infringe, directly or indirectly, literally or pursuant to the doctrine of equivalents, any claim of the patent in suit, because LGEUS has not made, used, offered to sell, or sold in the United States, or imported into the United States, any of the products accused by Plaintiff of purportedly infringing the patent in suit.

10.     This case qualifies as an exceptional case under 35 U.S.C. § 285.

### COUNT II
### Declaratory Judgment of Invalidity

11.     LGEUS repeats and realleges the allegations set forth in paragraphs 1-10, above, as if set forth fully herein.

12.     One or more claims of the '402 Patent are invalid for failing to comply with one or more requirements for patentability set forth in 35 U.S.C. §§ 101, 102, 103, 112, *et seq*.

13.     This case qualifies as an exceptional case under 35 U.S.C. § 285.

### COUNT III
### Declaratory Judgment of Unenforceability Based on Inequitable Conduct

14.     LGEUS repeats and realleges the allegations set forth in paragraphs 1-13, above, as if set forth fully herein.

15.     The '402 Patent is unenforceable because Wi-LAN failed to comply with its duty of candor and good faith in dealing with the USPTO.

16.     On information and belief, the named inventor of the patent in suit, Timothy Collings ("Collings") had knowledge of highly material prior art that was known and available to the public more than one year prior to the earliest claimed priority date of the patent in suit.

17.     Specifically Collings published without restriction an article he had written

entitled "Violence and Television: The Canadian Example" (the "Collings Article") at the International Symposium, Canadian Studies Centre, Sorbonne Nouvelle University, Paris, France, held June 16-18, 1994.

18.     The Collings Article anticipates or, taken individually or in combination with other references, renders obvious one or more claims of the patent in suit and was material to the patentability of the pending claims in the applications leading to the patent in suit.

19.     In particular, the Collings Article discloses, among other things, blocking the display of the video if the result of the comparison between the extracted information and the stored preference information indicates that the video should not be displayed, and allowing the video to be displayed if the result of the comparison indicates that the video should be displayed.

20.     The Collings Article is both material to the patentability of the patent in suit and non-cumulative of the prior cited by the Examiner during the prosecution of the applications leading to the patent in suit, as evidenced by the USPTO's recent Order Granting Request for Ex Parte Reexamination, dated March 2, 2010, and finding a Substantial New Question of Patentability affecting Claims 7-15 of the patent in suit, in view of the Collings Article, together with General Instrument's "System Information Description" and U.S. Patent No. 4,685,131.  The Collings Article published more than one year before the patent in suit's priority date of June 19, 1996.

21.     While Collings and others associated with the filing and prosecution of the applications resulting in issuance of the patent in suit were well aware of the substance and materiality of the Collings Article, the alleged inventors, their counsel, their assignees, their agent(s), representative(s), and/or other associated person(s) involved in the preparation or

prosecution of the patent in suit knowingly withheld the existence of the Collings Article from the patent examiner with the intent to deceive the PTO.  Accordingly, the alleged inventors, their counsel, and/or their assignees breached their duties of candor, good faith, and honesty to the USPTO in violation of 37 C.F.R § 1.56.

22.    Additionally, the '402 Patent is unenforceable because Wi-LAN has committed patent misuse.

23.    In attempting to mandate that LGEUS adopt the V-Chip technology allegedly covered by the '402 patent, Wi-LAN has improperly attempted to broaden its patent beyond its lawful scope.  Notwithstanding the fact that the non-exclusive License Agreement between the parties does not and cannot require LGEUS to practice the patented invention or pay royalties for products that do not implement the patented technology, by filing this action, Wi-LAN now attempts to convert its non-exclusive License Agreement into one with terms that (a) mandate LGEUS's adoption of Wi-LAN's patented technology and (b) bars LGEUS from adopting any other alternative technology to comply with the FCC regulations.  In so acting, Wi-LAN is attempting to use the '402 patent to enjoin the sale of products by LGEUS that do not and have never performed the patented method covered by the '402 patent, thereby extending the scope of the methods covered by the '402 patent far beyond that covered by the claims.  At the very minimum, such activity constitutes patent misuse.

24.    Wi-LAN's request that the Court enter a preliminary and permanent injunction against LGEUS, when Wi-LAN knows that it is obligated to offer a license to LGEUS, evidences further patent misuse.  Specifically, Wi-LAN submitted an intellectual property proffer ("IP Proffer") to the Consumer Electronics Association ("CEA") in connection with its industry standards setting activities directed to V-Chip technology.  Pursuant to that IP

Proffer, Wi-LAN promised to license its V-Chip patent on reasonable and non-discriminatory terms.  Indeed, Wi-LAN admits as much in Paragraph 28 of its Amended Complaint, stating that it is "required by United States law to license the Collings patent in a fair and non-discriminatory manner."

25.     Additionally, the '402 Patent is unenforceable under the doctrine of unclean hands.  Wi-LAN has engaged in a pattern and practice of improper activity to acquire, license, and assert the '402 patent in bad faith, including by making false and objectively baseless claims of patent infringement either without a reasonable investigation or basis in fact or law, and with knowledge that the '402  patent is  invalid, unenforceable, and/or not infringed by the accused standards and products.

26.     This case qualifies as an exceptional case under 35 U.S.C. § 285.

<u>**COUNT IV**</u>
<u>**Declaratory Judgment of Unenforceability For Failure to Disclose to**</u>
<u>**Standard Setting Organizations**</u>

27.     LGEUS repeats and realleges the allegations set forth in paragraphs 1-26, above, as if set forth fully herein.

28.     The '402 Patent was previously assigned to Wi-LAN's predecessor Tri-Vision Electronics Inc. ("Tri-Vision").

29.     During all or part of the time period it owned the '402 Patent, Tri-Vision was a participant of the Standard Setting Organization ("SSO") Advanced Televisions Systems Committee, Inc. ("ATSC").  The ATSC is a SSO that collaborates with its participants to create and establish specifications for digital television technologies.

30.     ATSC has written policies and disclosure requirements relating to the Patent rights of its participants.

**ATSC's Patent Disclosure Policy**

31.    ATSC's Patent Policy requires that its participants shall disclose to the ATSC all Essential Claims to a Specification Document "as soon as practically possible during the development of the specification document and, at the latest, within forty-five (45) business days after the Participant's Representative obtains actual knowledge of a Potential Claim relating to a Specification Document and in advance of any vote on the Specification Document with proposed standard."

32.    Article 11 of ATSC's Patent Policy defines the following terms as follows:

**"Essential Claim"** means claims of all patents issued, and patent applications filed, under the laws of any country that are necessarily infringed by implementing the normative portion of a Specification Document.  An Essential Claim is "necessarily infringed" only when there is no other technically reasonably non-infringing alternative for implementing a Specification Document.

**"Participant"** means a Member, Observer, individual, or organization that participates in the development of a Specification Document within the ATSC, an ATSC technology group, or an ATSC specialist group.

**"Potential Claim"** means a claim in any patent issued or granted under the laws of any country, as well as a claim in, or supported by, any pending published patent application filed under the laws of any country, of which a Representative of a Participant has actual personal knowledge and that, in the good faith judgment of such Participant's Representative, may be an Essential Claim.

**"Specification Document"** means an ATSC Standard, an ATSC Recommended Practice, a Proposed Standard, a Proposed Recommended Practice, a Candidate Standard or a Working Draft, as defined in the ATSC Bylaws.

33.    Article 1 of ATSC's Patent Policy requires a Participant to provide a written confirmation of its Essential Claim to the President of the ATSC and to elect whether or not the Participant will license the Essential Claim on reasonable and nondiscriminatory terms.

34.    Article 3 of ATSC's Patent Policy further states that a "Participant shall disclose in writing…the existence of any Potential Claim of which any Representative of the

Participant who is active in a technology group or specialist group has actual personal knowledge."

35.     Article 6 of ATSC's Patent Policy states "Any Participant's knowing failure to disclose a Potential Claim, whether by violation or manipulation of the provisions of this Policy, shall be deemed incompatible with such Participant's obligations toward ATSC and shall constitute a 'failure to disclose' with consequences as defined in this paragraph.  ATSC may in such a case terminate any such Participant's ability to participate in ATSC processes."

**Tri-Vision Failed to Properly Disclose the '402 Patent to ATSC**

36.     On information and belief Tri-Vision was at all relevant times a Participant in the ATSC and was therefore bound by the Patent Disclosure Policy detailed above.

37.     According to Tri-Vision, Timothy Collings, the named inventor of the '402 Patent, participated on behalf of Tri-Vision in ATSC committee meetings.

38.     On information and belief, Timothy Collings was active in a technology group or specialist group of the ATSC.  As the named inventor of the '402 Patent Timothy Collings had actual personal knowledge of the '402 Patent, a Potential Claim relating to a Specification Document, and the ATSC's Specification Document A/65 Standard, entitled "Program and System Information Protocol for Terrestrial Broadcast and Cable (PSIP)" ("A/65").

39.     The Specification Document ATSC Standard  A/65 was voted on and approved on December 23, 1997.  A/65 Revision A was voted on and approved on May 31, 2000. A/65 Revision B was voted on and approved March 18, 2003.  Earlier Specification Documents were voted on and approved prior to 1997.

40.     On May 11, 2005 Tri-Vision belatedly disclosed the '402 Patent to ATSC. Tri-Vision stated "The A/65 standard requires transmission of the RRT, which includes the informational scheme for the ratings systems in use.  Processing of an A65 compliant signal will necessarily perform the steps set forth in the claims of our '402 [Patent].  In accordance with the ATSC Patent Policy, Tri-Vision hereby reiterates its commitment to make available licenses upon request under reasonable and non-discriminatory terms and conditions to all applicants for the purpose of implementing the Specification Document."

41.     Tri-Vision failed to comply with the Patent Disclosure Policy of the ATSC. Tri-Vision never disclosed the '402 Patent or the application upon which the '402 Patent was based to the ATSC prior to the voting, approval, and/or publication dates of A/65, A/65 Revision A, A/65 Revision B, and earlier Specification Documents.

### Wi-LAN Claims that the '402 Patent is An Essential Claim to the A/65 Standard (and Related Standards)

42.     Tri-Vision belatedly provided a written confirmation to the ATSC that the '402 Patent was an Essential Claim to the ATSC A/65 Standard.

43.     In this case, Wi-LAN, Tri-Vision's successor, claims that LGEUS infringes the '402 Patent by practicing the A/65 Standard.  Prior to this lawsuit, Wi-LAN claimed that LGEUS infringes the '402 Patent by practicing the A/65 Standard, Revisions A and B.  Wi-LAN relied upon and identified the A/65 Standard to allegedly demonstrate LGEUS's infringement.  Plaintiff's discovery responses demonstrate Wi-LAN's position that the '402 Patent reads on the A/65 Standard, and that LGEUS purportedly cannot practice the A/65 Standard without infringing the '402 Patent.

44.     Tri-Vision and the Timothy Collings, the inventor of the '402 Patent, chose not to participate in the standards-setting process in an up-front, ethical and equitable

manner.   Rather, despite Tri-Vision's duty to disclose, Tri-Vision remained silent and allowed the ATSC to develop, vote on, approve, and publish the A/65 Standard (and related standards) while it secretly sought and acquired patent protection for the '402 Patent that Wi-LAN now claims reads on the A/65 Standard.

45.     Tri-Vision's conduct violates all reasonable standards of equity and fair dealing and its inequitable behavior runs with the '402 Patent.  The '402 Patent was secretly withheld by Wi-LAN's predecessor from the very organization responsible for setting digital television standards.  At all times relevant hereto, LGEUS' affiliate, and LGE's subsidiary, Zenith Electronics Company, was a participant in the ATSC.  Consequently, Wi-LAN, as Tri-Vision's successor, cannot assert the '402 Patent.

46.     As a result of Tri-Vision's inequitable conduct in i) failing to properly disclose the '402 Patent prior to the ATSC's development, voting on, approval and publication of the A/65 Standard (and related standards), ii)delaying its disclosure of the '402 Patent, and/or iii) failing to license the '402 Patent on fair, reasonable, and non-discriminatory terms as required by the CEA and the ATSC, the '402 Patent is unenforceable as against LGEUS for practicing the A/65 (and all related standards) based on waiver, equitable estoppel, implied license, implied waiver, and/or unclean hands.

## COUNT V
### Declaration that the License Agreement is Effective and Not Terminated

47.     LGEUS repeats and realleges the allegations set forth in paragraphs 1-46, above, as if set forth fully herein.

48.     On May 26, 2006, Wi-LAN's predecessor, Tri-Vision Electronics Inc. ("Tri-Vision"), and LGE entered into a License Agreement in which Tri-Vision granted to LGE a

24

license under the patent in suit to make, have made, import, export, use and sell television receivers which are, or the use of which is, within the scope of the patent in suit.

49.     The License Agreement also provided that Tri-Vision would not claim against the rights of distributors and retailers, including LGEUS, who purchase licensed products from LGE.  LGEUS is therefore a third-party beneficiary of the License Agreement.

50.     On November 26, 2007, Wi-LAN, through its counsel, sent a letter to LGE notifying LGE that it was in material breach of the License Agreement.

51.     LGE exchanged numerous correspondence with Wi-LAN during the first half of 2008 explaining that LGE had not breached the License Agreement.

52.     LGE has duly performed all terms and conditions of the License Agreement required of LGE.

53.     Wi-LAN admits that it is required by law to license the '402 patent to LGEUS, and others, on fair and non-discriminatory terms.

54.     Nevertheless, more than two and a half years after notifying LGE of its purported breach, nearly three months after filing this lawsuit and the day before it filed its Amended Complaint, Wi-LAN sent LGE a letter dated April 7, 2010, purporting to terminate the License Agreement.

55.     Notwithstanding its April 7, 2010 letter, Wi-LAN's website continues to advertise LGE as a licensee under its patented V-Chip technology.  *See* "WiLAN – Licensing – V-Chip," http://67.192.1.247/Licensing/V-Chip/default.aspx, May 5, 2010, Exhibit 1; *see also* "WiLAN V-CHIP LICENSING," http://67.192.1.247/Theme/WiLan/files/documents_licensing/Wi-LAN%20V-chip%20-

%20Companies%20Licensed%20April%2019%202010.pdf,   downloaded   May   28,   2010,
Exhibit 2.

56.     The License Agreement is valid, enforceable and continues to bind the parties
thereto, Wi-LAN's termination was unjustified and invalid, and the License Agreement was
not terminated but, instead, remains in full force and effect.

## COUNT VI
## Unjust Enrichment

57.     LGEUS repeats and realleges the allegations set forth in paragraphs 1-56,
above, as if set forth fully herein.

58.     Plaintiff alleges that the May 2006 license with LGE is void *ab initio*.

59.     To the extent the May 2006 license with LGE is void *ab initio*, LGE never had
the commercial and financial advantage of being licensed under the patent-in-suit.

60.     On information and belief, Plaintiff has nevertheless represented to multiple
potential licensees since May 2006, including on its website, that LGE, and thus LGEUS, are
licensed under the patent-in-suit.

61.     On information and belief, Plaintiff representation that LGE, and thus LGEUS,
are licensed has encouraged such potential licensees to take licenses in the patent-in-suit, and
Plaintiff has received additional royalty revenue from such potential licensees.

62.     To the extent the May 2006 license with LGE is void *ab initio*, Plaintiff has
been unjustly enriched through royalty revenue that it has received from licensees who were
encouraged to take a license, at least in part, by Plaintiff's representations that LGE, and thus
LGEUS, are licensed.

63.     Equity and good conscience require that Plaintiff compensate LGE for the
benefit Plaintiff has received at LGEUS's expense.

COUNT VII
**Federal Trademark Infringement (15 U.S.C. § 1114)**

64.    LGEUS repeats and realleges the allegations set forth in paragraphs 1-63, above, as if set forth fully herein.

65.    To protect its company reputation and product investments, LGEUS's parent, LG Corp., has filed for and obtained federal trademark registrations for its significant trademarks.    Specifically, LG Corp. has obtained federal registrations for the marks identified in the table below (collectively, the "LG Marks").

| Mark | Reg. No. | Reg. Date |
|---|---|---|
|  | 2339441 | 11-APR-2000 |
|  | 3661175 | 28-JUL-2009 |
|  | 3392769 | 04-MAR-2008 |

66.    LGEUS is licensed by LG Corp. to use and enforce the LG Marks.

67.    Wi-LAN has advertised its patent licensing services on its website using the LG Marks.  *See* Exhibit 1.

27

68.     Wi-LAN's use of the LG Marks is without authorization and constitutes trademark infringement in violation of 15 U.S.C. § 1114(1)(b).

69.     Wi-LAN's unauthorized use of the LG Marks as alleged herein is likely to cause confusion as to source or sponsorship, in that consumers are likely to believe mistakenly that Wi-LAN is affiliated with, connected with, sponsored by, approved by, or otherwise associated with LGE.

70.     Wi-LAN's knowing, intentional and unlawful use of the LG Marks is demonstrated by its contention in this lawsuit that LGE is not licensed under its patented V-Chip technology, which was directly contradicted by Wi-LAN's continuing use of the LG Marks to advertise its services on its website.

71.     It was only after LGE pointed out this contradiction in its original Answer that Wi-LAN self-servingly removed the LG Marks from its website (*see* "Wi-LAN - Licensing - V-Chip," http://67.192.1.247/Licensing/V-Chip/default.aspx, May 13, 2010, Exhibit 3), although Wi-LAN continues to advertise LGE, and thus LGUS, as being licensed (*see* Exhibit 2).

72.     Wi-LAN's knowing and intentional unauthorized use of the LG Marks and other acts of unfair competition alleged herein constitute intentional and willful trademark infringement, in violation of 15 U.S.C. § 1114.

73.     As a result of Wi-LAN's aforesaid acts, LGEUS has suffered and continues to suffer irreparable injury.

74.     LGEUS has no adequate remedy at law.  Unless and until Wi-LAN is enjoined by this Court, its infringing acts will continue to confuse the public, and cause irreparable injury to LGEUS and to its goodwill and business reputation.

<u>COUNT VIII</u>
**<u>False Designation of Origin, False Advertising, and Unfair Competition (15 U.S.C. § 1125)</u>**

75.    LGEUS repeats and realleges the allegations set forth in paragraphs 1-74, above, as if set forth fully herein.

76.    Wi-LAN's unauthorized use of the LG Marks as alleged herein is likely to cause confusion as to source or sponsorship, in that consumers are likely to believe mistakenly that Wi-LAN is affiliated with, connected with, sponsored by, approved by, or otherwise associated with LGEUS.

77.    Wi-LAN's knowing and intentional unauthorized use of the LG Marks and other acts of unfair competition alleged herein constitute intentional and willful false designation of origin and unfair competition with the intent to deceive, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

78.    In addition, Wi-LAN's false or misleading descriptions or representations of fact in correspondence, commercial advertisements, promotional materials, and/or media articles in connection with Plaintiff's licensing services constitutes false advertising that is likely to cause confusion, mistake, and deception among consumers as to the affiliation, connection, or association of Defendants with Wi-LAN's licensing services, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

79.    Specifically, Wi-LAN made bad faith false or misleading descriptions or representations that it was the exclusive source of DTV receivers that comply with FCC regulations and standards and that potential licensees could not manufacture a DTV receiver that would not infringe Wi-LAN's '402 Patent.

80.    Wi-LAN's deceptive actions are likely to influence the consuming public's purchasing decisions.  Wi-LAN's unfair competition jeopardizes the goodwill built up by

LGEUS in its DTV receivers and is causing irreparable harm to LGEUS for which there is no adequate remedy at law.

81.     As a result of Wi-LAN's aforesaid acts, LGEUS has suffered and continues to suffer irreparable injury.

82.     LGEUS has no adequate remedy at law.  Unless and until Wi-LAN is enjoined by this Court, its infringing acts will continue to confuse the public, and cause irreparable injury to LGEUS and to its goodwill and business reputation.

<u>COUNT IX</u>
<u>Deceptive Acts and Practices (New York General Business Law § 349)</u>

83.     LGEUS repeats and realleges the allegations set forth in paragraphs 1-82, above, as if set forth fully herein.

84.     Wi-LAN's unauthorized use of the LG Marks as alleged herein is likely to cause confusion as to source or sponsorship, in that consumers are likely to believe mistakenly that Wi-LAN is affiliated with, connected with, sponsored by, approved by, or otherwise associated with LGEUS.

85.     Wi-LAN's knowing and intentional unauthorized use of the LG Marks and other deceptive acts alleged herein constitute intentional and willful deceptive acts and practices, in violation of New York General Business Law § 349.

86.     As set forth with particularity in paragraphs 92-133 inclusive of Counts X to XII of the Counterclaims set forth below, which LGEUS hereby incorporates as if set forth herein verbatim, Wi-LAN's bad faith conspiracy to deceive the federal government and Wi-LAN's bad faith licensing scheme constitute intentional and willful deceptive acts and practices and unfair competition, in violation of New York General Business Law § 39.

87.     As a result of Wi-LAN's aforesaid acts, LGEUS has suffered and continues to suffer irreparable injury and other damages.

88.     LGEUS has no adequate remedy at law.  Unless and until Wi-LAN is enjoined by this Court, its acts will continue to confuse and deceive the public, and cause irreparable injury to LGEUS and to its goodwill and business reputation.

### COUNT X
### Attempted Monopolization of the Digital Television Receiver Market in Violation of Section 2 of the Sherman Antitrust Act

89.     LGEUS repeats and realleges the allegations set forth in paragraphs 1-88, above, as if set forth fully herein.

### Mr. Collings' and Tri-Vision's Early Participation Before The FCC

90.     Beginning in 1997, after Mr. Collings had filed the application for the '402 Patent, Mr. Collings submitted comments to the FCC on Simon Fraser University letterhead in an attempt to have the FCC adopt regulations that he could assert read on the claims of the '402 Patent.  In these comments, Mr. Collings intentionally failed to disclose to the FCC that he and Simon Fraser University had a pending patent application on television program blocking technology related to the regulations he was hoping to see adopted by the FCC.

91.     In August 2004 the FCC voted to require that all Digital Television ("DTV") Receivers must be able to respond to changes in the ratings system.  The FCC requirement took effect on March 15, 2006.  Between 2004 and 2006 many parties including Mr. Collings and Tri-Vision submitted comments discussing the FCC requirement.

92.     After the '402 Patent issued in 1998, Mr. Collings and Tri-Vision (A Canadian corporation that is Wi-LAN's predecessor-in-interest, collectively "Wi-LAN") continued to file and submit comments and ex parte notices to the FCC relating to the development and

31

clarification of regulations that they could allege read on the claims of the '402 Patent.  Once again, Mr. Collings and Wi-LAN intentionally failed to disclose to the FCC that they had a patent on related technology.  Indeed, it was not until the CEA identified the '402 Patent in a petition submitted to the FCC in late 2004 that Mr. Collings and Wi-LAN finally admitted to its ownership of the '402 Patent to the FCC.  By Wi-LAN's own admission, the FCC was not pleased with Wi-LAN's failure to disclose the '402 Patent until after the rules governing the capability of DTV receivers to respond to changes in the rating system had already been established.  Mr. Collings and Wi-LAN's intentional and delayed disclosure of the '402 Patent before the FCC was consistent with their intentional and delayed disclosure of the '402 Patent to other Standard Setting Organizations.

93.    Mr. Collings and/or Wi-LAN also lobbied members of Congress and their respective aides to pressure the FCC to adopt the same regulations relating to the '402 patent.

**Tri-Vision Engaged In A Bad Faith Conspiracy To Deceive The Federal Government and Subvert Governmental Oversight**

94.    After the CEA informed the FCC that Wi-LAN had failed to disclose the '402 Patent and the significant financial interest it had in the FCC's regulations, Wi-LAN became concerned the FCC would see through any further attempts to manipulate the FCC.  Thus, Wi-LAN orchestrated a plan to hire and conspire with one or more persons and/or organizations ("Lobbyists") to secretly influence the FCC, Members of Congress, and various Standard Setting Organizations.

95.    From approximately 2005 to the present, Wi-LAN and its agent(s) secretly paid the Lobbyists hundreds of thousands of dollars to lobby the federal government on Wi-LAN's behalf.

96.     Notably, on information and belief, Wi-LAN first used its secret Lobbyists to respond to the CEA's request for clarification of the FCC's rules so that Wi-LAN would have another seemingly independent voice in its attempt to oppose the CEA's request for clarification.

97.     Wi-LAN drafted most of the Lobbyists' comments, ex parte notices, speeches, emails, and letters, which the Lobbyists then submitted or presented to the FCC, Members of Congress, and/or Standard Setting Organizations in order to push Wi-LAN's corrupt agenda. One particular matter that the Lobbyists were tasked with by Wi-LAN was to encourage the FCC to require the transmission of RRT-5. Of course, Wi-LAN wanted the FCC to pass such a regulation so that Wi-LAN could argue that the FCC regulations read on its '402 Patent.

98.     The FCC has never required that RRT-5 be broadcast. Yet, Wi-LAN, with that knowledge, still claimed that the FCC regulations required the use of its '402 Patent. Wi-LAN has always known that its claims of infringement are objectively baseless and made in bad faith for at least that reason.

99.     Notwithstanding the industry uncertainty surrounding the meaning of the FCC regulations, Wi-LAN secretly instructed the Lobbyists to inform the FCC that certain manufacturers' DTV receivers did not comply with FCC regulations requiring that DTV receivers be able to respond to changes in the rating system. One of those manufacturers was LGEUS.

100.    With the Lobbyists installed as Wi-LAN's secret mouthpiece, Wi-LAN continued to make the occasional submission to the FCC, Members of Congress, and/or Standard Setting Organizations, and would often cite to its own Lobbyists' submissions or statements to make it appear that additional parties without financial interests in Wi-LAN's '402 Patent, supported Wi-LAN's corrupt agenda.

101.    In addition, Wi-LAN covertly instructed the Lobbyists to commission purportedly independent surveys or studies on the television program blocking functionality of DTV receivers.  Then, Wi-LAN would cite to these surveys or studies in comments submitted to the FCC and provide false and misleading information to the FCC to support its corrupt agenda.

102.    Wi-LAN engaged in bad faith, predatory, and highly anticompetitive conduct with the Lobbyists to deliberately deceive the federal government for Wi-LAN's own financial benefit and market power.

103.    Wi-LAN's deliberate deception of the federal government with respect to the '402 Patent renders the '402 Patent unenforceable.

104.    Despite receiving hundreds of thousands of dollars from Wi-LAN, the Lobbyists have never disclosed their secret lobbying relationship with Wi-LAN, as required under the Lobbying Disclosure Act, 2 U.S.C. § 1602 and other federal and state laws.  The Lobbyists knowingly and corruptly failed to disclose that relationship.

105.    Despite paying the Lobbyists hundreds of thousands of dollars, Wi-LAN has never disclosed its lobbying relationship with the Lobbyists as required under the Lobbying Disclosure Act, 2 U.S.C. § 1602 and other federal and state laws.  Wi-LAN knowingly and corruptly failed to disclose that relationship.

### Tri-Vision's Bad Faith Patent Licensing Scheme

106.    All of the claims of the '402 Patent are method claims.  The only claim even remotely relevant to DTV receiver manufacturers such as LGEUS is Claim 7 which claims a method to receive and store two separate rating region tables ("RRTs"0 embedded in a television signal, store user preferences for those two separate RRTs, and compare the user preferences with the RRT embedded in a television program.

34

107.    Wi-LAN's Canadian '474 Patent counterpart to the '402 Patent contains apparatus claims which are not present in the '402 Patent.  Accordingly there is a substantial difference in claim scope between the two patents.

108.    Over the course of Wi-LAN's licensing campaign, Wi-LAN was fully aware that its infringement claims with respect to Claim 7 of the '402 were objectively baseless because: the FCC did not require the broadcasting of RRT-5; most manufacturers did not receive any RRTs because RRT-1 was hardwired in the DTV receiver; certain broadcasters no longer transmitted RRT-1; Wi-LAN would need to show that every step of the method claimed in Claim 7 of the '402 Patent was actually performed to demonstrate infringement; most consumers do not store their preferences; the FCC regulation and standards did not read on Claim 7 of the '402 Patent; and Wi-LAN's attempt to change its infringement theory to require only one RRT rendered Claim 7 invalid, based upon at least public use of the alleged invention in Buffalo, New York.

109.    With this aforementioned knowledge, Wi-LAN made bad faith claims of patent infringement which were outrageous and insupportable.  Tri-Vision's bad faith, predatory, and highly anticompetitive conduct also included sending letters, faxes, and emails throughout the United States, by way of its:

(a)    asserting to potential licensees that in order to comply with the FCC regulations potential licensees had to license the '402 Patent because the alleged invention of the '402 Patent was the exclusive way to comply and that potential licensees could not manufacture a DTV receiver that would not infringe Wi-LAN's '402 Patent;

(b)    asserting to potential licensees that the FCC regulations require the downloading of RRT-5 or would require the downloading of RRT-5;

(c)        changing its infringement theory knowing that its new infringement theory rendered the Claim 7 invalid;

(d)        offering and tying a license to Wi-LAN's Canadian counterpart '474 Patent with the '402 Patent in order to claim that the patents had similar scope when they do not;

(e)        threatening potential licensees with FCC penalties despite its knowledge that the FCC regulations were not clear and did not read on Claim 7 of the '402 Patent;

(f)        inducing a potential licensee to license the '402 Patent by claiming that the licensee did not need to pay until it used the technology or the FCC mandated the use of the '402 Patent and subsequently threatening the licensee with a breach action knowing that the licensee did not infringe;

(g)        intentionally expanding and exaggerating the scope of the '402 Patent in licenses so that it would have a breach of contract threat even though it did not have a reasonable infringement claim;

(h)        attempting to expand the scope of method Claim 7 of '402 Patent beyond the scope of the method claimed by arguing that a DTV receiver needed only one RRT to have the capability of infringing;

(i)        asserting to potential licensees that various standards require the exclusive use of the '402 Patent;

(j)        offering licenses on unfair, unreasonable, and discriminatory terms notwithstanding its purported proffers to the FCC, CEA, and ATSC;

(k)        misrepresenting the scope of its '402 Patent;

(l)     expanding the scope of the '402 Patent by collecting double royalties on the same product through its licenses with OEMs, brands, and manufacturers, based on its failure to employ any reasonable means to determine whether royalties were being collected twice;

(m)     expanding the scope of the '402 Patent by attempting to collect double royalties on the same product through its attempts to license broadcasters, cable and satellite companies, and manufacturers, and based on its failure to employ any reasonable means to determine whether royalties were being collected twice; and

(n)     hiring witnesses who may have highly probative factual evidence concerning prior art that renders the '402 Patent invalid so that it could order these witnesses to refuse to provide any factual evidence to potential licensees.

**Relevant Market and Monopoly Power**

110.    Entry into the DTV receiver market as a manufacturer requires a substantial financial investment.

111.    The geographic scope of the DTV receiver market is massive, worldwide, and growing.  For example, the entire U.S. DTV receiver market provides DTV receivers to tens of millions of users.  The DTV receiver market will remain robust within the U.S. and worldwide for the foreseeable future.

112.    Wi-LAN claims to have secured licenses with a significant portion of the DTV receiver industry.  In a submission to the FCC, Wi-LAN claimed to have licensed at least two thirds of the U.S. DTV receiver market.  Wi-LAN continues to urge the remaining unlicensed industry members to take licenses from Wi-LAN for the '402 Patent.

113.    Wi-LAN claims that the FCC gave Wi-LAN a monopoly to the DTV receiver market.

114.    The DTV receiver market is a relevant antitrust market.  Wi-LAN has willfully engaged, and is illegally engaging, in a cumulative course of predatory or anticompetitive conduct.   These practices have no legitimate business justification.

115.    Wi-LAN had full knowledge of its failure to timely disclose the '402 Patent to the FCC and certain Standard Setting Organizations.

116.    Wi-LAN has full knowledge that its assertion that the practice of the method of Claim 7 of the '402 Patent is required to comply with the FCC regulations and CEA or ATSC standards is objectively baseless.

117.    Wi-LAN's claim that, without a license to the '402 Patent, no party may make or sell a DTV receiver in the United States DTV receiver market is objectively baseless and Wi-LAN knows this.

118.    Wi-LAN has full knowledge that its infringement claims are objectively baseless and that its newer infringement theory renders Claim 7 of the '402 Patent invalid.  Indeed, as part of its attempt to preserve the patentability of the '402 Patent before the PTO in the pending reexamination, Wi-LAN has taken a claim construction position that directly contradicts its infringement position in this litigation, one which demonstrates that LGEUS does not infringe the '402 Patent.

119.    Wi-LAN has full knowledge that it covenanted to license the '402 Patent on reasonable and non-discriminatory terms, yet offered royalty free licenses and licenses that are not fair, reasonable nor non-discriminatory, when compared to other licenses.

120.    Wi-LAN had full knowledge that its behavior before the FCC and Standard Setting Organizations renders the '402 Patent unenforceable.

38

121.    Wi-LAN filed this lawsuit with full knowledge of the non-infringement, invalidity, and unenforceability of the '402 Patent, and its aforementioned acts.

### Attempted Monopolization

122.    Wi-LAN's predatory or anticompetitive conduct was undertaken with the specific intent to monopolize the DTV receiver market and without any legitimate business objective. Wi-LAN has a dangerous probability of successfully achieving a monopoly in the DTV receiver market.

123.    Wi-LAN's past, present, and continuing violations of the Sherman Act, 15 U.S.C. § 2, have injured LGEUS in its business or property in the form of lost past, present, and future profits, lost customers and potential customers, loss of goodwill and product image, and by the potential destruction of its DTV receiver business.

124.    Wi-LAN's actions have caused LGEUS irreparable injury that will continue until and unless the Court enjoins such actions.

### COUNT XI
### Monopolization of the DTV Receiver Market in Violation of Section 2 of the Sherman Antitrust Act

125.    LGEUS repeats and realleges the allegations set forth in paragraphs 1-124, above, as if set forth fully herein.

### Monopolization

126.    Wi-LAN has unlawfully monopolized the DTV receiver market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 by licensing or attempting to license the non-infringed, invalid, and unenforceable '402 Patent to virtually the entire DTV receiver industry, with full knowledge of the noninfringement, invalidity, and unenforceability of the '402 Patent. Wi-LAN willfully acquired its monopoly in the DTV receiver market.

39

127.    Wi-LAN's violations of Section 2 of the Sherman Act have injured LGEUS in its business or property in the form of lost past, present, and future profits, lost customers and potential customers, loss of goodwill and product image, and by the potential destruction of its DTV receiver business.

128.    Wi-LAN's past, present, and continuing actions have caused LGEUS irreparable injury that will continue until and unless the Court enjoins such actions.

## COUNT XII
## Combination of Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Antitrust Act

129.    LGEUS repeats and realleges the allegations set forth in paragraphs 1-128, above, as if set forth fully herein.

130.    Wi-LAN orchestrated a plan to secretly hire and conspire with the Lobbyists to influence the FCC, the federal government, Members of Congress, and various Standard Setting Organizations.  From approximately 2005 to the present, Wi-LAN and/or its agent(s) paid the Lobbyists hundreds of thousands of dollars to lobby the federal government on Wi-LAN's behalf without disclosing their relationship in an effort to get the FCC to pass regulations that Wi-LAN would then argue required potential licensees to take a license.

131.    Wi-LAN and the Lobbyists engaged in a concerted action in the form of a contract, combination, or conspiracy to unreasonably restrain foreign or interstate trade.

132.    Wi-LAN and the Lobbyists engaged in a conscious, knowing commitment to a common scheme designed to achieve unlawful objectives for the benefit of Wi-LAN.

133.    Wi-LAN's past, present, and continuing actions have caused LGEUS irreparable injury that will continue until and unless the Court enjoins such actions.

## LGEUS'S PRAYER FOR RELIEF

WHEREFORE, LGEUS respectfully prays that the Court grant the following relief:

A.     Enter judgment in LGEUS's favor on each and every count of Wi-LAN's First Amended Complaint and LGEUS's Counterclaims;

B.     Enter an order directing that LGEUS is not liable to Wi-LAN for any damages pursuant to Wi-LAN's Amended Complaint;

C.     Enter a judicial declaration that LGEUS has not infringed and is not infringing, directly or indirectly, literally or pursuant to the doctrine of equivalents, or otherwise any claim of U.S. Patent No. 5,828,402;

D.     Enter a judicial declaration that the claims of U.S. Patent No. 5,828,402 are invalid;

E.     Enter a judicial declaration that the claims of U.S. Patent No. 5,828,402 are unenforceable;

F.     Enter a judicial declaration that the May 17, 2006 License Agreement remains in force and effect;

G.     Award to LGEUS money damages, including compensatory damages, treble damages, punitive damages, and attorneys' fees and costs;

H.     Enter an order preliminarily and permanently enjoining Wi-LAN from using or displaying LGEUS's trademarks, and requiring Wi-LAN to serve on LGEUS and the Court a report in writing under oath setting forth in detail the manner and form in which Wi-LAN has complied with the injunction;

I.     Enter an order preliminarily and permanently enjoining Wi-LAN from its violations of federal antitrust laws.

41

J.      Entry of an order that LGEUS is a prevailing party and that this is an exceptional case, and awarding LGEUS its costs, disbursements, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285, 15 U.S.C. § 1117(a), New York General Business Law § 349(h), and any other applicable statutes, rules, or common law; and

K.      Such other and further relief that the Court deems just and appropriate.

## JURY DEMAND

LGEUS requests a trial by jury on all issues so triable.

Dated: December 6, 2010                        **GREENBERG TRAURIG, LLP**


*/s/ James J. Lukas, Jr.*
Richard A. Edlin (RE 1998)
Daniel I.A. Smulian (DS 4746)
200 Park Avenue
New  York, New York 10166
(212) 801-6528 (*telephone*)
(212) 801-5528 (*facsimile*)
edlinr@gtlaw.com

Of counsel:

Richard D. Harris (*pro hac vice*)
Jeffrey G. Mote (*pro hac vice*)
James J. Lukas, Jr. (*pro hac vice*)
Eric J. Maiers (*pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
(312) 456-8400 (*telephone*)
harrisr@gtlaw.com
motej@gtlaw.com
lukasj@gtlaw.com
maierse@gtlaw.com

*Attorneys for Defendants LG Electronics,*
*Inc. and LG Electronics U.S.A., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 6, 2010, the foregoing **LG Electronics U.S.A., Inc.'s First Amended Answer and Counterclaims to Plaintiff's Second Amended Complaint** was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel that have appeared for any party in this matter.

*/s/ James J. Lukas, Jr.*
James J. Lukas, Jr.