CONFIDENTIAL – ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WI-LAN INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>LG ELECTRONICS, INC. and LG<br>ELECTRONICS U.S.A., INC., )<br><br>Defendants. ) | 10 Civ. 432 (LAK) (AJP) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF WI-LAN INC.'S MOTION FOR SUMMARY JUDGMENT ON
DEFENDANTS' CLAIMS OF LACK OF NOTICE, LACHES,
FAILURE TO MITIGATE DAMAGES, UNJUST ENRICHMENT,
EQUITABLE RELIEF UNAVAILABLE, AND INVALIDITY UNDER 35 U.S.C. §112**

David E. Sipiora
Matthew C. Holohan (admitted *pro hac vice*)
KILPATRICK TOWNSEND AND STOCKTON LLP
1400 Wewatta Street, Suite 600
Denver, CO 80202
(303) 571-4000
disipiora@kilpatricktownsend.com
mholohan@kilpatricktownsend.com

David A. Koenigsberg
MENZ BONNER & KOMAR LLP
444 Madison Ave., 39th Floor
New York, New York 10022
(212) 223-2100
dkoenigsberg@mbklawyers.com

ATTORNEYS FOR PLAINTIFF
WI-LAN INC.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

### TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................................... 2

III.   LEGAL STANDARD .......................................................................................... 7

   A.   General Standard for Summary Judgment ............................................... 7

   B.   Notice ...................................................................................................... 9

   C.   Laches ..................................................................................................... 9

   D.   Mitigation of Damages .......................................................................... 10

   E.   Unjust Enrichment ................................................................................. 10

   F.   The Disclosure Requirement of 35 U.S.C. §112, First Paragraph ................... 11

   G.   35 U.S.C. § 112, Second Paragraph ...................................................... 12

IV.   ARGUMENT ..................................................................................................... 13

   A.   LG's Lack of Notice Affirmative Defense is Objectively Baseless. ............. 13

   B.   LG Cannot Prove Laches. ...................................................................... 14

       1.   Wi-LAN's Fraud Claim is Timely. .............................................. 14

       2.   LG Cannot Prove that Wi-LAN's Patent Infringement Claim is Untimely ................. 14

   C.   LG Cannot Show that Wi-LAN Failed to Mitigate Damages ................... 17

   D.   LG Cannot Prove Unjust Enrichment. .................................................... 19

   E.   LG Has Not Shown that Equitable Relief is Unavailable ....................... 21

   F.   LG Has No Basis to Argue Invalidity based on 35 U.S.C. § 112, First Paragraph ....... 22

       1.   LG Cannot Show that the '402 Patent Does Not Meet the Written Description or Enablement Requirement ........................................ 22

       2.   LG Cannot Show that the '402 Patent Does Not Meet the Best Mode Requirement .... 23

   G.   LG Cannot Show that the '402 Patent Claims are Indefinite ................... 24

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1.   The Term "First Group of One or More Multi-Level Categories of Labels" Is Amenable to Construction....................................................................... 24

2.   The Term "Said Descriptive Text for Labels" Is Amenable to Construction................ 26

V.      CONCLUSION.................................................................................... 27

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF AUTHORITIES

CASES

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) (*en banc*) ...............................................................9, 10, 15

*Advanced Cardiovascular Sys. Inc v Scimed Life Sys., Inc.*,
  988 F.2d 1157 (Fed. Cir. 1993).....................................................................................8

*Ajinomoto Co. v. International Trade Com'n*,
  597 F. 3d 1267 (Fed, Cir, 2010)......................................................................11, 12, 24

*Allan Block Corp. v. E. Dillon & Co.*,
  509 F. Supp. 2d 795 (D. Minn. 2007)...........................................................................22

*American Medical Systems, Inc. v. Medical Engineering Corp.*,
  6 F.3d 1523 (Fed.Cir.1993).........................................................................................13

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986)...................................................................................................8, 9

*APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.*,
  592 F.3d 108 (2d Cir.2010).........................................................................................10

*Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*,
  598 F. 3d 1336 (Fed.Cir.2010)....................................................................................11

*BarTex Research, LLC v. FedEx Corp.*,
  611 F. Supp. 2d 647 ...................................................................................................21

*Bayer AG v. Schein Pharms., Inc.*,
  301 F.3d 1306 (Fed. Cir. 2002)...................................................................................12

*Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*,
  448 F.3d 573 (2d Cir. 2006)...................................................................................10, 20

*Brown v. Tonawanda Housing, Inc.*,
  507 N.Y.S.2d 92 (N.Y. App. Div. 1986) .....................................................................14

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................7, 8

*Church & Dwight Co. v. Abbott Labs.*,
  No. 05-2142 (GEB)(JJH), 2008 WL 5416383 (D.N.J. Dec. 23, 2008) ...........................16

*Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech. Inc.*,
  492 F. Supp. 2d 600 (E.D. Tex. 2007)..........................................................................21

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*,
    559 F.3d 1308 (Fed.Cir.2009)..................................................................9, 13

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001)...............................................................9, 13

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005)..................................................................12

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)..................................................................................21

*Exigent Technology, Inc. v. Atrana Solutions, Inc.*,
    442 F.3d 1301 (Fed. Cir. 2006).....................................................................8

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002)..................................................................................11

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010).....................................................................9

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*,
    60 F.3d 770 (Fed. Cir. 1995).......................................................................16

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
    607 F.3d 766 ...............................................................12, 24, 25, 26, 27

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)..................................................................12

*Hearing Components, Inc. v. Shure Inc.*,
    600 F.3d 1357 (Fed. Cir. 2010)..........................................................9, 10, 15

*Humanscale Corp. v. CompX Intern. Inc.*,
    No. 3:09-CV-86, 2010 WL 3222411 (E.D. Va. Aug. 16, 2010) ............................16

*In re CBI Holding Co., Inc.*,
    419 B.R. 553 (S.D.N.Y. 2009)............................................................10, 18, 19

*In re Wright*,
    999 F.2d 1557 (Fed. Cir. 1993)...................................................................11

*J.A.O. Acquisition Corp. v. Stavitsky*,
    745 N.Y.S.2d 634 (N.Y. Sup. Ct. 2001) ........................................................14

*Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*,
    No. 04-5172 (JAP), 2009 U.S. Dist. LEXIS 15531 (D. N.J. Feb. 26, 2009)..................22

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

*Kowalski v. Mommy Gina Tuna Resources,*
    No. 05-00679-BMK, 2009 U.S. Dist. LEXIS 26216 (D. Hi. Mar. 30, 2009)..........................22

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,*
    47 A.D.3d 103 (N.Y. App. Div. 2007) ..........................................................................10, 19

*Martek Biosciences Corp. v. Nutrinova, Inc.,*
    579 F.3d 1363 (Fed. Cir. 2009)....................................................................................11, 21

*Mass Engineered Design, Inc. v. Ergotron, Inc.,*
    633 F. Supp. 2d 361 (E.D. Tex. 2009)................................................................................16

*Novozymes A/S v. Genencor Int'l, Inc.,*
    474 F. Supp. 2d 592 (D. Del. 2007).....................................................................................22

*PowerOasis, Inc. v. T-Mobile U.S.A., Inc.,*
    522 F.3d 1299 (Fed. Cir. 2008) ..........................................................................................11

*Sanofi-Synthelabo v. Apotex Inc.,*
    488 F. Supp. 2d 317 (S.D.N.Y. 2006)................................................................................15

*Symbol Techs., Inc. v. Lemelson Medical, Education & Research Found.,*
    422 F.3d 1378 (Fed. Cir. 2005) ..........................................................................................17

*Thom v. Ashcroft,*
    369 F.3d 158 (2d Cir. 2004)..................................................................................................9

*Trust for the Certificate Holders of the Merrill Lynch Mortgage Pass-Through
    Certificates Series 1999-C1 v. Love Funding Corp.,*
    736 F.Supp.2d 716 (S.D.N.Y. 2010)...................................................................................10

*Wavetronix v. EIS Electronic Integrated Sys.,*
    573 F.3d 1343 .....................................................................................................................11

*Young v. Lumenis, Inc.,*
    492 F.3d 1336 .....................................................................................................................12

## STATUTES

35 U.S.C. § 112................................................................................1, 2, 11, 12, 22, 24

35 U.S.C. § 286.......................................................................................................9, 13

35 U.S.C. § 287.......................................................................................................9, 13

35 U.S.C. § 287(a) .......................................................................................................9

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(c) ...................................................................................................7, 8

Fed. R. Civ. P. 56(e) ......................................................................................................8

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.    INTRODUCTION

Defendants LG Electronics, Inc. ("LGE") and LG Electronics U.S.A., Inc. ("LGEUS") (collectively "Defendants" or "LG") have raised a host of "stock" affirmative defenses and counterclaims that are not supported by record evidence and should have been dropped by LG long before summary judgment.  Specifically, LG's affirmative defenses of lack of notice, equitable relief unavailable, laches, failure to mitigate damages, unjust enrichment, and invalidity based upon 35 U.S.C. § 112 each fail as a matter of law in light of the undisputed evidentiary record.  Accordingly, Plaintiff Wi-LAN Inc. ("Plaintiff" or "Wi-LAN") respectfully requests that the Court grant summary judgment dismissing LGE's third, fourth, fifth, sixth, and thirteenth affirmative defenses; LGE's second and seventh counterclaim; LGEUS's third, fourth, fifth, sixth, and thirteenth affirmative defenses; and LGEUS's second and sixth counterclaim.[1]

As explained more fully below, Wi-LAN and its predecessor Tri-Vision Electronics, Inc. ("Tri-Vision") were diligent in bringing the patent-in-suit to LG's attention, engaging in extensive negotiations with LG in an effort to secure compensation for LG's willful infringement of the patent-in-suit, and, ultimately, filing this litigation when those negotiations failed.  To date, Wi-LAN has reaped no benefit whatsoever from its dealings with LG, and has in fact lost substantial amounts of royalty revenue from other licensees as a result of LG's fraudulent conduct in signing an agreement it never intended to honor.  LG, meanwhile, has been able to infringe the patent-in-suit with impunity, even as it engaged in dilatory conduct in its negotiations with Tri-Vision and Wi-LAN.  Now, Wi-LAN has the right to protect its intellectual property rights through all remedies available at law and equity.  As this action moves toward

---

[1] Although LGE and LGEUS filed separate answers and counterclaims, they raised substantively identical affirmative defenses and counterclaims at issue in this memorandum.  Accordingly, this memorandum will consider the affirmative defenses and counterclaims together, as though raised by a single party.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

trial, now is also the time to prune the dead branches in this case. LG's assortment of baseless

defenses raise no triable issues of material fact and should be disposed of via summary

adjudication.

## II.   FACTUAL BACKGROUND

Among its pile of stock, blindly-pleaded affirmative defenses, LG alleges that it lacked

notice of U.S. Patent No. 5,848,402 ("the '402 patent"), that Wi-LAN unduly delayed in bringing

suit, that Wi-LAN has been unjustly enriched, and that Wi-LAN is categorically barred from

obtaining equitable relief. As shown below, the undisputed facts stand in contradiction to each

of these claims such that no reasonable jury could find in favor of LG as to any of these defenses.

Wi-LAN is the owner of numerous patents, and is engaged in the business of developing,

protecting, and monetizing intellectual property. Middleton Dec. ¶ 2. Wi-LAN also engages in

research and development and is the owner by assignment of the '402 patent. *Id.* ¶¶ 2-3.

Wi-LAN (through its predecessor, Tri-Vision) initially contacted LG concerning the '402

patent at least as early as August 2001. Holohan Dec. Ex. 129. By August 27, 2001 LG had

already analyzed the '402 patent. *Id.* Tri-Vision contacted LG again concerning the '402 patent

in November 2004, subsequent to an October 2003 meeting. Holohan Dec. Exs. 46, 58, and 126.

Accordingly, LG cannot deny that it has been on notice of the '402 patent since as early as

August 2001, and November 2004 at the very latest.

Following the November 2004 communication concerning the '402 patent, LG and Tri-

Vision engaged in extensive licensing negotiations. These negotiations included at least five in-

person meetings conducted on or about December 22, 2004, October 11, 2005, February 28,

2006, March 21, 2006 and April 25, 2006 (*see* Holohan Dec. Exs. 59, 62, 67, and 121), as well as

numerous communications via telephone, email, and letter. *See, e.g.*, Holohan Dec. Exs. 47, 49-

53, 55, 60, 61, 64-66, 68-71, 75-78, 94, 103-107, 113, 114, 120, 121, 124, 125, 141. As early as

CONFIDENTIAL – ATTORNEYS' EYES ONLY

January 31, 2005, S.Y. Kang, a senior manager at LG, acknowledged that forthcoming FCC

regulations required use of the technology of the '402 patent and sought to negotiate a license

with Tri-Vision on favorable terms.  Holohan Dec. Ex. 125.  By this statement and subsequent

conduct, LG led Tri-Vision to believe, and Tri-Vision reasonably believed, that LG would

implement the technology of the '402 patent in order to comply with FCC regulations.  Tri-

Vision expressed this belief to LG through subsequent communications. *See, e.g.*, Holohan Dec.

Ex. 121 at WL0054043 ("I can only assume that LG's planning [to reach compliance with FCC

DTV mandate for flexible V-chip] if not concluded, at least very well underway."); Holohan

Dec. Ex. 120; Holohan Dec. Ex. 53 ("our success in licensing V-chip, in part is due to the FCC

regulatory requirements for manufacturers . . . .").  LG never made any representations to the

contrary.  Holohan Dec. Ex. 18, Eldon Tr. at 317:7-318:1.

        Throughout the licensing negotiations, LG demanded a reduced royalty rate that was

lower than the prevailing rate that Tri-Vision had offered its other licensees.  Holohan Dec. Ex.

125 ("we expect your party to suggest more favorable rate"); Holohan Dec. Ex. 19, Fortkort Tr.

at 220:17-221:8, 222:17-223:15; Holohan Dec. Ex. 21, Siddiqui Tr. at 258:19-259:5.  Tri-Vision

explained it could not reduce its standard royalty rate because "most favored nation" provisions

in its existing license agreements would require it to reduce the royalty rate for existing (and

future) licensees, resulting in a large decrease in revenue to Tri-Vision.  Holohan Dec. Ex. 18,

Eldon Tr. at 306:7-19; Holohan Dec. Ex. 19, Fortkort Tr. at 225:6-17.  In response, LG

representatives justified this reduction in the royalty rate, which LG clearly understood would

apply to existing and future licensees, by representing that the large volume of LG products that

would become royalty bearing products after LG executed the license would more than make up

for the reduction in royalties due to a decreased royalty rate.  Holohan Dec. Ex. 18, Eldon Tr. at

CONFIDENTIAL – ATTORNEYS' EYES ONLY

307:13-308:3; 311:15-312:5; 313:13-314:10; Holohan Dec. Ex. 21, Siddiqui Tr. at 177:11-180:6;

Holohan Dec. Ex. 171 at WL0434249 ████████████████████████████████████

██████████████████████████████████████████; Holohan Dec. Ex.

172 at WL0434259 ███████████████████████████████

████████████████████████. The parties even

discussed an advertising agreement that was drafted in which Tri-Vision would pay LG $0.15

per unit in return for advertising the use of patented technology on its products, thereby

effectively reducing the royalty rate, but not triggering most favored nation clauses in existing

customer agreements.  Holohan Dec. Ex. 63.

The end result of these initial negotiations was the execution of a license agreement in

May 2006 ("May 2006 License Agreement").  Holohan Dec. Ex. 44.  Tri-Vision thereafter

informed its licensees that their respective royalty rates would be reduced to the lower royalty

rate that had been demanded by and offered to LG.  *See* Holohan Dec. Ex. 18, Eldon Tr. at

121:3-22, 123:8-12; Holohan Dec. Ex. 19, Fortkort Tr. at 161:2-10, 163:2-10.  Furthermore,

future licensees were also offered the reduced rate that was given to LG based on Tri-Vision's

"RAND" licensing obligations.  Holohan Dec. Ex. 19, Fortkort Tr. at 161:11-20; Holohan Dec.

Ex. 26.

Following the execution of the license agreement, LG disavowed nearly every

representation to Tri-Vision and immediately embarked on a plan of denial in order to complete

its fraudulent scheme of deceiving Tri-Vision into entering into a license agreement that LG did

not intend to honor.  In July and October 2006, LG provided royalty reports indicating no sales

of licensed products.  Holohan Dec. Exs. 112, 117, 153, & 161.  After receipt of the October

2006 report, Tri-Vision re-opened the line of communications with LG in an effort to determine

CONFIDENTIAL – ATTORNEYS' EYES ONLY

why LG had refused to pay royalties, and attempt to reach a resolution of the dispute.  Holohan

Dec. Ex. 118.  In response, LG shockingly explained that it had chosen not to comply with the

FCC regulations (███████████████████████████████

███████████████████) and would not be paying royalties to Tri-Vision despite its

previous representations.  *Id*.  Notably, LG's willful noncompliance with the FCC regulations

was the only basis LG identified at that time for its refusal to pay royalties.[2]

Over the next three years, Tri-Vision and, later, Wi-LAN engaged in extensive

discussions and negotiations with LG, going to extraordinary lengths to seek to resolve the

dispute.  These further negotiations included an additional four face-to-face meetings on or about

January 22, 2007, May 28, 2007, October 30, 2007, and March 13, 2008 (Holohan Dec. Exs. 73,

82, 102, 135), as well as telephone calls and dozens of email communications.  *See, e.g.*,

Holohan Dec. Exs.  72, 73, 79-83, 85-89, 92, 102, 108, 110, 111, 119, 131-134, 136-140, 142,

143, 145-147, 151, 152, and 154-160.

In the meantime, on August 13, 2007, the FCC sent LG a Notice of Investigation

concerning LG's noncompliance with the FCC V-Chip regulations that LG had chosen to ignore.

Holohan Dec. Ex. 45.  LG subsequently ████████████████████████

██████████████████, and a consent decree was entered in April 2008,

terminating the investigation after LG agreed to pay a $1.7 million fine.  Holohan Dec. Ex. 57.

Even after LG began complying with the regulations, however, LG continued to refuse to pay

royalties to Tri-Vision or Wi-LAN, despite its representations to the contrary.  *See, e.g.*, Holohan

---

[2] LG's Accused Products infringed the patent even without complying with the FCC regulations,
as Tri-Vision explained as early as February 2007, based upon the receipt and storage of
configuration information in the US rating region table called RRT-01 (RRT1).  (Holohan Dec.
Ex. 134).  However, the negotiations between the parties focused on LG's infringement
following compliance with the FCC regulations.  Furthermore, LG never denied that it would
infringe the '402 patent once the FCC regulations went into effect.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Dec. Ex. 102 at WL0006681- WL0006682 ("'When the time comes that FCC strongly enforces it's [sic] new regulation to the DTV manufacturers and technical problems clearly resolved including the field test issue, then we will not have the option but implementing the feature [W-LAN patented V-chip technology]'").

Furthermore, on numerous occasions during the post-agreement negotiations, Tri-Vision and Wi-LAN provided detailed memoranda to LG showing that LG's products infringed the '402 patent and that LG's non-infringement arguments and claim construction positions were wrong. Such communications were sent at least on February 12, 2007 (Holohan Dec. Ex. 134); March 18, 2007 (Holohan Dec. Ex. 146), August 14, 2007 (Holohan Dec. Ex. 143), November 26, 2007 (Holohan Dec. Ex. 142), May 16, 2008 (Holohan Dec. Ex. 109), and August 26, 2008 (Holohan Dec. Ex. 145 at WL0167948-WL0167962).

Notably, it was LG, not Wi-LAN, who engaged in dilatory behavior during these discussions. Wi-LAN repeatedly pressed LG for responses to its letters and emails, and LG often waited weeks to respond without explanation. *See, e.g.*, Holohan Dec. Exs. 79; 102 at WL0006669-70; 145 at WL0167943, WL0167979, and WL0167981-82; 147 at WL0171038 and WL0171041. Meanwhile, LG was intentionally developing a strategy of delay behind the scenes. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ Furthermore, LG replaced its representatives in the communications with Wi-LAN with individuals who had no familiarity with the dispute, causing further delay and confusion. *See* Holohan Dec. Ex. 147.

Throughout these communications, LG was acutely aware that Wi-LAN could terminate the agreement and file a lawsuit. ████████████████████████████████████

CONFIDENTIAL – ATTORNEYS' EYES ONLY

██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████

Finally, on January 19, 2010, Wi-LAN's General Counsel, William Middleton, emailed LG's latest representative informing him that the May 2006 License Agreement had been formally terminated and that legal proceedings had been initiated. Holohan Dec. Ex. 147. To date, LG has not paid any royalties to Wi-LAN for its use of the '402 patent.

Although it later became clear that LG had procured the license agreement through fraud, the damage was done to Wi-LAN's licensing program. Having informed its licensees of the reduced royalty rate and executed numerous additional licenses under the rate secured by LG, there was no reasonable or practical way for Wi-LAN to go back to its licensees and unilaterally raise the rates to their previous levels. Rather, the only practicable way to recover the losses associated with LG's reduced royalty rate was to bring this suit against LG.

## III.    LEGAL STANDARD

### A.    General Standard for Summary Judgment[3]

One of the major purposes of a motion for summary judgment is to isolate and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-343 (1986). The party moving for summary judgment must demonstrate that there is no genuine issue of material fact as to the claims or defenses in issue and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

---

[3] Wi-LAN does not repeat these general standards in its other summary judgment memoranda for the sake of brevity. However, these standards are equally applicable to Wi-LAN's other memoranda.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

In situations where the non-moving party has the burden of proof at trial, "the movant need not 'produce evidence' showing the absence of a genuine issue of material fact in order to properly support its summary judgment motion." *Exigent Technology, Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1307 (Fed. Cir. 2006) (citing *Celotex*, 477 U.S. at 325). Rather, "'[t]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Id.* at 1308 (quoting *Celotex*, 477 U.S. at 325).

Once the moving party satisfies its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings," but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). The evidence relied upon by the non-moving party in demonstrating a genuine issue of material fact must be evidence upon which a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A mere scintilla of evidence is insufficient. *Id.* Therefore, the non-moving party must go beyond the pleadings and submit to the Court specific evidence raising a genuine issue for trial. *Celotex*, 477 U.S. at 322. Should the non-moving party's evidence be insufficient to demonstrate the existence of a genuine issue of material fact for trial, summary judgment must be granted. Fed. R. Civ. P. 56(e). Rule 56(c) mandates entry of summary judgment against a non-moving party when it "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. This is because a complete failure of proof concerning an essential element necessarily renders all other facts immaterial. *Id.* at 323. Thus, there is a "substantial burden" on the non-moving party to "place in dispute the material facts of the case." *Advanced Cardiovascular Sys. Inc. v Scimed Life Sys., Inc.*, 988 F.2d 1157,

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1164 (Fed. Cir. 1993).  Finally, "in ruling on a motion for summary judgment, the judge must

view the evidence presented through the prism of the substantive evidentiary burden" that would

apply at trial.  *Anderson*, 477 U.S. at 254.

### B.    Notice

"If a plaintiff practices the claimed invention and fails to mark its product with the

relevant patent number, damages may be limited."  *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321,

1332 (Fed. Cir. 2010) (citing 35 U.S.C. § 287(a)).  However, "[t]he law is clear that the notice

provisions of § 287 do not apply where the patent is directed to a process or method."  *Crown*

*Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed.Cir.2009).  Rather,

damages are calculated from the date the infringing activity began so long as the defendant had

notice of the patent itself at that time.  *Crystal Semiconductor Corp. v. TriTech Microelectronics*

*Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001).  Damages are recoverable for infringing

activities beginning six years prior to the filing of suit.  35 U.S.C. § 286.

### C.    Laches

As a general matter, a party asserting the defense of laches must establish "1) a lack of

diligence by the party against whom the defense is asserted, and 2) prejudice to the party

asserting the defense."  *Thom v. Ashcroft*, 369 F.3d 158, 166 (2d Cir. 2004).  The standard is

similar for claims of patent infringement.  *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960

F.2d 1020, 1032 (Fed. Cir. 1992) (*en banc*).  Specifically, a patent defendant asserting a laches

defense must show (1) the plaintiff "delayed filing suit for an unreasonable and inexcusable

length of time from the time it knew or reasonably should have known of its claim against" the

defendant, and (2) "the delay operated to the prejudice or injury of" the defendant.  *Hearing*

*Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1375 (Fed. Cir. 2010).  The delay "is measured

from the time [the plaintiff] knew or reasonably should have known of [the defendant's] alleged

infringing activities to the date of suit." *Id.* "The length of time which may be deemed
unreasonable has no fixed boundaries but rather depends on the circumstances." *A.C. Aukerman*,
960 F.2d at 1032.

### D.     Mitigation of Damages

An injured party "'bears an obligation to make reasonable efforts to mitigate its damages
and failure to do so may cause a court to lessen the recovery.'" *Trust for the Certificate Holders
of the Merrill Lynch Mortgage Pass-Through Certificates Series 1999-C1 v. Love Funding
Corp.*, 736 F. Supp. 2d 716, 722 (S.D.N.Y. 2010) (quoting *APL Co. PTE Ltd. v. Blue Water
Shipping U.S. Inc.*, 592 F.3d 108, 111 (2d Cir.2010)).  "The plaintiff's duty is to make reasonable
efforts and take reasonable measures, but he is under no obligation to take extraordinary or costly
measures, or measures the efficacy of which is doubtful." *In re CBI Holding Co., Inc.*, 419 B.R.
553, 572 n.22 (S.D.N.Y. 2009).  Furthermore, it is "defendants' burden to establish not only that
plaintiff failed to make diligent efforts to mitigate its damages," but also "the extent to which
such efforts would have diminished its damages." *LaSalle Bank Nat. Ass'n v. Nomura Asset
Capital Corp.*, 47 A.D.3d 103, 107, 846 N.Y.S.2d 951 (1st Dep't 2007).

### E.     Unjust Enrichment

"To prevail on a claim for unjust enrichment in New York, a [claimant] must establish (1)
that the [opposing party] benefitted; (2) at the [claimant's] expense; and (3) that equity and good
conscience require restitution." *Beth Israel Medical Center v. Horizon Blue Cross and Blue
Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (internal quotations omitted).  "The
theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation the law creates *in
the absence of any agreement*." *Id.* (emphasis in original).  Accordingly, LG's unjust enrichment
claim is inconsistent with its breach of contract claims.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

### F.    The Disclosure Requirement of 35 U.S.C. §112, First Paragraph

The requirements for the specification of patent are set forth in 35 U.S.C. §112 ¶1:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Courts have interpreted this statute as creating three requirements: an adequate written description; that is *enabling*, and includes the *best mode*. *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F. 3d 1336, 1351 (Fed. Cir.2010) (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736, (2002)).  All three requirements are amenable to summary judgment as being matters of law or for failure of proof. *See, e.g., PowerOasis, Inc. v. T-Mobile U.S.A., Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008) (written description); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1378 (Fed. Cir. 2009) (enablement); *Wavetronix v. EIS Electronic Integrated Sys.*, 573 F.3d 1343, 1361 (Fed. Cir. 2009 (best mode).

The Federal Circuit has held that the test for sufficiency of the written description "is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharmaceuticals*, 598 F.3d at 1351 (Fed. Cir. 2010) (citations omitted).

"To meet the enablement requirement, 'the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F. 3d 1363, 1378 (Fed. Cir. 2009) (quoting *In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)).

"To satisfy the best mode requirement, an inventor must disclose the preferred embodiment of his invention as well as preferences that materially affect the properties of the invention. *Ajinomoto Co. v. International Trade Com'n*, 597 F. 3d 1267, 1272-73 (Fed, Cir,

CONFIDENTIAL – ATTORNEYS' EYES ONLY

2010). "The disclosure requirement, however, is limited to 'the invention defined by the claims.'" *Id.* at 1273 (quoting *Bayer AG v. Schein Pharms., Inc.*, 301 F.3d 1306, 1315 (Fed. Cir. 2002)).

Once the invention is determined, the best mode requirement then comprises two different inquiries: The first inquiry is "subjective," and requires the court to "determine whether, at the time the patent application was filed, the inventor possessed a best mode of practicing the claimed invention." *Id.* at 1273 (citations omitted). The second inquiry is "objective," and requires the court to "determine whether the inventor 'concealed' the preferred mode from the public." *Id.*

### G. 35 U.S.C. § 112, Second Paragraph

The Patent Act additionally requires that, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶2.

"The purpose of the definiteness requirement is to 'ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude.'" *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). "Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 (Fed. Cir. 2008) (quoting *Datamize*, 417 F.3d at 1347). "A claim is not indefinite merely because parties disagree concerning its construction." *See Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 766, 783 (Fed. Cir. 2010).

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IV.   ARGUMENT

### A.   LG's Lack of Notice Affirmative Defense is Objectively Baseless.

LG raises two allegations in support of its "lack of notice" affirmative defense, both of which are entirely without merit, legally and factually.

First, LG's assertion that Wi-LAN failed to properly mark its articles pursuant to 35 U.S.C. § 287 fails as a matter of law because the only asserted claims in this litigation are method claims.  Indeed, the '402 patent contains *only* method claims.  "The law is clear that the notice provisions of § 287 do not apply where the patent is directed to a process or method." *Crown Packaging*, 559 F.3d at 1316.  Accordingly, neither Wi-LAN nor its licensees were required to mark any product to collect damages for infringement.  Indeed, "where the patent claims are directed to only a method or process there is nothing to mark" because the claim covers a series of steps rather than a physical article. *Id.* at 1316-1317 (quoting *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1538-39 (Fed.Cir.1993)).

Second, LG's allegation that "Plaintiff cannot recover damages from [LG], if any are awarded, with respect to the patent in suit, prior to the date on which LG received notice of Plaintiff's infringement contentions regarding the patent in suit on January 19, 2010" is likewise incorrect.  Damages are calculated from the date the infringing activity began so long as the defendant had notice of the *patent itself* at that time. *Crystal Semiconductor*, 246 F.3d at 1353.  As set forth above, LG has been on notice of the '402 patent since at least August 2001.  Thus, Wi-LAN may recover damages for LG's infringement going back six years from the filing of the complaint, *i.e.* January 2004. *See* 35 U.S.C. § 286.

Accordingly, LG's baseless affirmative defense of lack of notice should be dismissed as a matter of law.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**B.      LG Cannot Prove Laches.**

**1.      Wi-LAN's Fraud Claim is Timely.**

LG has asserted an affirmative defense of laches, without specifying which cause of

action is allegedly time-barred.  To the extent LG alleges that Wi-LAN's cause of action for

fraudulent inducement is time-barred, LG's assertion fails as a matter of law.  Claims for

fraudulent inducement are governed by a six-year statute of limitations in New York. *See, e.g.,*

*Brown v. Tonawanda Housing, Inc.*, 507 N.Y.S.2d 92, 93, 123 A.D. 493 (4th Dep't 1986); *J.A.O.*

*Acquisition Corp. v. Stavitsky*, 745 N.Y.S.2d 634, 641 (Sup. Ct. N.Y. County 2001).  The

licensing negotiations between LG and Tri-Vision began in November 2004, less than six years

before this litigation was filed, and LG's fraudulent conduct did not become apparent until years

after negotiations over LG's lack of payment began in Fall 2006.  Indeed, after LG ███████

████████████████████████████████████ and paid its fine to the FCC in 2008, it was

reasonable to expect that LG would honor its contractual obligation to pay royalties, particularly

in light of LG's prior representations. *See, e.g.,* Holohan Dec. Ex. 132 at WL0124101 ("When

the time comes that FCC strongly enforces its new regulation to the TV manufacturers and

technical problems are clearly resolved including the field test issue, then we will not have the

option but implementing the feature.").  Only later that year when LG continued to refuse to pay

royalties after the FCC consent decree was entered did the full extent of LG's fraud become

apparent.  Accordingly, Wi-LAN's fraud cause of action is timely as a matter of law.

**2.      LG Cannot Prove that Wi-LAN's Patent Infringement Claim is Untimely.**

Nor can LG prove that Wi-LAN's patent infringement cause of action is barred by laches.

To prove laches, LG must show (1) that Wi-LAN "delayed filing suit for an unreasonable and

inexcusable length of time from the time it knew or reasonably should have known of its claim

CONFIDENTIAL – ATTORNEYS' EYES ONLY

against" LG, and (2) "the delay operated to the prejudice or injury of" LG. *Hearing Components*, 600 F.3d at 1375. LG can satisfy neither element.

### (a)   Wi-LAN Did Not Engage in Inexcusable Delay.

First, Wi-LAN's timing in initiating this litigation is proper and LG's laches defense fails as a matter of law. Tri-Vision began negotiating with LG in late 2004. Less than two years later, LG and Tri-Vision executed a License Agreement. Tri-Vision clearly cannot reasonably be expected to have brought suit while the parties were negotiating a license agreement.

Furthermore, LG's disavowal of its prior representations and refusal to make royalty payments was not suspected until Fall 2006, when LG sent Tri-Vision a second royalty report over seven months after the March 2006 FCC compliance date reporting $0 sales of royalty bearing products. Holohan Dec. Ex. 153. Over the next three plus years, Wi-LAN engaged in further negotiations with LG in an effort to resolve the dispute short of litigation. Wi-LAN filed suit less than three and a half years after LG first stated that it would not pay royalties. Again, after LG ████████████████████████████████████████████████, it was reasonable to expect that LG would begin paying royalties based upon its previous representations. But, it was not until much later that it became clear that LG would not pay royalties, even after LG began complying with the FCC regulations. However, even ignoring these facts, a three-year period is objectively reasonable regardless of the circumstances.

Furthermore, even if the time period between Wi-LAN's knowledge of LG's infringement and the filing of suit could be considered unreasonable, Wi-LAN's delay in bringing suit was justified as a matter of law due to the fact that it was engaging in "negotiations with the accused" during the relevant time period. *See A.C. Aukerman*, 960 F.2d at 1033. "[A]ctive negotiations between the parties is a legitimate excuse to a delay in bringing suit sufficient to bar a laches defense." *Sanofi-Synthelabo v. Apotex Inc.*, 488 F. Supp. 2d 317, 348

CONFIDENTIAL – ATTORNEYS' EYES ONLY

(S.D.N.Y. 2006).  *See also Humanscale Corp. v. CompX Intern. Inc.*, No. 3:09-CV-86, 2010 WL

3222411 at *10 (E.D. Va. Aug. 16, 2010); *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633

F. Supp. 2d 361, 383-84 (E.D. Tex. 2009) (denying a finding of laches where delay in filing suit

was the result of "ongoing negotiations"); *Church & Dwight Co. v. Abbott Labs.*, No. 05-2142

(GEB)(JJH), 2008 WL 5416383, at *7-8 (D.N.J. Dec. 23, 2008).  Accordingly, any delay in

bringing suit is excused by the extensive negotiations between Wi-LAN and LG prior to the

litigation.

### (b)    LG Cannot Show Prejudice.

Even if LG could show unreasonable delay, LG must also show that it suffered prejudice

as a result of the delay.  Specifically, LG must show that it has suffered either evidentiary or

economic prejudice due to Wi-LAN's purported delay in bringing suit.  *Gasser Chair Co. v.*

*Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774 (Fed. Cir. 1995).  LG has presented no evidence of

either type of prejudice.

LG cannot demonstrate evidentiary prejudice, as hundreds of thousands of pages of

documents from the time period in question have been exchanged by the parties throughout this

litigation.  Nor can LG demonstrate economic prejudice.  Importantly, "a change in the economic

position of the infringer during the period of delay must be as a result of the delay; the infringer

must prove that the change in economic position *would not have occurred had the patentee sued*

*earlier.*" *Id.* at 775 (emphasis added).  LG has not identified any "change in economic position"

during the time period prior to the litigation, or anything that would have been different had Wi-

LAN brought suit earlier.  Furthermore, as explained above, ████████████████████

████████████████████████████████████████

████████████████████████████ LG therefore conducted its business with full

CONFIDENTIAL – ATTORNEYS' EYES ONLY

knowledge that its ongoing failure to pay royalties to Tri-Vision and Wi-LAN may result in litigation.

In sum, LG's laches affirmative defense fails as a matter of law and should be dismissed.[4]

### C.   LG Cannot Show that Wi-LAN Failed to Mitigate Damages.

LG's affirmative defense of failure to mitigate damages is based on a misrepresentation of undisputed facts.  As set forth above, Wi-LAN suffered extensive damages in the form of reduced royalty payments from its other licensees as a result of LG's demand for a lower royalty rate in exchange for an unkept promise to pay significant royalties to Wi-LAN to make up for the difference.  As explained above, Wi-LAN was required under the "most favored nation" clauses in its other license agreements to offer the reduced royalty rate to its other licensees after LG was given the lower royalty rate.  This loss in royalty revenue is a direct result of LG's fraudulent representations that it would comply with FCC regulations, implement the technology of the '402 patent, and offset Wi-LAN's losses with its own royalties.

LG makes three allegations in support of its contention that Wi-LAN failed to mitigate this loss of royalty revenue: (1) Plaintiff is no longer obligated to offer reduced royalty rates to its other licensees pursuant to the most favored nation clauses as of the date of the termination of the May 2006 License Agreement; (2) "To the extent the May 2006 license is void *ab initio*, Plaintiff was never obligated to offer reduced royalty rates to its other licensees pursuant to the most favored nation clause" as of that date; and (3) "Plaintiff has represented in open court that,

---

[4] LG's laches allegations include a vague assertion that Plaintiff "unreasonably delayed in prosecuting the asserted claims," suggesting that LG may attempt to assert prosecution laches as a defense.  This defense, too, fails as a matter of law.  "[P]rosecution laches may render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution."  *Symbol Techs., Inc. v. Lemelson Medical, Education & Research Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005).  Here, the '402 patent application was filed on December 5, 1996, and issued less than two years later on October 27, 1998.  There is simply no evidence of unreasonable and unexplained delay in prosecuting the asserted claims.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

regardless of whether a license between Plaintiff and LGE ever existed or continues to exist, it does not intend to unwind the most favored nations clause vis-à-vis its other licensees." LG Electronics, Inc.'s Answer and Counterclaim to Wi-LAN's Second Amended Complaint at 14. All three allegations fail as a matter of law to prove that Wi-LAN failed to mitigate damages.

First, LG does not dispute that the most favored nation clauses in Wi-LAN's other license agreements obligated Wi-LAN to offer the reduced royalty rate that LG demanded to Wi-LAN's other licensees. At the time the May 2006 License Agreement was executed, Wi-LAN had no way of knowing that LG had fraudulently misrepresented its intent to pay royalties. By all appearances, LG had entered into a binding license agreement that required Wi-LAN to lower its rates for other licensees in exchange for the promised increased revenues from LG. Accordingly, Wi-LAN notified its other licensees of the reduction in royalty rate, and the respective license agreements were modified accordingly. *See* Holohan Dec. Ex. 18, Eldon Tr. at 121:3-22, 123:8-12; Holohan Dec. Ex. 19, Fortkort Tr. at 161:2-10, 163:2-10.

Having taken this step, there was simply no reasonable way for Wi-LAN to "undo" the reduction in royalties. LG has pointed to no contractual provisions that would have allowed Wi-LAN to do so. Thus, LG's assertion that the formal termination of the May 2006 License Agreement enabled Wi-LAN to unilaterally raise the royalty rates for its 100 other licensees is simply false. Nor did Wi-LAN's after-the-fact discovery of LG's fraud enable Wi-LAN to raise the rates for existing licensees. LG's theory that Wi-LAN can simply "unwind" its universal reduction in royalty rates is pure fantasy.

LG also ignores that a plaintiff is never obligated to take extraordinary measures to mitigate damages. Rather, "[t]he plaintiff's duty is to make *reasonable* efforts and take *reasonable* measures." *CBI Holding Co.*, 419 B.R. at 572 n.22 (emphasis added). A plaintiff "is

CONFIDENTIAL – ATTORNEYS' EYES ONLY

under no obligation to take extraordinary or costly measures, or measures the efficacy of which is doubtful." *Id.* LG has produced no evidence that its proposed "unwinding" efforts would be reasonable or efficacious.

Furthermore, LG bears the burden to establish "the extent to which [mitigation] efforts would have diminished . . . damages." *LaSalle Bank Nat. Ass'n*, 47 A.D.3d at 107. Not only has LG failed to show that Wi-LAN did not take reasonable steps to mitigate its damages, but LG has not shown what the result of such reasonable efforts would be.

Contrary to LG's conclusory allegations, the undisputed record shows that Wi-LAN took reasonable and, indeed, extraordinary measures to minimize the losses occasioned by LG's fraudulent conduct. Wi-LAN negotiated with LG for more than three years after LG's initial refusal to pay royalties, investing significant time and expense in seeking to correct its relationship with LG without resorting to litigation. It was clearly more reasonable to focus on the single entity who could compensate Wi-LAN for its losses across the board rather than seeking to increase the royalty rates of Wi-LAN's individual licenses.

In sum, LG's theory of failure to mitigate damages misrepresents the salient facts and advances an overly formalistic interpretation of the applicable contractual terms and legal principles. LG has failed to show that Wi-LAN did not take reasonable measures to mitigate its damages, and Wi-LAN is therefore entitled to summary judgment on this affirmative defense.

**D.      LG Cannot Prove Unjust Enrichment.**

LG has also asserted a frivolous counterclaim for unjust enrichment based on benign conduct by Wi-LAN that has neither benefitted Wi-LAN nor harmed LG. LG's theory of unjust enrichment is that Wi-LAN represented to other potential licensees that LG had taken a license to the '402 patent, and that this representation encouraged other companies to take a license to

CONFIDENTIAL – ATTORNEYS' EYES ONLY

the '402 patent, yielding additional royalty payments to Wi-LAN. LG's unjust enrichment claim fails for a number of reasons.

First, to the extent that Wi-LAN informed other entities that LG had executed a license agreement to the '402 patent, this statement was and remains true. The fact that the contract was void *ab initio* due to LG's fraudulent conduct does not change the fact that the agreement was actually signed by LG. Wi-LAN cannot be held liable for representing true facts.

Second, LG has not pointed to a single licensee that took a license to the '402 patent as a result of Wi-LAN's alleged representations concerning LG, nor has LG identified a single penny of revenue traceable to such representations. Accordingly, LG cannot satisfy the first element of unjust enrichment, "that [Wi-LAN] benefitted." *Beth Israel Medical Center*, 448 F.3d at 586.

Third, even if LG could prove that Wi-LAN benefitted from informing other companies that LG had taken a license, LG has not shown, and cannot show, that such benefit came at LG's expense, as required to prove the second element of unjust enrichment. *Id.* LG has never paid a dime in royalties for its infringement of the '402 patent. Thus, if anything, Wi-LAN's act of licensing LG's competitors benefitted LG, as LG is able to practice the same standardized technology as Wi-LAN's licensees without compensating Wi-LAN for its infringement of the '402 patent. Thus, the cost of its goods are less than the licensed competition.

Finally, even if LG could prove that Wi-LAN benefitted at LG's expense, LG still bears the burden of demonstrating that "equity and good conscience require restitution." *Id.* LG has produced no evidence that Wi-LAN's representations to potential licensees were made in bad faith, or otherwise shown that equity and good conscience require Wi-LAN to disgorge its hypothetical royalty payments to LG.

Because LG cannot prove any of the elements, let alone all elements, of its unjust enrichment claim, summary judgment on this counterclaim is appropriate.

### E.     LG Has Not Shown that Equitable Relief is Unavailable.

LG appears to allege in its Fifth Affirmative Defense that Wi-LAN is categorically barred from obtaining injunctive relief because "Plaintiff is a non-practicing, patent licensing entity that is obligated to license the '402 on fair and non-discriminatory grounds pursuant to the policies of certain standards setting organizations to which it submitted the '402 patent, and cannot show irreparable harm if injunctive relief is not granted." LG Electronics, Inc.'s Answer and Counterclaim to Wi-LAN's Second Amended Complaint at 11.  However, the law is clear that Wi-LAN's status as a non-practicing entity does not bar injunctive relief.  The Supreme Court expressly held as such:

> [S]ome patent holders, such as university researchers or self-made inventors, might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves.  Such patent holders may be able to satisfy the traditional four-factor test [for injunctive relief], *and we see no basis for categorically denying them the opportunity to do so.*

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006) (emphasis added).

As a U.S. patent holder, Wi-LAN is entitled to injunctive relief to protect its property rights.  "The statutory right to exclude represents a tangential benefit associated with patent rights that cannot be quantified in monetary damages."  *Martek Biosciences Corp. v. Nutrinova Inc.*, 520 F. Supp. 2d 537, 558-59 (D. Del. 2007), *rev'd on other grounds*, 579 F.3d 1363. Numerous cases decided after *eBay* have held that injunctive relief is available to licensing entities such as Wi-LAN.  *See, e.g., Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600, 607-08 (E.D. Tex. 2007) (granting permanent injunction to non-practicing entity following summary judgment of infringement and validity, post *e-Bay*); *BarTex*

## CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Research, LLC v. FedEx Corp.*, 611 F. Supp. 2d 647, 652 ("BarTex may still be entitled to a permanent injunction, even though it does not practice its patent."); *Allan Block Corp. v. E. Dillon & Co.*, 509 F. Supp. 2d 795, 811 (D. Minn. 2007); *Kowalski v. Mommy Gina Tuna Resources*, No. 05-00679-BMK, 2009 U.S. Dist. LEXIS 26216, at *1-5 (D. Hi. Mar. 30, 2009); *Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*, No. 04-5172 (JAP), 2009 U.S. Dist. LEXIS 15531, at *30-37 (D. N.J. Feb. 26, 2009); *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 612 (D. Del. 2007).

Moreover, Wi-LAN's obligation to offer licenses on reasonable and non-discriminatory terms does not preclude Wi-LAN from pursuing injunctive relief. LG has cited no law supporting its position that a licensor cannot obtain injunctive relief against infringers due to participation in standard setting organizations.

Accordingly, there is no basis for LG's assertion that Wi-LAN is categorically barred from equitable relief.

### F.   LG Has No Basis to Argue Invalidity based on 35 U.S.C. § 112, First Paragraph

#### 1.   LG Cannot Show that the '402 Patent Does Not Meet the Written Description or Enablement Requirement

LG has not identified with any specificity how or why the '402 patent allegedly fails to meet either the written description requirement or the enablement requirement of 35 U.S.C. §112. Other than blanket statements by LG that the patent is invalid for any such lack of disclosure (*see, e.g.* Defendants Responses to Plaintiff's Interrogatory 21), LG has not made any specific arguments based on the four corners of the '402 patent. Indeed, LG's own consultant did not even venture to posit that the specification of the '402 patent was invalid for either one of these issues, despite opining (incorrectly) on these issues for the purposes of determining the priority date. *See* Goldberg Report on Invalidity.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

However, to the extent that LG is permitted to present such an argument without expert testimony, it fails as a matter of law.  Despite there being no legal requirement to do so, the '402 patent specification provides numerous examples of the invention, including various illustrations and pseudo code that would more than adequately inform a person of ordinary skill in the art how to make and use the invention; and that Professor Collings was in possession of the claim subject matter.  '402 patent at col. 2, line 66 – col. 28, line 9, and Figures 1-7.

Thus, because LG has failed to articulate any specific alleged deficiency in the specification of the '402 patent, and provided no expert testimony supporting such an allegation, summary judgment dismissing any counterclaim or affirmative defense based on either of these theories is warranted.

## 2.   LG Cannot Show that the '402 Patent Does Not Meet the Best Mode Requirement

Similarly, LG cannot meet its burden of showing that the '402 patent is invalid for failure to disclose the best mode.  The only evidence that LG has proffered on the alleged failure to disclose the best mode of the invention (as claimed in the '402 patent) is the opinion of its own *technical consultant* on the subjective mindset of Professor Collings.  LG's consultant's conclusion is based solely on an agreement that Professor Collings had to commercialize receivers that were relatively basic blocking apparatuses.  Goldberg Invalidity Report, ¶¶90-91. LG's consultant postulates that the best mode known to the inventor of practicing the invention was a basic "field configurable" device; that is a device that must be upgraded by the viewer connecting to the device (through a physical interface) and providing an update for the software (i.e. replacing the configuration information).  However, this argument fails.

First, there is no evidence that the *inventor* considered this as the best mode of carrying out his invention at the time the '402 patent was filed.  Indeed, the '402 patent discloses a much

CONFIDENTIAL – ATTORNEYS' EYES ONLY

more elegant solution to upgrade a receiver in the field through the use of configuration information, which allows a receiver to be "remotely configured to accommodate new or changing rating systems" without user intervention.  *See* '402 patent at Abstract, Col. 14, line 20 – Col. 16, line 15   Moreover, Mr. Goldberg's alleged "best mode" does not even meet the claim limitation of receiving configuration *embedded in a television channel*, so it cannot possibly be the best mode of practicing the invention.  *Ajinomoto*, 597 F. 3d at 1272-73 ("[s]ubject matter outside the scope of the claims falls outside of the best mode requirement").  LG has offered no other evidence as to whether Professor Collings had a subjective belief of any best mode of carrying out his invention.  In addition, LG has offered no evidence of the required objective factor that the '402 patent fails to disclose Mr. Goldberg's alleged best mode.  In light of this clear failure of proof, summary judgment on this issue is warranted.

**G.     LG Cannot Show that the '402 Patent Claims are Indefinite**

LG also cannot, by clear and convincing evidence, meet the exacting standard of showing that the claims at issue in the '402 patent are indefinite under 35 U.S.C. § 112, second paragraph, which requires proof that they are not amenable to *any* construction or are *insolubly ambiguous*. This is an extremely high burden, and LG has to show that a person of ordinary skill in the art could not discern the metes and bounds of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art.  *See Haemonetics* 607 F.3d at 783.

**1.     The Term "First Group of One or More Multi-Level Categories of Labels" Is Amenable to Construction.**

LG, through its consultant, has alleged only that two claim terms are indefinite.  The first of these claim features is in claim 7, which recites, in relevant part:

7.     A method for selectively blocking video signals, said method comprising the steps of:

> a) receiving first configuration information embedded in a first
> television channel, said first configuration information describing a
> first informational scheme, said first configuration information
> specifying, at least, *numbers of levels in a first group of one or
> more multi-level categories of labels*, in said first informational
> scheme;

'402 patent, Claim 7 (emphasis added).  In particular, LG is allegedly unable to construe the

claim term "first group of one or more multi-level categories of labels."  LG's consultant claims

to be confounded by the term "labels" and comes to the conclusion that a person of ordinary skill

in the art would find that "the composite phrase 'categories of labels' is *incomprehensible*." *Id.*

at ¶ 58 (emphasis added).  However, this is contrary to the numerous examples provided in the

specification and the express definitions.

    For instance, a person of ordinary skill in the art would undoubtedly understand that the

"multi-level categories" are the same categories that are referred to throughout the patent,

including for example, Violence, Language, Sex, and Age Based ratings, and that each of these

categories has levels. *See* Tanner Dec. ¶16.  Moreover, the '402 patent specifically states that

these "levels" can have "labels," where a label is descriptive text about the level that may be

used to assist viewer's in setting their receiver's blocking levels (such as, for instance, "G;"

"PG;" "PG-13," etc. for the MPAA, or "No Violence," "Mild Violence," "Graphic Violence" for

the Violence content rating). *Id.* at ¶¶16-17.  Thus, if categories have more than one level, they

are "multi-level categories." *Id.* at ¶¶17-18.  If the level has a label, then the category also

comprises labels. *Id.*  Therefore, each of these categories is a "multi-level category of labels."

*Id.* at ¶18.

    Thus, as the claim term has at least one construction based upon examples in the patent, it

is not indefinite.  Accordingly, summary judgment is warranted dismissing any and all of LG's

counterclaims and affirmative defenses based on the allegation that claim 7 is indefinite.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

2.     **The Term "Said Descriptive Text for Labels" Is Amenable to Construction.**

Mr. Goldberg also opines that a claim term in dependent claim 11 is insolubly ambiguous so as to not be amenable to construction.  Claim 11 depends in part from claim 10, so it is necessary to read both to have proper context for the claims.  *See* Tanner Dec. ¶20.  Each of these claims provides:

> 10.     The method of claim 9 wherein said first configuration information comprises descriptive text for two or more levels in each of said first group of categories and said second configuration information comprises descriptive text for two or more levels in each of said second group of categories.
>
> 11.     The method of claim 10 wherein said step of storing said user preference information comprises displaying on a display *said descriptive text for labels* in said first informational scheme and accepting from a user, and storing, user preference information for said first informational scheme said user preference information comprising a threshold level for each of said categories in said first informational scheme

'402 Patent, Claims 10 and 11 (emphasis added).  LG's consultant opines that the claim feature "said descriptive text for labels" is insolubly ambiguous.  Goldberg Invalidity Report at ¶80.  This is simply not true.  *See* Tanner Dec. ¶¶19-22.

As described above, each level in a category may have a label, and the label may comprise descriptive text that describes the level so as to assist viewers when making preference selections.  *See id.* at 16; 21.  Thus, the descriptive text for labels is exactly that, descriptive texts for the various labels of the levels (*e.g.* for instance, "G;" "PG;" "PG-13," etc. for levels 1, 2, 3, etc. of the aged based rating, or "No Violence," "Mild Violence," "Graphic Violence" for the levels 1, 2, 3 for a Violence content rating).  *See id.* at ¶¶21-22.  Therefore, the meaning of this claim is entirely clear, and is not insolubly ambiguous as alleged by LG.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

In addition, for substantially the same reasons discussed above and as illustrated in the figure in the Tanner Declaration, the term "said descriptive text for labels" has antecedent basis in the term "descriptive text for two or more levels," as recited in claim 10. *Id.* at ¶¶21-22. This is based on the fact that each *level* has a *label* that comprises *descriptive text*, and therefore the descriptive text *for the level* also refers to the same descriptive text *for the label* that corresponds to that level. *Id.*

Therefore, a person of ordinary skill in the art would readily ascertain the meaning of the claim terms used in claim 11 or, at the very least, it is not so insolubly ambiguous that it is not amenable to construction. Thus, summary judgment is warranted dismissing any and all of LG's counterclaims and affirmative defenses based on the allegation that claim 11 is indefinite.

## V.    CONCLUSION

For the foregoing reasons, Wi-LAN respectfully requests that the Court grant summary judgment dismissing LGE's third, fourth, fifth, sixth, and thirteenth affirmative defenses; LGE's second and seventh counterclaim; LGEUS's third, fourth, fifth, sixth, and thirteenth affirmative defenses; and LGEUS's second and sixth counterclaim.

Dated: April 1, 2011                    KILPATRICK TOWNSEND & STOCKTON LLP


                                        David E. Sipiora
                                        Matthew C. Holohan (admitted *pro hac vice*)
                                        KILPATRICK TOWNSEND & STOCKTON LLP
                                        1400 Wewatta Street, Suite 600
                                        Denver, CO 80202
                                        Telephone: (303) 571-4000
                                        Facsimile: (303) 571-4321

                                        David A. Koenigsberg
                                        MENZ BONNER & KOMAR LLP
                                        444 Madison Ave., 39th Floor
                                        New York, New York 10022
                                        (212) 223-2100

                                        Attorneys for Plaintiff
                                        Wi-LAN Inc.