UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WI-LAN INC., | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) 10 Civ. 432 (LAK) (AJP) |
| v. | ) <br> ) |
| LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., | ) <br> ) <br> ) |
| Defendants. | |

## DECLARATION OF CRAIG K. TANNER

I, Craig K. Tanner, declare as follows:

1.　　I am a paid expert consultant for Wi-LAN, Inc.. The following facts are within my personal knowledge and if called as a witness by the Court, I would be competent to testify to the matters set forth below.

2.　　I received a Bachelor of Science degree in Electrical Engineering in 1975 and a Bachelor of Arts in Communications from the University of Delaware. I also earned an MBA in Finance from Fairleigh Dickinson University in 1981. I have more than 34 years experience in television technology and standards, including serving as the Executive Director of Advanced Television Systems Committee ("ATSC"), which is an organization that is responsible for issuing television transmission standards.

3.　　I have been asked, and I have provided, expert reports and rebuttal reports on issues involving the '402 patent in this case. I am therefore competent to testify, and if I am asked I may testify, on any of the facts and/or expert opinions discussed below.

**I.    VTV Slides Are Less Relevant and Cumulative of the Prior Art of Record in the '402 Patent**

4.      I have been asked to review and analyze the slide presentation materials created by Professor Timothy Collings, the inventor of U.S. Patent No. 5,828,402 ("the '402 patent"), entitled *Violence and Television: The Canadian Example*, International Symposium, Canadian Studies Centre, Sorbonne Nouvelle University, Paris. (16-18 June 1994) (hereinafter "VTV"). LG041581-LG041591.  Based upon my analysis of VTV, the '402 patent, the references of record in the file wrapper of the '402 patent,[1] and my own knowledge and understanding of the state of the art at the time of filing of the '402 patent, it is my expert opinion that VTV is entirely cumulative of the disclosures of the prior art references of record.  That is, all of the relevant features that are related to the '402 patent disclosed in VTV are expressly taught in at least one, but typically more than one, of the references that were considered by the U.S. Patent and Trademark Office (PTO) during the prosecution of the '402 patent.  Moreover, VTV does not teach many of the features recited at least in claim 7 of the '402 patent, such as the use of configuration information embedded in a television channel and utilizing multiple informational schemes simultaneously.  Accordingly, it actually is less relevant than the prior art of record.

5.      VTV is generally directed to the development of a classification system for rating television programming content for use in a basic blocking system.  In fact, VTV is directed to creating a *universal* (*i.e.* a single) rating system.  *Id.* at p. 11 ("ViewLevels™ are consistent across national and cultural boundaries, and changing social values").  This single classification system as disclosed contains three different categories: Violence, Language, and Sex, with levels therein that attempt to quantify the amount and degree of each type of content.

---

[1] Including U.S. Pat. No. 5,550,575 to West, U.S. Pat. No. 4,554,584 to Elam, and U.S. Pat. No. 5,387,942 to Lemelson.

*Id*. at 3-5.  Such informational schemes having multiple levels were known at the time and disclosed in art of record.  *See, e.g.* West, 5:30-3l (According to the preferred embodiment, there are multi-tiered levels of censorship, *e.g*., G, PG, PG-13, R, and X); Elam, 1:62 (In the preferred embodiment the ratings may be the well-known P, PG, and R used for movies); Lemelson 1:25-30 ("The program codes may represent an arbitrary number of designations which rate the program content according to what degree it contains graphic sex, violence, and strong language, for example.").

      6.     VTV also discloses that "the format used to encode ViewLevel$^{TM}$ data is similar to that used for closed captioning encryption."  Embedding program codes in the same manner as that closed caption data (*e.g.*. in the vertical blanking interval for analog systems), or other unused potions of the video signal, were also well known at the time, and disclosed in the art of record.  *See, e.g*. West, 6: 63 -7:4 ("In the preferred embodiment, such program rating data is sandwiched into the viewing signal during frame vertical intervals…"); 8: 24-27 ("It is here that the rating data may be combined (e.g., multiplexed) into the transmitted signal and appear during the vertical blanking intervals between video frames.); *see also* Elam 1:15-19 ("Present regulations of the Federal Communications Commission permit program related data in the ASCII code format to be inserted by television broadcasters in the vertical blanking interval for line 21, field 1 of the baseband video signal."); Lemelson, Abstract ("In accordance with the invention, a digital program code is simultaneously transmitted along with the audio and video information in an unused portion of the composite video signal, such as the so-called back porch region of the blanking interval.").

      7.     Also as noted above, VTV discloses a basic blocking system for utilizing the proposed universal content rating system.  In this regard, VTV disclosed "programming settings

for different members of the family." VTV, p.9. Setting preferences for basic blocking systems and for a single informational scheme was well known in the art at the time. *See, e.g.*, West, 15:9-13 ("Here, censorship criteria are being entered for the person whose PIN number is 5267. Arrows point to key 76d for setting the desired censoring level….").

8. VTV also discloses that a "tiny integrated circuit (V-Chip) can be built into a receiver …to strip the ViewLevels$^{TM}$ from the video signal," that "[t]he received ViewLevels$^{TM}$ can then be compared to three threshold levels chosen by the viewer," and further that "if the ViewLevels$^{TM}$ are higher than those selected, the screen switches from the program and informs the audience that viewing is inappropriate." VTV at p. 8-9. Again, however, this is simply a basic blocking system that is extracting embedded codes and comparing those with stored values. This was well known at the time, and was disclosed in the art of record. For instance, Lemelson discloses:

> Circuitry is interposed between the video signal and the display generating circuitry of a television receiver which extracts such program code and either passes or blocks the reception and display of the video signal in accordance with a comparison between the extracted program code and a stored program code.

Lemelson, Abstract. In this same regard, West discloses:

> After reading program ratings data base 64, the system proceeds to compare the rating of the selected program with the authorized ratings as included in viewer data base 46b (diamond 128). If the rating of the proposed channel selection does not fall within those for which viewing is permitted, then the system proceeds to the generation of a program prohibited message (legends 130 and 131) and return [sic] via path 132 to start condition 90. However, if viewing is permitted, then the system proceeds to enable program video and audio as represented by legend 133.

West, 11:36-45. Therefore, this basic blocking system that compares stored values with those values corresponding to a program was well known in the art, and specifically considered by the Patent Examiner during prosecution of the '402 patent.

9. Although VTV does disclose that there could be two ratings (*e.g.* a primary and

4

a secondary level) in each category for a program (VTV at p.7), this does not teach the use of multiple informational schemes as used in the '402 patent. In VTV, the primary level "applies uniformly to the entire program and represents the overall rating as designated by the scale in each category." *Id*. "The secondary level corresponds to the rating of the segment being displayed." *Id*. The primary and secondary levels merely represent multiple ratings referencing a single informational scheme. For instance, the overall program rating may have a violence level 5 (with other values for the language and sex categories), but one scene may be particularly violent, and have a secondary level of 8. Therefore, the overall program rating and scene rating are based on the same informational scheme (*e.g*. violence, language, and sex). Thus, for at least this reason, VTV fails to disclose multiple informational schemes that may be used simultaneously. Moreover, this method of assigning multiple ratings using a single informational scheme to a single program was also disclosed in the references considered by the PTO. *See, e.g*. Lemelson, Abstract ("The system may be employed to either block entire programs or only those portions of programs having an objectionable program content.")

10. Therefore, as described above, all of the features disclosed in VTV were well-known in the art and the references that included these features were expressly cited and made of record during the original prosecution of the '402 patent.

11. As noted above, VTV fails to disclose several key features of the '402 patent. First, there is simply nothing in this disclosure that could constitute configuration information describing a first informational scheme that is embedded in a television channel, as recited in steps (a) – (d) of claim 7 of the '402 patent. VTV is directed to a proposed classification or rating system with a basic blocking system – the informational scheme that is used by the viewer is not updatable. Indeed, the emphasis in the VTV reference on developing a single universal

5

rating system follows directly from the expectation that this system would remain fixed – that is, that it would be unable to adapt to a new or revised rating system.

12. VTV also does not disclose the use of multiple informational schemes, let alone a system or method for handling multiple informational schemes simultaneously. Instead, VTV proposes a system in which "ViewLevels$^{TM}$ are consistent across national and cultural boundaries, and changing social values." VTV at p. 11. This is the direct opposite of what the '402 patent teaches and addresses with respect to the multiple informational scheme-based invention of claim 7. Thus, VTV does not address another of the important features of the '402 patent, which is that the "methods of the invention are extremely flexible and allow several different rating systems to be used simultaneously." '402 Patent Abstract.

13. Therefore, for at least this reason, VTV fails to disclose many of the features disclosed in the '402 patent, including features such as configuration information that describes an informational scheme and the use of multiple informational schemes. Indeed, VTV not only does not disclose these features, but the discussion of a single universal rating system teaches away from the invention disclosed in the '402 patent, because with a single universal rating system, there is no need for handling multiple rating schemes or the need to update to new or revised systems.

14. VTV actually appears to be less relevant than the prior art of record because, for instance, the VTV slides provide far less discussion of the subject matter that is related to the claims of the '402 patent. Thus, the other references of record, such as West, Elam, and Lemelson, all provide additional disclosure that is not shown in the VTV reference.

**II. The Meaning of the Claims of the '402 Patent is Clear**

15. I have also been asked to review and analyze the claims of the '402 patent in

view of the specification and prosecution history and in light of the state of the art at the time the patent was filed to determine if the meaning of the claim terms is clear. In particular, I was asked to determine if the claim feature recited in claim 7 of a "first group of one or more multi-level categories of labels" is unintelligible, insolubly ambiguous, and therefore indefinite. After careful review, I have concluded that a person of ordinary skill in the art reading the entirety of claim 7, and considering the plain and ordinary meaning of the words in view of the specification, would understand the scope of the claim.

16. The specification makes clear that a "category" may have one or more levels and that these levels may have descriptive labels. For instance, the specification states:

> Preferably the configuration information also identifies the names of the different categories of multi-level information in the informational scheme (e.g. violence, sexuality, language etc.); <u>descriptive labels for each level within each category</u> (e.g., for the violence category: none, comedic, mild, brief, strong, graphic etc.); and some or all of the descriptive labels used in the informational scheme. This information can be provided to a user to assist the user in providing user preference information for storage in apparatus 20. In general, it is easier or a user to select between blocking programming in which the level of violence is "strong" or "graphic" than it is to select between levels "4" and "5".

'402 patent, 13:26-39. The '402 patent thereby clearly discloses that each level within a category may have a descriptive label (*e.g.* the first "level" in the violence "category" may be have a "label" = none; the second "level" in the violence "category" may have a "label" comedic; etc.). Indeed, Table II from the '402 patent is clearly illustrative of this concept (partial reproduction below):



'402 patent, Table V (labels, boxes and lines added). The <u>labels</u> for the <u>levels</u> in the <u>multi-level Violence category</u> include Level 1 = "none" (not shown above); Level 2 = "Violent"; and Level 3 = Graphic. Thus, the "violence category" is an example of a multi-level category of labels.

17. Returning to the claim language with reference to Table V shown above: The "[numbers of levels] in a [first group] of one or more [multi-level categories] of [labels]" is clearly defined. In particular the "first group" refers to one or more categories that may comprise an informational scheme. The levels are the levels within each of the group of categories. Each category contains one or more levels and each level has a descriptive label. Therefore, because each level has a descriptive label, and categories may comprise more than one level, it is clear that the specification teaches an example where each category is a "multi-level categories of labels."

18. LG's[2] expert has opined that the term "label" as used in claim 7 means content labels that describe content subject matter as shown in the '402 patent at Col. 15:44-56. However, the specification also makes clear that the descriptive labels referred to by LG's expert

---

[2] "LG" refers to Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc.

are a separate system for conveying information about a program.  While the term "label" is also used for these content advisories, based on the specification (as discussed above), the plain and ordinary meaning of the terms in the claims, as well as the context of the claim taken in its entirety, the scope of this portion of step (a) of claim 7 would have been apparent to a person of ordinary skill in the art.  Step (c) of claim 7 recites similar features using similar claim terms, and therefore is also clearly defined.

19.     I have also been asked to determine if the dependent claim 11 is unintelligible, insolubly ambiguous, and therefore indefinite.  After careful review, I have concluded that a person of ordinary skill in the art reading the entirety of claim 11, including the claims that it is dependent on, and considering the plain and ordinary meaning of the words in view of the specification, would clearly understand the scope of the claim.

20.     Claim 11 recites: "The method of claim 10 wherein said step of storing said user preference information comprises displaying on a display said <u>descriptive text for labels</u> in said first informational scheme and accepting from a user, and storing, user preference information for said first informational scheme said user preference information comprising a threshold level for each of said categories in said first informational scheme."  LG's expert has opined that the phrase "descriptive texts [for labels] is indefinite."  This is incorrect.

21.     Claim 11 is dependent on claim 10, so I first look for antecedent basis there. Claim 10 recites: The method of claim 9 wherein said first configuration information comprises <u>descriptive text for two or more levels</u> in each of said first group of categories and said second configuration information comprises descriptive text for two or more levels in each of said second group of categories.  As explained above, the '402 patent specifically describes that the levels in a category may have descriptive text labels.  *See, e.g.* '402 patent, 13:26-39 ("Preferably

the configuration information also identifies the names of the different categories of multi-level information in the informational scheme (*e.g.*, violence, sexuality, language etc.); descriptive labels for each level within each category (*e.g.*, for the violence category: none, comedic, mild, brief, strong, graphic etc.)"). Thus, the descriptive text for a level is a label, which comprises text. This is illustrated below:

> 10. The method of claim 9 wherein said first configuration information comprises descriptive text for two or more levels in each of said first group of categories and said second configuration information comprises descriptive text for two or more levels in each of said second group of categories.
>
> 11. The method of claim 10 wherein said step of storing said user preference information comprises displaying on a display said descriptive text for labels in said first informational scheme and accepting from a user, and storing, user preference information for said first informational scheme said user preference information comprising a threshold level for each of said categories in said first informational scheme.

22.     A person of ordinary skill in the art, reading claim 11 in view of the specification, the plain and ordinary meaning of the terms in the claims, as well as the context of the claim taken in its entirety, would clearly recognize that the descriptive text for labels refers to the descriptive text levels in claim 10, because they are one and the same and defined as such in the specification.

Executed this __31st__ day of March, 2011 at __Washington, DC__.

_____
Craig K. Tanner