## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

WI-LAN INC.,                                                    10 CV 432 (LAK) (AJP)

        Plaintiff,

v.

LG ELECTRONICS, INC. and LG
ELECTRONICS U.S.A., INC.,

        Defendants.

-------------------------------------------------------------- x

## <u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>

Richard A. Edlin (RE 1998)
Daniel I.A. Smulian (DS 4746)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-6528 (*telephone*)
(212) 801-5528 (*facsimile*)
edlinr@gtlaw.com
smuliand@gtlaw.com

Richard D. Harris (*pro hac vice*)
Jeffrey G. Mote (*pro hac vice*)
James J. Lukas, Jr. (*pro hac vice*)
Eric J. Maiers (*pro hac vice*)
Matthew J. Levinstein (*pro hac vice*)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 456-8400 (*telephone*)
harrisr@gtlaw.com
motej@gtlaw.com
lukasj@gtlaw.com
maierse@gtlaw.com
levinsteinm@gtlaw.com

Attorneys for Defendants LG Electronics,
Inc. and LG Electronics U.S.A., Inc.

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL STANDARDS ...................................................................................... 1

        A.      General Rules of Claim Construction. ................................................... 1

        B.      The "Summary of the Invention" Limits the Scope of the Claims. ....................... 2

        C.      Different Claim Terms Must Have Different Meanings and the Same Claim
                Term Must Have the Same Meaning. ................................................... 3

        D.      The Preamble of the Claim Must Be Considered. .................................. 3

        E.      The Definiteness Requirement Under 35 U.S.C. § 112, ¶ 2. ................... 4

III.    THE PROPER CONSTRUCTION OF THE TERMS OF THE '402 PATENT. .............. 4

        A.      Background of Parental Control Requirements for Television Viewing. .............. 4

        B.      The '402 Patent and the Alleged Invention of the Asserted Claims. ................ 5

        C.      Independent Claim 7 of the '402 Patent. ............................................. 6

                1.      "selectively blocking video signals" ......................................... 6

                2.      "receiving first configuration information" and "receiving second
                        configuration information" ...................................................... 8

                3.      "first television channel" and "second television channel" ............ 10

                4.      "first informational scheme" and "second informational scheme" ....... 11

                        a.      The Receiving Device Cannot Have Advance Knowledge of the First
                                and Second Informational Schemes ........................... 11

                        b.      An Informational Scheme is Expressly Defined as Including
                                Information Assigned by One or More Rating Organizations. ........ 14

                5.      "first group of one or more multi-level categories of labels" and "second
                        group of one or more multi-level categories of labels" ................. 15

                6.      "storing" .............................................................................. 18

                7.      "memory" ............................................................................. 19

                8.      "storing in said memory user preference information for each of said
                        categories in each of said first and second informational schemes" ........... 20

                        a.      "User Preference Information" is Program Blocking Preferences
                                Selected by a User. ............................................... 21

        b.     A User Must Select Program Blocking Preferences For Every Category in Both the First and Second Informational Schemes.............................. 22

    9.    "video signal comprising embedded information" ......................................... 23

D.    Dependent Claims 8 - 11....................................................................................... 24

    1.    "said descriptive text [for labels]" [Claim 11]................................................. 24

IV.    CONCLUSION............................................................................................................. 25

## TABLE OF AUTHORITIES

### Federal Cases

*Agilent Techs. Inc. v. Affymetrix Inc.*,
   567 F.3d 1366 (Fed. Cir. 2009)..................................................................... 3, 10, 11, 16, 24

*Aquatex Indus., Inc. v. Technique Solutions*,
   419 F.3d 1374 (Fed. Cir. 2005)..................................................................................... 2

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006)...................................................................................... 3

*Bowers v. Baystate Techs., Inc.*,
   320 F.3d 1317 (Fed. Cir. 2003)..................................................................................... 2

*Datamize LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005).............................................................................. 16, 26

*Halliburton Energy Services, Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008)........................................................................... 4, 17, 26

*In re Stencel* ,
   828 F.2d 751 (Fed. Cir. 1987)...................................................................................... 8

*Kropa v. Robie*,
   187 F.2d 150 (C.C.P.A. 1951) ..................................................................................... 8

*Manning v. Paradis*,
   296 F.3d 1098 (Fed. Cir. 2002)................................................................................. 4, 7

*Markman v. Westview Instruments, Inc.*,
   52 F3d 967 (Fed. Cir. 1995) (en banc)........................................................................... 3

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004)..................................................................................... 2

*NTP, Inc. v. Research In Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2004)................................................................................. 4, 7

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)..................................................................................... 2

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................................... 2, 12

*Process Control Corp. v. HydReclaim Corp.*,
   190 F.3d 1350 (Fed. Cir. 1999)................................................................................. 3, 27

*Quantum Corp. v. Rodime, Plc*,
   65 F.3d 1577 (Fed. Cir. 1995).................................................................................. 4, 18

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001)............................................................................. 3, 13

*Spectrum Int'l v. Sterilite Corp.*,
    164 F.3d 1372 (Fed. Cir. 1998)............................................................................. 2, 15

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)............................................................................. 3, 13

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)............................................................................. 15

## Federal Statutes

35 U.S.C. § 112........................................................................................... 4, 12, 16, 26

# I.    INTRODUCTION

Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. ("LG") submit their proposed constructions for Claims 7 through 11 ("Asserted Claims") of U.S. Patent No. 5,828,402 ("the '402 Patent").[1]   LG's proposed constructions reflect how a person of ordinary skill in the art would understand the claim terms in the context of the intrinsic evidence, *i.e.,* the patent's claim language, its specification, and its prosecution history.  Notably, to date Wi-LAN and its experts have refused to offer any claim constructions and LG does not expect Wi-LAN to substantively respond to LG's claim constructions.[2]   However, based on the limited information gleaned from Wi-LAN's infringement contentions and Wi-LAN's experts, it is readily apparent that Wi-LAN's reading of the claims is non-sensical and wholly divorced from the claim language, the specification, and claim construction law.  For example, Wi-LAN and its experts read out entire limitations and define the same term three different ways (depending on where it appears in the Asserted Claims) in order to maintain Wi-LAN's tenuous infringement positions, while wholly disregarding antecedent basis requirements.  Thus, the Court should adopt LG's proposed constructions for application to the issues of noninfringement and invalidity.

# II.    LEGAL STANDARDS

## A.    General Rules of Claim Construction.

When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve the meaning and scope of the patent claims that the plaintiff

---

[1]  Contemporaneous with the filing of this brief, LG is filing a motion to exclude Wi-LAN's experts' opinions for their failure to construe the claims in their infringement and validity reports among other significant errors.

[2]  Knowing That Its Infringement Allegations Are Objectively Baseless, Wi-Lan Has Avoided Any Court's Construction Of The '402 Patent Terms That Would Destroy Its Frivolous Licensing Model.  As Such The Terms Of The Asserted Claims Have Yet To Be Construed By Any District Court.   The Terms Of The Asserted Claims Have Been Construed In The Pending Re-Examination Proceedings Involving The '402 Patent In Which The U.S. Patent And Trademark Office ("Pto") Already Issued Its Non-Final Rejection Of All Of The Asserted Claims.

alleges have been infringed. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The claims of a patent are construed from the viewpoint of a person having ordinary skill in the art in light of the entire patent, including the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005) (*en banc*). In construing the claims, the claim terms, specification, and prosecution history are of central importance and are the best source for understanding a disputed technical term. *Aquatex Indus., Inc. v. Technique Solutions*, 419 F.3d 1374, 1380 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1313, 1315).[3] In some cases the prosecution history may be even more significant if the patentee disclaimed or disavowed an interpretation. *See Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998) ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover"). Any arguments made during prosecution of patents or applications in the same family related to common subject matter limits the scope of claim terms. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004). In addition, during reexamination a patentee's statements and amendments may disclaim claim scope. *See, e.g.*, *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1333 (Fed. Cir. 2003) ("The reexamination history also precludes this court from adopting a broader construction").

### B.    The "Summary of the Invention" Limits the Scope of the Claims.

The claims should not be construed to cover processes which are excluded as beyond the scope of the "summary of the invention" section of a patent specification. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he

---

[3] Extrinsic evidence, such as a dictionary definition, may be considered but "is less significant than the intrinsic record in determining the legally operative meaning of claim language," and is "unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1317, 1319. Finally, care must be take in relying upon "extrinsic evidence consisting of expert reports and testimony [] generated at the time of and for the purpose of litigation" because such information "suffer[s] from bias that is not present in intrinsic evidence." *Id.* at 1318.

2

characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure"); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("[w]hen a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention") (citing *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006)).

### C.   Different Claim Terms Must Have Different Meanings and the Same Claim Term Must Have the Same Meaning.

A principal tenet of claim construction law requires that different claim terms or limitations be construed to have different meanings – and that the same claim term or limitation be construed to have the same meaning throughout the claim.   *Markman v. Westview Instruments, Inc.*, 52 F3d 967, 976 (Fed. Cir. 1995) (*en banc*)) (a patent specification is a "fully integrated written instrument" in which words are assumed to have the same meaning throughout); *Agilent Techs. Inc. v. Affymetrix Inc.*, 567 F.3d 1366, 1377-78 (Fed. Cir. 2009) (a "closed chamber" must have a different meaning than a "chamber"; claim construction cannot render a claim term superfluous); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim").   The application of an antecedent basis is integral in ensuring that these cannons of claim construction are followed.   *See Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356-57 (Fed. Cir. 1999) (noting the importance of an antecedent basis in claim construction).

### D.   The Preamble of the Claim Must Be Considered.

The preamble of a claim should be construed when "it is necessary to give life, meaning, and vitality" to the claim.   *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1305-06 (Fed. Cir. 2004) (quoting *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).)   Likewise when the preamble defines the intended purpose of the invention or helps

determine the scope of the patent claim, it should not be treated as superfluous.  *Id.*; *Manning v. Paradis*, 296 F.3d 1098, 1103 (Fed. Cir. 2002).  Consistent with this premise, when the preamble is essential to understand limitations or terms in the claim body or to provide context for those limitations or terms, the preamble limits claim scope.  *NTP*, 418 F.3d at 1305-06.  Moreover, clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation.  *Catalina*, 289 F.3d at 808.

### E.    The Definiteness Requirement Under 35 U.S.C. § 112, ¶ 2.

Every patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2.  The definiteness requirement ensures that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude.  *See Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  Importantly, courts are not permitted to redraft claims to cure drafting errors and preserve its validity.  *See Quantum Corp. v. Rodime, Plc*, 65 F.3d 1577, 1584 (Fed. Cir. 1995).

## III.   THE PROPER CONSTRUCTION OF THE TERMS OF THE '402 PATENT.

Attached at **Exhibit A** is LG's claim chart highlighting the terms, as they first appear in the Asserted Claims, which LG requests the Court to construe ("LG's Proposed Terms").  Also attached at **Exhibit B** is a table listing LG's proposed  constructions for those terms.

### A.    Background of Parental Control Requirements for Television Viewing.

In early 1997, the television industry, through the Valenti Coalition, submitted an initial proposal for parental controls, which was subsequently modified in August, 1997 ("the Ratings System").  The Ratings System was adopted as a single integrated ratings system by the FCC in March of 1998.  Eventually, the television industry standardized a mechanism for implementing

the Ratings System on television receivers and created the U.S. Rating Region (region 1) table ("RRT1").  For digital television broadcasts in the United States, the ratings system upon which programming is rated is defined in the standard CEA-766-A ("CEA-766").[4]  Because CEA-766 provides additional information that is *not* included in RRT1, television receivers must have complete knowledge of the information included in the Ratings System in order to implement the blocking functionality which is required by FCC regulation.  They are therefore required by FCC regulation to have the contents of CEA-766 permanently encoded during manufacture.

### B.    The '402 Patent and the Alleged Invention of the Asserted Claims.

The '402 Patent was filed on December 5, 1996, as a continuation-in-part application of parent application 08/667,030 which was filed on June 20, 1996.  The '402 Patent was issued on October 27, 1998 and is entitled "Method and Apparatus for Selectively Blocking Audio and Video Signals."  ('402 Patent, [54]).[5]  Wi-LAN has asserted Claims 7-11, the Asserted Claims, against LG.  Claim 7 is a method claim and it is the only independent claim asserted by Wi-LAN.  Claims 8-11 all depend directly or indirectly from Claim 7.  The Asserted Claims of the '402 Patent are generally directed to a method whereby two new, complete, and different parental control ratings systems (i.e., configuration information describing informational schemes) are transmitted via broadcast transmission, received on separate television channels, and stored by television receivers.  Each complete configuration information describes a distinct informational scheme (or parental control rating system) of which the user's receiving device or television has no advance or prior knowledge, i.e., the informational schemes cannot have been previously embedded or encoded in the receiving device.  Parental control preferences (or user

---

[4] Other rating regions are defined (*e.g.*, Canada and Korea), and, though never broadcast in the United States, a second rating region (RRT5) which is reserved for use in the United States at some unspecified time in the future.
[5] In the "Summary of the Invention" section, Patentee distinguished the claimed invention over the prior art by stating that the prior art could not provide "selective blocking."  (2:23-26.)

preferences) that reference the newly downloaded parental control ratings systems are then obtained and stored, and television programming is selectively blocked based on a comparison between program rating information transmitted in the video signal portion of the television signal and the stored user preferences.  In order to selectively block, the user selects and stores his/her user blocking preferences for every category in the two received and stored informational schemes..

### C.    Independent Claim 7 of the '402 Patent.

LG's Proposed Constructions are presented in the order they appear in Asserted Claim 7:

### 1.    "selectively blocking video signals"

| Claim Language | LG's Construction |
|---|---|
| selectively blocking video signals | preventing the viewing of the displayable component of a "television channel" based on user selections |

The limitation "selectively blocking video signals" appears in the preamble, but the terms "blocking" and "video signal" also appear in other limitations of Claim 7.  The term "video signal" also appears in steps (f), (h), and (i) while the term "blocking" also appears in step (h). Because the preamble is necessary to understand the limitations of Claim 7 and to provide context for those limitations, it should itself be considered a limitation and construed by the Court.  *NTP*, 418 F.3d at 1305.

Additionally, because the preamble of Claim 7 defines the intended purpose of the invention of Claim 7, it is anything but superfluous.  *Manning*, 296 F.3d at 1103; *NTP*, 418 F.3d at 1305-06 (quoting *Catalina Mktg*., 289 F.3d at 808 (the preamble should be construed when "it is necessary to give life, meaning, and vitality" to a claim).)   The title of the '402 Patent is "Method and apparatus for selectively blocking audio and video signals."   Moreover, the specification makes it very clear that the sole purpose of the invention is for a user to selectively

6

block television programming.  (Col. 1:14-16 ("This invention relates to apparatus and methods *for selectively blocking* the reception of video signals in response to information which is encoded in the signals"); Col. 1:26-28 ("There is a need for an effective way *to block* offensive or inappropriate material from being viewed"); Col. 2:23-26 ("Further, such systems cannot readily provide *selective blocking*[6] where different coding schemes are used on different programs or in different channels that may be received in one location"); Col. 2:35-37 ("*This invention provides a video blocking system capable of dealing with programs which may be coded according to two or more distinct coding schemes*") (emphasis added).)

The specification concludes with a summary of all the types of selective blocking that a user can achieve according to the claimed invention.  A user can "*block*[] programming," "*block*[] programs," "*block* out specific channels," "*block* out programs of a specific title," "*block* programs which contain labels," and "*block* access to all programming at certain times of day."  (Col. 27:44-63 (emphasis added).)  The term "selectively blocking" should also be considered limiting because it is "deemed essential to point out the invention defined," *Kropa v. Robie*, 187 F.2d 150, 152 (C.C.P.A. 1951) and because it is necessary to differentiate the claimed invention from the prior art. *See In re Stencel*, 828 F.2d 751, 754-55 (Fed. Cir. 1987) (finding a preamble statement limiting because it was necessary to differentiate the invention from the prior art).  Steps (h) and (i) of Asserted Claim 7 allow for blocking (h) or display (i) of a video signal.  If no blocking ever occurred according to step (h), Claim 7, standing alone, could not claim a "new" patentable invention.  Therefore, the limitation set forth in the preamble is essential to point out the purported invention of Claim 7.  It can not be disputed that selective blocking is the intended purpose of Claim 7.  In fact, Patentee relied on the limitation "selectively blocking

---

[6] In the "Summary of the Invention" section, Patentee distinguished the claimed invention over the prior art by stating that the prior art could not provide "selective blocking."  (2:23-26.)

video signals" to distinguish its invention from the prior art during prosecution.  (SUF ¶ 13[7]

("none of the cited reference deals with the main problem addressed by this application, which is

how to accommodate changing rating (or "classification") schemes in *[sic]* apparatus for

***selectively blocking video signals***") (emphasis added).)

      Furthermore, Wi-LAN's own experts, Mssrs. Tanner and Dolan agree with this aspect of

LG's construction.  Mr. Dolan testified that his interpretation of what it means to "selectively

block a video signal" is that "the video signal would be ***blocked based on some selection***

***criteria***."  (SUF ¶ 38 (emphasis added).)    Moreover, Mr. Tanner testified that "selectively

blocking video signals" refers to "the belief that parents in -- particularly may wish to have some

control over the kinds of programs that are seen in their home, and they should have ***the ability***

***according to their preferences, to block*** display of that programming on their TVs, according to

their own tastes and judgments"  (SUF ¶ 39 (emphasis added),) and "the parent, let's say, who

owns the TV, having the ability to make some decisions and have them implemented about what

gets blocked or what gets allowed on that television." (*Id.*)[8]  Wi-LAN's own experts agree that

blocking must occur, and that it must be done based on user selections.[9]  As shown above, LG's

proposed construction for "selectively blocking video signals" – "preventing the viewing of the

displayable component of a 'television channel' based on user selections" is supported by the

specification, the claim language and Wi-LAN's own experts.

        2.      **"receiving first configuration information" and "receiving second**
                    **configuration information"**

---

[7] Citations to Defendants' Rule 56.1 Statement of Undisputed Facts are referred to herein as **SUF ¶**.

[8] Also, in response to the question, "Do you believe an intended use of an informational scheme is to enable a user to selectively block programming rated in accordance with that scheme?", Mr. Tanner testified that "It's part of a system that can be used to do that, yes."  (SUF ¶ 40.)

[9] During discovery, Wi-LAN defined LG's Accused Products as all LG television receiver devices that include "V-Chip" parental control functionality or similar technology to ***block programming*** based upon a content advisory descriptor or program rating included with the program of infringing the Asserted Claims.  (SUF ¶ 37.)

| Claim Language | LG's Construction |
|---|---|
| **receiving first configuration information** | receiving, via broadcast, a first complete data structure |
| **receiving second configuration information** | receiving, via broadcast, a second complete data structure which is different from the "first configuration information" |

LG's proposed constructions for "receiving first configuration information" and "receiving second configuration" are supported by the specification of the '402 Patent and are consistent with the usage of the terms in the claims. For example, the specification states that the configuration information is transmitted via broadcast: "[c]onfiguration information specifying the rating scheme is transmitted to the apparatus" (Abstract) and that "***[b]roadcaster*** 26 transmits configuration information which describes the scheme of information about video signal 24 used by broadcaster 26." (Col. 13:7-9 (emphasis added).)   Further, the specification makes clear that the configuration information is a ***complete*** data structure which identifies all of the categories, levels, and labels: "[t]he configuration information identifies: the number of categories (0 or more) and the number of levels within each category in the informational scheme; the number of groups of labels (0 or more) and the number of labels in each group." (Col. 13:14-18.)  Although the specification states that a single configuration information can be broken up and transmitted as a series of data packets (Col. 27:35-39), this configuration information cannot be "received" until all packets comprising the configuration information are received.

The specification also provides that the "first configuration information" is a separate and distinct data structure from the "second configuration information."   The "Summary of the Invention" section of the specification states that this is a requirement of the invention: "[t]his invention provides a video blocking system capable of dealing with programs which may be coded according to ***two or more distinct coding schemes.***"   (Col. 2:35-37; *See also* Col. 2:27-34.)  Of course, "first configuration information" must be different from "second configuration

information" according to controlling claim construction law.  *Agilent Techs. Inc.*, 567 F.3d at 1377-78.  Otherwise, one of those terms would improperly be rendered superfluous.

Finally, Wi-LAN's own expert, Mr. Tanner, agrees with LG's proposed construction that the configuration informations must be received via broadcast and be separate and distinct.  Mr. Tanner testified that the "primary meaning" of "receiving" is "receiving from a transmitted signal."  (Ex. 126, Tanner Dep. at 155.)  In response to a question about whether the "first configuration information" can be the same as the second configuration information," Mr. Tanner also testified "No, I don't believe so.  To the extent that the second configuration information describes a second and different informational scheme, I believe the configuration information is intended to be different."  (SUF ¶ 56.)

### 3.     "first television channel" and "second television channel"

| Claim Language | LG's Construction |
|---|---|
| **first television channel** | a first television frequency having a displayable component and an audible component |
| **second television channel** | a second television frequency having a displayable component and an audible component, and which is different from the "first television channel" |

LG's proposed constructions for "first television channel" and "second television channel" are supported by the specification of the '402 Patent and the claim language.  First, the specification uses the term "television channel," or just "channel," in context of what is commonly understood in the art to correspond to a given frequency that includes a displayable video component and an audible audio component.  (Col. 1:29-32.) Similarly, the specification also provides that the "first television channel" is a separate and distinct television channel from the "second television channel."   For example, the specification provides the following illustrative example:  "A television viewer located in Flint Mich., might, for example, receive *television channels from stations* in Detroit Mich." (Col. 21:59-61 (emphasis added).)   Of

10

course, "first television channel" must be different from "second television channel" according to controlling claim construction law. *Agilent Techs. Inc.*, 567 F.3d at 1377-78. Otherwise, one of those terms would improperly be rendered superfluous.

LG's proposed construction is consistent with the meaning of "television signal" in the art: "[t]he general term for the audio and visual signals that are broadcast together to provide the sounds and pictures of a television program." (SUF ¶ 49.) Wi-LAN's expert, Mr. Tanner, agrees with LG's proposed construction that a television channel is a television frequency having a displayable component and an audible component. (SUF ¶ 50 ("Unless otherwise indicated, the term 'channel' when used in this report refers to the RF signal whose modulation contains the entire ATSC transport stream).)[10]

### 4. "first informational scheme" and "second informational scheme"

| Claim Language | LG's Construction |
|---|---|
| **first informational scheme** | a first set of kinds of ratings information transmitted about a program that includes information assigned by one or more rating organizations, and of which the receiver has no advance knowledge |
| **second informational scheme** | a second set of kinds of ratings information transmitted about a program that includes information assigned by one or more rating organizations, and of which the receiving device has no advance knowledge, and which is different from the "first informational scheme" |

a. *The Receiving Device Cannot Have Advance Knowledge of the First and Second Informational Schemes*

LG's proposed constructions for "first informational scheme" and "second informational scheme" should be adopted because they are supported by the specification and the prosecution

---

[10] Mr. Tanner also testified that a "first television channel" can be the same channel as a "second television channel." (SUF ¶ 51.) Of course Wi-LAN's interpretation violate numerous canons of claim construction and the Court should either adopt LG's construction for "[first, second] television channel" or render the term invalid as indefinite under 35 U.S.C. § 112, ¶ 2 because the same claim term cannot have multiple meanings. *See Phillips*, 415 F.3d at 1315.

history and are consistent with the stated purpose of the alleged invention.  According to the purpose of the invention of the '402 Patent, a receiving device cannot have advance knowledge of the "first informational scheme" and the "second informational scheme."   Indeed, in distinguishing the invention of the '402 Patent from the prior art in the "Summary of the Invention" section of the specification, the '402 Patent specification makes clear that the alleged invention expressly requires that a receiving device cannot have advance knowledge of a received informational scheme:

> As noted above, the prior art includes various devices which block reception of an incoming video signal when a code encoded in the signal matches a code *stored in the device*. The inventor has recognized that the previous video blocking systems known to the inventor share the disadvantage that they assume that a single consistent coding scheme will be used for all video programs. ***The prior art blocking systems include devices which must be constructed or initially programmed with advance knowledge of the coding scheme to be used. The advance knowledge must include what codes are used in the coding scheme*** and embedded in the incoming video signal and should also include the meanings of those codes.  (Col. 2:11-23 (emphasis added).)

As shown above, the "Summary of the Invention" section of the '402 Patent distinguishes prior art systems, on the one hand,  which had advance knowledge of informational schemes, from the invention of the '402 Patent, on the other, which does not have advance knowledge of any informational scheme.   As the claims should not be construed to cover processes or products which are excluded as beyond the scope of the "Summary of the Invention" section of a patent specification, both the "first informational scheme" and "second informational scheme" must be construed to include the requirement that the receiving device has no advance knowledge of either.   *See SciMed Life Sys.,* 242 F.3d at 1343 ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure"); *Verizon Servs. Corp.*

503 F.3d at 1308 ("[w]hen a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention") (citations omitted).

Consistent with the "Summary of the Invention" in the specification, the restriction that the "first informational scheme" and "second informational scheme" must be schemes of which the receiver has no prior or advance knowledge is also required in view of the multitude of express disclaimers which the Patentee made during the prosecution history of the '402 Patent and its parent application:[11]

> [N]*one of the cited references deals with the main problem addressed by this application*, which is how to accommodate changing rating (or 'classification') schemes in apparatus for selectively blocking video signals.  None of the cited references even mention this problem, which arises, in part, because many advisory bodies, acting independently, are creating many different classification schemes.  Each of the cited references shows a video blocking system in which a *blocking device is constructed with a priori knowledge of the rating scheme* to be used." (SUF ¶ 13 (emphasis added).)

In an Office Action dated November 4, 1997, the PTO examiner rejected most of the pending claims as being anticipated by several separate prior art references.  (*See generally*, Ex. 3 at LG082028-LG082030.)  In order to overcome the PTO examiner's prior art rejections, the Patentee **expressly, unequivocally, and repeatedly** argued that each of the cited prior art references disclosed receiving devices with advance or prior knowledge of the received informational schemes (*i.e.* "pre-programmed" informational schemes), **but that the invention of the '402 Patent did not**:

> The West system is apparently **programmed with advance knowledge** of all rating schemes which might be applied to programming in the received video signal.  (SUF ¶ 15 (emphasis added).)[12]

---

[11] *Microsoft Corp.*, 357 F.3d at 1349-50 (any arguments made during prosecution of patents or applications in the same family related to common subject matter limits the scope of claim terms).

[12] *See also* "The information transmitted and received by the cited references merely specifies the rating being applied to video programs **according to a predetermined scheme known a priori to both the transmitter and the receiver**." (SUF ¶ 15 (emphasis added).)

As shown above, the prosecution history makes clear what an informational scheme according to the invention of the '402 Patent is **not – namely, a scheme of which a receiver has prior or advance knowledge.**  The Patentee also expressly defined an informational scheme over the prior art during prosecution based upon the asserted novel use of informational schemes that are received and stored, rather than pre-programmed informational schemes of which the receiving device has advance knowledge.  It is therefore appropriate to limit the scope of "[first, second] informational scheme" to that of which the receiver does not have prior or advance knowledge.  *See Spectrum Int'l*, 164 F.3d at 1378-79 ("[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover").

> b.     *An Informational Scheme is Expressly Defined as Including Information Assigned by One or More Rating Organizations.*

The other component of LG's proposed construction for "first informational scheme" and "second informational scheme" – "a [first, second] set of kinds of ratings information transmitted about a program that includes information assigned by one or more rating organizations"– is also supported by the specification.  For example, the  specification provides the following express definition for "informational scheme":

> In this application, the term 'informational scheme' means a set of kinds of information that may be transmitted about a program, a set of values that may be transmitted for the different kinds of information and the meanings of those values.  ***An informational scheme may include several groups of labels****.* ***Different groups of labels*** *may describe different aspects of a program or* ***may contain labels assigned by different rating organizations****.* (Col. 5:39-46 (emphasis added).)

LG's proposed construction is consistent with the express definition included in the specification.  When the specification defines a claim term, there is no need to go any further.  *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Wi-LAN has

taken an infringement position that directly contradicts the above, express definition of informational scheme, namely, that a ratings table which includes some aspects assigned by one rating organization and other aspects assigned by another ratings organization constitutes two informational schemes.  As Wi-LAN's interpretation is inconsistent with the above, express language of the specification, which states that different aspects of a single informational scheme can be assigned by different rating organizations, it is necessary for any informational scheme to be construed to expressly include information assigned by one or more rating organizations.

The specification also provides that the "first informational scheme" is a separate and distinct from the "second informational scheme."  For example, the "Summary of the Invention" section of the specification states that this is a requirement of the invention: "***two or more distinct coding schemes***" (Col. 2:35-37 (emphasis added),) and "***different coding schemes*** are used on different programs or in different channels that may be received in one location."  (Col. 2:23-26 (emphasis added).)  Of course, "first informational scheme" must be different from "second informational scheme" – again, according to claim construction law.  *Agilent Techs. Inc.*, 567 F.3d at 1377-78.  Otherwise, one of those terms would improperly be rendered superfluous.  Wi-LAN's expert Mr. Tanner agrees that the two informational schemes must be different.  (SUF ¶ 55.)

### 5. "first group of one or more multi-level categories of labels" and "second group of one or more multi-level categories of labels"

| Claim Language | LG's Construction |
|---|---|
| first group of one or more multi-level categories of labels | *Invalid under 35 U.S.C. § 112 as indefinite, lacking written description, and nonenabled* |
| second group of one or more multi-level categories of labels | *Invalid under 35 U.S.C. § 112 as indefinite, lacking written description, and nonenabled* |

Because the '402 Patent contains no definition to explain the scope of the limitations "first group of one or more multi-level categories of labels" and "second group of one or more

multi level categories of labels," the Asserted Claims are invalid under 35 U.S.C. § 112, ¶ 2 for failing to particularly point out and distinctly claim the subject matter which the patentee regards as his invention.  The sole mention of the term "categories of labels" appears in Claim 7.  It does not appear anywhere in the specification, and the prosecution history fails to add any clarity.  As there is no teaching in the patent or the prosecution history, about what "categories of labels" or "a [first, second] group of one or more multi-level categories of labels" means, there is no way to "discern the boundaries of the claim based on the claim language, the specification, and the prosecution history."  *Halliburton*, 514 F.3d at 1249-50.  Furthermore, the term "categories of labels" has no meaning to one of ordinary skill in the art.  (Ex. 130, Decl. of Adam Goldberg in Support of Invalidity ("Goldberg Decl. Inv.") at  ¶¶ 30-31.)   The specification states that "[a]n example of a category is the 'Rating' information described in Table I and that "labels … may be used to indicate whether certain subject matter is present in the program… includ[ing] things such as "Action", "Drug-use", "Adult", "Talk-show" etc."   (Col. 5:30-38.)  In another passage of the '402 Patent, the patentee describes another example of an informational scheme that includes both categories and labels as two distinct features:

> In this example, the rating scheme includes: 4 categories of category information--rating, violence, sexuality and language--each having levels described as in Table II, ***and*** a group of eight ***labels*** or ***"keywords" for describing program content***--Action, Sexuality, Mild Action, Language, Family, Mature Content, Graphic Violence, and Nudity… In this example, the informational scheme includes ***both category information and label information***. ***Configuration information about the categories in the scheme*** is sent first, followed by ***configuration information about the labels in the scheme.*** (Col. 15:44-56 (emphasis added).)

Based on the foregoing examples from the specification, the '402 Patent appears to define "categories" as ratings classifications and "labels" as keywords for describing program content subject matter.  It therefore follows that "***categories of labels***" would be defined as ratings classifications of keywords for describing program content subject matter, which is unintelligible

in the context of the '402 Patent.  One simply cannot determine what is meant by "categories of labels," given the respective, distinct meanings of "categories" and "labels" supported by the specification.   It is also apparent from the above-cited passages that categories and labels are distinct items for which a user can separately set preferences.  Indeed, the Abstract of the '402 Patent states:  "[t]he data packets include at least packets which contain *category information* specifying a level in one or more multi-level categories *and/or label information* specifying labels applied to the program content of the signal."  (Abstract (emphasis added).)[13]  This is further illustrated in Figure 5C - 5E of the '402 Patent.

The specification's treatment of categories and labels as two separate and distinct concepts further supports the point that the composite phrase "categories of labels" and therefore the limitations "a [first, second] group of one or more multi-level categories of labels" are incomprehensible.  A review of the claims included in the parent application demonstrate that the term "categories of labels" was not included in the original application either.  Instead all of the original claims refer to categories and labels as *alternatives.*[14]  Accordingly, the ambiguity of the limitation "categories of labels" in the Asserted Claims is solely attributable to the Patentee during the drafting of the continuation application for the '402 Patent.[15]  LG should not be prejudiced by Patentee's claim drafting mistakes, and the Court should not attempt to rewrite the claims in light of those mistakes.  *See Quantum Corp. v. Rodime, Plc*, 65 F.3d at 1584 (Courts

---

[13] "Apparatus 20 has stored in it configuration information which identifies the number of multi-level categories and the number of labels being used."  (Col. 10:12-15.)

[14] *See* (SUF ¶  16 ("either a number of levels in one or more multi-level categories **or** a number of labels in one or more groups of labels" (original independent Claims 1, 13); "either a category comprising a graduated plurality of levels **or** one or more labels in one or more groups of labels"  (original independent Claim 16); "at least either a multi-level category and a plurality of levels in said category **or** a plurality of labels" (original independent Claim 18) (emphasis added).)

[15] For this reason alone, the limitation "a [first, second] group of one or more multi-level categories of labels" also fails to satisfy the written description requirement of 35 U.S.C. § 112, ¶ 1.  Accordingly, the Asserted Claims of the '402 Patent are invalid for this other reason.

are not permitted to redraft claims to cure drafting errors and preserve validity).[16]   The specification fails to disclose, let alone define what "**categories of labels**" is or what "a [first, second] group of one or more multi-level categories of labels" are, the limitations do not make sense in the context of the specification, and the limitations have no meaning to one of ordinary skill in the art.  (Ex. 130, Goldberg Decl. Inv. at ¶ ¶  30-31.)  Accordingly, the Asserted Claims of the '402 Patent are invalid.

      **6.**        **"storing"**

| Claim Language | LG's Construction |
|---|---|
| **storing** | retaining for later use my a microprocessor |

LG's proposed construction for "storing" is supported by the specification of the '402 Patent, the purpose of the claimed invention, and the claim language itself.  For example, in Claims 7 and 11, three separate items are "stored":  "first configuration information … specifying a first informational scheme," "second configuration information … specifying a second informational scheme" and "user preference information for each of said categories in said first and second informational scheme."   In step (g) of Claim 7, these three items are involved in a comparison that is necessarily performed by a microprocessor.  Thus, in order for the claimed invention to work as described, "storing" **must involve** the retention of these items for later use by a microprocessor.  The specification also supports this proposed construction:

> Each time an embedded code data packet is received, **microprocessor** 42 simply determines what type of information is stored in the received data packet and **overwrites the memory location(s) 52 corresponding to that type of information with the data in the received data packet. Microprocessor 42 may use configuration information stored in apparatus 20** which specifies how the

---

[16] Wi-LAN's expert Mr. Tanner apparently concedes that this limitation is indefinite in his report.  Mr. Tanner states that "dimensions" mean the same thing as "categories."  (SUF ¶  63 ("The terms 'dimension' and 'category' (and their plural forms) are used interchangeably in this report").  Mr. Tanner then states that "TV Parental Guidelines contains seven dimensions or multilevel categories of labels."  (SUF ¶  63.)  Using Mr. Tanner's own construction, Mr. Tanner equates "seven categories" to "multilevel categories of labels" and reads out the term "label."

encoded information is organized in the received data packet to separate different types of information stored in the data packet *before storing the information in memory locations 52.*  (Col. 9:53-62 (emphasis added).)

The prosecution history further supports LG's proposed construction.  The Patentee confirmed in a response to a PTO office action that the alleged invention "relates to systems which involve transmitting particular configuration information and *using that information in particular ways.*"  (SUF ¶ 14 (emphasis added).)  Finally, LG's construction is consistent with the meaning ascribed in the art for "store":  "[t]o transfer an element of information to memory or storage in a computer *for later extraction.*"  (SUF ¶ 64 (emphasis added).)[17]

> 7.   "memory"

| Claim Language | LG's Construction |
|---|---|
| memory | non-volatile storage medium |

LG's proposed construction for "memory" is supported by the specification of the '402 Patent, the purpose of the claimed invention, and the claim language.  In Claim 7, the same three separate items are described as stored in the same "memory" (*i.e.* "a memory" or "said memory"): "first configuration information … specifying a first informational scheme," "second configuration information … specifying a second informational scheme" and "user preference information for each of said categories in said first and second informational scheme."  The specification unequivocally states that user preference information and configuration information must be stored in *non-volatile* memory (*i.e.* element #58 of Figure 2):

> Under the control of software program 54, microprocessor 42 compares the data stored in memory locations 52 with corresponding *user preference information stored in, or loaded from, memory locations 56 in non-volatile memory* <u>*58*</u>*. Any suitable compatible non-volatile memory,* for example, flash RAM ("FRAM"), electrically erasable programmable ROM ("EEPROM") or a suitable magnetic or other storage medium, may be used for non-volatile memory 58.  (Col. 11:38-45

---

[17] LG's construction is also supported by the definition in the art for "memory":  "Circuitry that allows information *to be stored and retrieved*."  (SUF ¶ 65 (emphasis added).)

(emphasis added); *See also* Col. 13:18-22; Col. 17:34-39; Col. 15:19-25; Col. 15:39-42.)

Thus, in the specification the Patentee never states that the first configuration information, the second configuration information and/or the user preference information are stored anywhere else but in memory other than non-volatile memory. Finally, in accordance with the purpose of the invention of the '402 Patent, one of ordinary skill in the art at the time of the alleged invention would have appreciated that the first configuration information (specifying the first informational scheme), the second configuration information (specifying the second informational scheme) and the user preference information ***must*** be retained in non-volatile storage medium, or the claimed invention would be rendered inoperable for its intended purpose of parental control. For example, if the first configuration information, second configuration information and user preferences were stored in a volatile storage medium (*i.e.* one that loses its data upon disconnection of power), a child could circumvent his/her parents' content blocking preferences by simply turning the television off and then back on. Thus, in order for the alleged invention of the '402 Patent to work as intended, the "memory" must be a non-volatile storage medium.[18] Finally, Wi-LAN's own expert, Mr. Dolan, agrees with LG's proposed construction. For example, Mr. Dolan testified that, in accordance with the claim, user preference information has to be stored in non-volatile memory. (SUF ¶ 66.)

### 8.    "storing in said memory user preference information for each of said categories in each of said first and second informational schemes"

| Claim Language | LG's Construction |
|---|---|
| **storing in said memory user preference information for each of said categories in each of said first and second informational schemes** | "storing" in said "memory," program blocking preferences selected by a user for every category in the "first informational scheme" and every category in the "second informational scheme" |

---

[18] "Non-volatile memory" is memory in which data is retained even when power is disconnected from the storage medium. (SUF ¶ 67.)

LG's proposed construction for "storing in said memory user preference information for each of said categories in each of said first and second informational schemes" should be adopted because it is supported by the specification, the alleged purpose of the claimed invention, the claim language, and the prosecution history.

a.     *"User Preference Information" is Program Blocking Preferences Selected by a User.*

The specification clearly defines a user as the person operating and/or watching the receiving device or television.  (Col. 10:63 ("While a user is watching television").)  In addition, the specification discloses a user selecting or inputting his/her blocking preferences or user preference information.  (Col. 1:46-48 ("The picture and sound are blanked whenever the received ASCII code matches or exceeds a value ***selected by the user***" (emphasis added).))[19] Indeed, as shown below, the specification also discloses that the selection of program blocking preferences by a user is a requirement of the '402 Patent in accordance with the blocking purpose of the claimed invention:

> [a]fter a ***user has selected*** thresholds for each category, the currently set threshold level for each category is stored as preference information in non-volatile memory 58.  (Col. 17:58-60 (emphasis added).)

Accordingly, LG's construction that "user preference information" is "program blocking preferences selected by a user" is  consistent with the meaning of user according to the specification and claim language and common sense.  Finally, Wi-LAN's own expert Mr. Tanner agrees with LG's proposed construction.  Mr. Tanner testified that the "clear meaning" of "user" is "***somebody who is operating the television***."  (SUF ¶ 68 (emphasis added).)  This is consistent

---

[19] *See also* Col. 3:11-16 ("This provides the viewer, or the viewer's parent or guardian, with some control over the television programming that the viewer can be exposed to. In the alternative, apparatus 20 may permit viewing of video signal 24 only if the decoded information matches certain stored user preferences").

21

with Mr. Tanner's testimony that the "***main purpose of the invention*** [of the '402 Patent] is to allow ***a parent***, ***an individual user***, ***to set user preferences***."  (SUF ¶ 68 (emphasis added).)

> b.      *A User Must Select Program Blocking Preferences For Every Category in Both the First and Second Informational Schemes.*

The specification, claim language, and the prosecution history also supports LG's proposed construction that a user must select program blocking preference for every category in both the first and second informational schemes.  In fact, the claim language specifically claims: "e) storing in said memory ***user preference information*** for ***each of said categories*** in ***each of said first and second informational schemes.***"  (Claim 7 (emphasis added).)  The specification contains the same requirements:  "[t]his [configuration] information is used by apparatus 20 to allocate locations in non-volatile memory means 58 to ***store user preference*** information corresponding to each category and each group of labels in the informational scheme."  (Col. 13:18-22.)  In addition, Wi-LAN made a number of statements in the currently pending reexam that confirm that this limitation is not satisfied unless and until user preferences are stored for ***each category*** in both the first informational scheme and the second informational scheme, including:

> "Again, even assuming arguendo that GISID discloses storing ***user preference*** information ***for each category in a first informational scheme***, GISID fails to disclose storing user preference information ***for each category in each of said first and second informational schemes***."  (SUF ¶ 76.)

> "Step (e) specifically recites storing ***user preferences*** for ***both informational schemes***."  (SUF ¶ 76.)

Therefore, LG's proposed construction for "storing in said memory user preference information for each of said categories in each of said first and second informational schemes" should be adopted.  Finally, Wi-LAN's own expert, Mr. Dolan, agrees with LG's construction. Mr. Dolan testified that in order to meet limitation (e), user preference information must be

stored for each category in each of the first and second informational schemes and that limitation (e) would not be met if user preference information for only one of four categories of a certain informational scheme were stored.  (SUF ¶ 77.)  Mr. Dolan also testified that if user preference information was stored for all categories in one informational scheme only and not the other informational scheme, limitation (e) would not be met.  (*Id.*)

9.      **"video signal comprising embedded information"**

| Claim Language | LG's Construction |
|---|---|
| **video signal comprising embedded information** | displayable component signal of a "television channel" containing information |

LG's proposed construction is supported by the specification and the claim language itself.  First, Claim 7 separately recites that certain information is embedded in first and second "television channels," while other information is embedded in a "video signal."  Because the Patentee chose to use different terminology – "television channel" versus "video signal" – those terms must be given different meanings according to controlling claim construction law.  *Agilent Techs. Inc.*, 567 F.3d at 1377-78.  Otherwise, one of those terms would improperly be rendered superfluous.  In the context of Claim 7, it is clear that "video signal" refers to the displayable component signal of the broader "television channel."  In particular, steps (h) and (i) of Claim 7 are instructive:  h) if the result of said comparison indicates that said first video signal should not be displayed, blocking said ***first video signal from being displayed on a video display***; and, i) if the result of said comparison indicates that said first video signal should be displayed, allowing said ***first video signal to be displayed on said video display***.  (Claim 7 (emphasis added).)

The specification further supports LG's proposed construction.  For example, the specification states that in one embodiment, data is embedded in the video signal by transmitting the data in the video blanking interval of the video signal and, preferably, within the Extended

23

Data Services (XDS) portion of the blanking interval.  (Col. 4:18-24.)  In so doing, the data is modulated onto a portion of the displayable (i.e. video) component, separate from the audible (i.e audio) component, of the signal in a manner that a receiver may demodulate and reconstruct the data from the displayable component.  Moreover, one of ordinary skill in the art would have recognized that the state of the art as of the filing date of the '402 Patent was such that methods and systems were known, including but not limited to those described in A/56, in which tables defining ratings schemes are transmitted outside of the displayable component of a television channel.  The fact that the Patentee did not disclose these other methods and systems as alternative embodiments further demonstrates that "video signal" should be interpreted to mean the displayable component of a television channel.  LG's construction is also consistent with the meaning of "video" in the art: "***the visual (rather than the audio) component of a television signal***."  (SUF ¶ 78 (emphasis added).)   Finally, Wi-LAN's own experts, Mssrs. Tanner and Dolan agree with LG's proposed construction.  Both of them testified that "video signal" means the displayable component of a television channel signal.  (SUF ¶ 82; SUF ¶ ¶ 81-2.)[20]

    **D.**    **Dependent Claims 8** - 11 of the '402 Patent

        **1.**    **"said descriptive text [for labels]" [Claim 11]**

| Claim Language | Defendants' Construction |
|---|---|
| **said descriptive text [for labels]** | *Invalid under 35 U.S.C. § 112 as indefinite, lacking written description, and nonenabled* |

---

[20] While Wi-LAN's experts agree with LG that "video signal" means the displayable component of the television channel signal, they also testified that the term "video signal" can have multiple meanings depending on where it appears in the same Claim 7.  For example, Wi-LAN's experts offered the following three definitions for "video signal": (1) "displayable component signal of the television channel signal"; "displayable and audible components of the television channel signal"; and "the entire ATSC transport stream."  (SUF ¶ 82; SUF ¶ ¶ 82-82.)  Of course Wi-LAN's experts' attempts to interpret the same term three different ways to support Wi-LAN's infringement allegations violate numerous canons of claim construction, and the Court should either adopt LG's construction for "video signal comprising embedded information" or render the term invalid as indefinite under 35 U.S.C. § 112, ¶ 2 because the same claim term simply cannot have multiple meanings, within the same claim no less.  *See Markman v. Westview Instruments, Inc.,* 52 F.3d at 978 (a patent specification is a "fully integrated written instrument" in which words are assumed to have the same meaning throughout).

Because the '402 Patent contains no definition or context to explain the scope of the limitation "said descriptive text [for labels]," Asserted Claim 11 is invalid under 35 U.S.C. § 112, ¶ 2 for failing to particularly point out and distinctly claim the subject matter which the patentee regards as his invention.  The sole mention of the term "descriptive text [for labels]" appears in Claim 11 and the term has no meaning to one of ordinary skill in the art.  (Ex. 130, Goldberg Decl. Inv. at ¶¶ 32-33.)  And, based on the meanings the '402 Patent ascribes to the term "labels," the phrase "descriptive text for labels" is ambiguous.  The specification defines "labels" as keywords for describing program content subject matter (*i.e.* descriptors).  It therefore follows that "said descriptive text [for labels]" alternatively means "descriptive text for keywords for describing program content subject matter" or "descriptive text for descriptors," both of which are circular and unintelligible in the context of the '402 Patent.[21]  One cannot determine what is meant by "descriptive text," when it is paired with "labels," as it is in Claim 11. In addition, Claim 11 is indefinite because the limitation "*said* descriptive text [for labels]" does not have a any antecedent basis in Claims 7 through 10, interpretation of the claim is precluded and the claim remains hopelessly indefinite.  *See Process Control Corp.*, 190 F.3d at 1356-57.  Claim 11 is therefore invalid as indefinite.

## IV.   CONCLUSION

For each of the foregoing reasons, where the Court may determine that a term is not indefinite, LG respectfully requests that the Court adopt LG' proposed constructions, as set forth herein and in Exhibit B, attached hereto.

---

[21] Further confusing the issue is the fact that the specification refers to "labels" themselves as being "descriptive": "*descriptive labels* for each level within each category.  (Col. 13:29-32 (emphasis added); *See also* Col. 18:38-50.)

Dated:  April 1, 2011                              Respectfully submitted,

                                                  **GREENBERG TRAURIG, LLP**

                                                  */s/ Richard D. Harris*
                                                  Richard A. Edlin (RE 1998)
                                                  Daniel I.A. Smulian (DS 4746)
                                                  200 Park Avenue
                                                  New  York, New York 10166
                                                  (212) 801-6528 (*telephone*)
                                                  (212) 801-5528 (*facsimile*)
                                                  edlinr@gtlaw.com
                                                  smuliand@gtlaw.com

                                                  Richard D. Harris (*pro hac vice*)
                                                  Jeffrey G. Mote (*pro hac vice*)
                                                  James J. Lukas, Jr. (*pro hac vice*)
                                                  Eric J. Maiers (*pro hac vice*)
                                                  Matthew J. Levinstein (*pro hac vice*)
                                                  Greenberg Traurig, LLP
                                                  77 West Wacker Drive, Suite 3100
                                                  Chicago, Illinois 60601
                                                  (312) 456-8400 (*telephone*)
                                                  harrisr@gtlaw.com
                                                  motej@gtlaw.com
                                                  lukasj@gtlaw.com
                                                  maierse@gtlaw.com
                                                  levinsteinm@gtlaw.com

                                                  Attorneys  for  Defendants  LG  Electronics,
                                                  Inc. and LG Electronics U.S.A., Inc.

26

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on April 1, 2011.

*/s/ Richard D. Harris*