**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x

**WI-LAN INC.,**                                                    10 CV 432 (LAK) (AJP)

         Plaintiff,

v.

**LG ELECTRONICS, INC. and LG**
**ELECTRONICS U.S.A., INC.,**

         Defendants.

-------------------------------------------------------------- x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT OF UNENFORCEABILITY BASED ON UNCLEAN HANDS, INEQUITABLE CONDUCT, PATENT MISUSE AND EQUITABLE ESTOPPEL**

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.   FACTUAL BACKGROUND ..................................................................................... 3

   A.   The Prosecution History of U.S. Patent No. 5,828,402. ................................. 3

   B.   Wi-LAN And The Named Inventor Of The '402 Patent Hid Their Financial Interests In The '402 Patent And FCC Regulations From The Federal Government. ................. 3

   C.   The FCC Enacts Its V-Chip Mandate And Wi-LAN Claims That A '402 Patent License Is Necessary To Comply With The Mandate. .................................................... 4

   D.   The CEA Notifies The FCC That Wi-LAN And Mr. Collings Failed To Disclose Their Financial Interest In The '402 Patent And The FCC Regulations. ...................... 5

   E.   While Wi-LAN Was Secretly Influencing The FCC's 2004 V-Chip Mandate, It Was Also Misrepresenting Its Interests To The Advanced Television Systems Committee To Obtain More Favorable Standard Language. ....................... 7

   F.   Wi-LAN Hires Dominic Perri And His Coalition For Independent Ratings Services To Act As Its Secret Lobbyist To Push Its Agenda On The FCC, Obtain Favorable CEA Standard Language, And to Exact Revenge On LG. ............................................. 8

      1.   Background On The Coalition For Independent Ratings Services. ........................... 9

      2.   Wi-LAN And The Coalition Join Forces. .................................................... 9

      3.   Mr. Perri Is A Member Of The Wi-LAN V-Chip Team. ............................................ 9

      4.   To The Outside World, Wi-LAN Took Painstaking Efforts To Preserve The Appearance Of Independence Between Itself And Mr. Perri And The Coalition. ... 10

      5.   Wi-LAN And Mr. Perri Conspire To Defraud The FCC. ........................................ 10

         a.   Wi-LAN Worked Through the Coalition To Enlist Third Party Support For An RRT-05 Test To Try To Bolster Its '402 Patent Infringement Position. ................. 12

         b.   Wi-LAN Directed the Coalition To Report Non-Compliant LG DTV Receivers To The FCC. .................................................................................................... 12

         c.   The Coalition Never Disclosed Its Relationship With Wi-LAN To The FCC. ........ 13

      6.   Wi-LAN And The Coalition Conspire To Defraud The CEA In Direct Contravention of CEA Policy Requiring Them To Disclose Their Relationship and the '402 Patent. ...................................................................................... 14

   G.   Since 2004, Wi-LAN Has Attempted, Unsuccessfully, To "Hold-Up" The Entire Digital Television Receiver Market Using Bad Faith Patent Licensing Tactics. ......... 16

   H.   Wi-LAN Intentionally Withheld Indisputably Material Information From The United States Patent And Trademark Office During The '402 Patent Reexamination. ........... 17

   I.   Wi-LAN's Pattern Of Deceitful Behavior Has Carried Over Into The Current Litigation. ...................................................................................................... 19

1.    Wi-LAN's Woefully Deficient Privilege Log ........................................................ 19

2.    Wi-LAN's Numerous Attempts To Vitiate The Court's Protective Order.............. 20

3.    Wi-LAN's Refusal To Agree To A Formal Claim Construction. ........................... 20

III.     ARGUMENT ...................................................................................................... 21

A.    Summary Judgment ........................................................................................ 21

B.    Wi-LAN's Fraudulent Conduct With Respect To The Acquisition And Licensing Of The '402 Patent Rises To The Level Of Unclean Hands And Patent Misuse. ............. 21

C.    Wi-LAN's Intentional Failure To Disclose Indisputably Material Documents To The PTO Constitutes Inequitable Conduct. ........................................................................ 24

D.    Wi-LAN's Failure To Disclose Its Ownership Of The '402 Patent While It Participated In The A/65 Standard Setting Process Is An Equitable Estoppel That Renders The '402 Patent Unenforceable. ................................................................... 26

IV.     RELIEF REQUESTED....................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

### <u>Federal Cases</u>

*Aptix Corp. v. Quickturn Design Systems, Inc.*,
   269 F.3d 1369 (Fed. Cir 2001)....................................................................... 21

*Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*,
   605 F.3d 1305 (Fed. Cir. 2010)...................................................................... 27

*Aukerman Co. v. R.L. Chaides Constr. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992)................................................................. 26, 27

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
   157 F.3d 1340 (Fed. Cir. 1998)...................................................................... 22

*Cargill, Inc. v. Canbra Foods, Ltd.*,
   476 F.3d 1359 (Fed. Cir. 2007)...................................................................... 24

*Hynix Semiconductor, Inc. v. Rambus Inc.*,
   2006 U.S. Dist. LEXIS 48028 (N.D. Cal. July 6, 2006)............................... 27

*In re Smith*,
   714 F.2d 1127 (Fed. Cir. 1983)...................................................................... 25

*Keystone Driller Co. v. General Excavator Co.*,
   290 U.S. 240 (1933)....................................................................................... 21

*Libutti v. U.S.*,
   107 F.3d 110 (2d Cir. 1997)........................................................................... 23

*Molding Corp. v. BW Photo Utilities*,
   319 F.2d 347 (9th Cir. 1963) ......................................................................... 21

*Molins PLC v. Textron, Inc.*,
   48 F.3d 1172 (Fed. Cir. 1995)................................................................... 24, 27

*Monsanto Co. v. Scruggs*,
   459 F.3d 1328 (Fed. Cir. 2006)...................................................................... 22

*Morton Salt Co. v. G.S. Suppiger Co.*,
   314 U.S. 488 (1942)....................................................................................... 22

*Potter Instr. Co. v. Storage Tech. Corp.*,
   207 U.S.P.Q. 763 (E.D. Va. 1980), aff'd, 641 F.2d 190 (4th Cir. 1981)....... 27

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
   324 U.S. 806 (1945).................................................................................. 21, 24

*Qualcomm v. Broadcomm*,
   548 F.3d 1004 (Fed. Cir. 2008)...................................................................... 26

*Stambler v. Diebold Inc.*,
   1988 U.S. Dist. LEXIS 10132 (E.D.N.Y. Aug. 30, 1988)............................. 27

*Virginia Panel Corp. v. MAC Panel Co.*,
   133 F.3d 860 (Fed. Cir. 1997)...............................................................22

*Windbond Elecs. Corp. v. ITC*,
   262 F.3d 1363 (Fed. Cir. 2001).............................................................21

*Worley v. Tobacco Co.*,
   104 U.S. 340 (1881) ...............................................................................3

*Zenith Elecs. Corp. v. Touchsys., Inc.*,
   182 F.3d 1340 (Fed. Cir. 1999).............................................................23

## **Federal Rules**

Fed. R. Civ. P. 56(c) ..................................................................................21

## **Federal Regulations**

37 C.F.R. § 1.56(b) (2006)..........................................................................24

## I.    INTRODUCTION

In this lawsuit, Wi-LAN has asserted claims for infringement of U.S. Patent No. 5,828,402 ("the '402 Patent") and fraudulent inducement relating to certain licensing transactions between Wi-LAN and LG related to the '402 Patent.  But the '402 Patent is tainted with fraud.  Shown below are just a few, undisputed "lowlights" of Wi-LAN's bad faith, fraudulent actions related to the '402 Patent and Wi-LAN's fraudulent inducement claim against LG.  While some of Wi-LAN's actions, by themselves, constitute inequitable conduct, unclean hands, and/or equitable estoppel, taken in their totality, Wi-LAN's bad faith scheme meets and surpasses the requirements for patent misuse.

- Wi-LAN and Tim Collings failed to disclose their relationship, their ownership interests in the '402 Patent, and their financial interests in favorable Federal Communications Commission ("FCC") regulations to the FCC, even as Tim Collings independently submitted comments arguing for regulations that purportedly read on the '402 Patent;

- Wi-LAN hired Dominic Perri to secretly do its bidding before the Consumer Electronics Association ("CEA") and FCC, to negotiate for CEA-766-B standard language that purportedly reads on the '402 Patent and to report LG's non-compliance with the 2004 FCC V-Chip Mandate to the FCC to indirectly pressure LG into paying '402 Patent royalties;

- Wi-LAN failed to disclose the '402 Patent for over a year to the ATSC in violation of ATSC policy, while it vied for ATSC A/65 standard language that read on the '402 Patent; and

- Wi-LAN retained (and silenced) ███████████ to prevent him from disclosing damaging information on the publication status of a key prior art reference from the PTO during the '402 Patent reexamination.

In its typical overstated fashion, Wi-LAN incorrectly asserts that the FCC has mandated the technology covered by the '402 Patent and that there is no possibility for a "design around."  LG has consistently stated that it does not infringe the '402 Patent simply by manufacturing devices that may have the *capability* to perform a claimed method which *has never been performed* and, at the very least, *cannot be performed* until new ratings systems are transmitted

1

in the United States.  The CEA's request for **clarification** of the same FCC regulations that Wi-LAN believes mandates use of the '402 Patent, evidences widespread uncertainty as to what the FCC's regulations actually require and thus contradicts Wi-LAN's position that FCC compliance equals infringement.  No wonder Wi-LAN opposed that request.

All told, Wi-LAN's inequitable conduct and deception has spanned nearly a decade, generated ████████ of dollars in undeserved royalties, and continues to this day.  With the help of various outside counsel and its ostensibly independent, secret lobbyist, Wi-LAN has defrauded the United States Patent and Trademark Office, the FCC, members of Congress, this Court, and two well-respected standards setting organizations—deceptive behaviors that have cost LG, as well as the entire consumer electronics industry, dearly.

Putting aside the fact that Wi-LAN's Complaint is without merit and was filed with an improper purpose, the Court is well aware of the extensive litigation misconduct Wi-LAN has engaged in since this action began.  Indeed, it was not until this Court ordered Wi-LAN to disclose more than 125,000 pages of documents Wi-LAN improperly withheld under faulty claims of privilege, that the extent of Wi-LAN's fraudulent activities become fully evident.

Accordingly, the Court should grant summary judgment in LG's favor on its affirmative defenses of Unclean Hands, Inequitable Conduct, Patent Misuse, and Equitable Estoppel as well as its Counterclaim of Unenforceability, hold the '402 Patent unenforceable as against LG, and bar Wi-LAN's fraudulent inducement claim.

## II.      FACTUAL BACKGROUND

For ease of the Court's review of the full contours of Wi-LAN's inequitable and fraudulent behavior related to the '402 Patent and Wi-LAN's patent infringement and fraudulent inducement claims, LG discusses Wi-LAN's[1] improper behavior in overall chronological order:

### A.      The Prosecution History of U.S. Patent No. 5,828,402.

During prosecution, the patentee failed to disclose a highly relevant, prior art paper that the named inventor, Tim Collings, presented at the Sorbonne (*Violence and Television: The Canadian Example*) to the U.S. Patent and Trademark Office ("PTO").  (SOF at ¶ 10, 17.)[2] Similarly, neither Mr. Collings, nor his attorney, disclosed the public disclosure and use of several different V-Chip rating systems in Buffalo, NY, in the 1993-1996 timeframe or any documentary evidence relating to same.  (SOF at ¶ 10, 94.)

### B.      Wi-LAN And The Named Inventor Of The '402 Patent Hid Their Financial Interests In The '402 Patent And FCC Regulations From The Federal Government.

From 1997 through 2003, the named inventor of the '402 Patent, Mr. Collings, submitted comments to the FCC related to certain proposed FCC regulations which Wi-LAN contends cover the '402 Patent.  (2nd Amd. Complaint, Dkt. 67 at ¶¶ 2, 23, 28, 30; SOF at ¶ 95, 100.)  Not one of these communications to the FCC disclosed Mr. Collings' relationship with Wi-LAN, the '402 Patent (or the application therefor) or, most importantly, the fact that Mr. Collings and Wi-LAN had significant financial interests in the rules under consideration.  (SOF at ¶ 95, 97, 99.) Indeed, Wi-LAN admits that it never disclosed its interests in the '402 Patent to the FCC prior to the August 2004 Report and Order.  (SOF at ¶ 99.)  The FCC's August 2004 Report and Order

---

[1]      Tri-Vision, Inc. is Wi-LAN's predecessor-in-interest to the '402 Patent.  For purposes of this brief, LG refers solely to Wi-LAN (which necessarily includes Tri-Vision).  *Worley v. Tobacco Co.*, 104 U.S. 340, 344 (1881) ("[T]he assignee of a patent right takes it subject to the legal consequences of the previous acts of the patentee").

[2]      U.S. Patent No. 5,828,402 ("'402 Patent") issued on October 27, 1998.  (SOF at ¶ 10.)  On December 5, 1996, continuation-in-part to application Ser. No. 08/761,091 was filed.  (SOF at ¶ 10.)  The application for the '402 Patent claims priority to a June 20, 1996, U.S. patent application Ser. No. 08/667,030.  (SOF at ¶ 10.)

("V-Chip Mandate") required that all DTV receivers be able to respond to changes in the rating system, effective March 15, 2006.  (SOF at ¶ 98.)   Wi-LAN also went to great lengths to encourage third parties to submit aligned comments and other correspondence to the FCC endorsing regulations that Wi-LAN claims cover the '402 Patent, without the FCC's knowledge and without disclosing Wi-LAN's financial interest in such regulations to those third parties. (SOF at ¶ 96.)   For example, Mr. Collings edited a letter Congressman ███████ submitted to the FCC on January 29, 2003, relating to the FCC's 2004 V-Chip Mandate— notably, without disclosing to the Congressman his connection to Wi-LAN or the '402 Patent. (SOF at ¶ 96.)

> **C.    The FCC Enacts Its V-Chip Mandate And Wi-LAN Claims That A '402 Patent License Is Necessary To Comply With The Mandate.**

In its 2004 V-Chip Mandate, the FCC cited to Tim Collings' April 7, 2003 and October 24, 2003 submissions, and to Congressman ████'s January 29, 2003, letter.  (SOF at ¶ 98.) As noted above, all three of these documents were submitted to the FCC without any indication that Mr. Collings was affiliated with Wi-LAN and/or that Wi-LAN owned the '402 Patent.  (SOF at ¶ 95, 97.)   Put simply, the 2004 FCC V-Chip Mandate issued not only without anyone disclosing to the FCC Wi-LAN's ownership interest in the '402 Patent or its relationship with Tim Collings, but also without any suggestion of their financial interests in the rules themselves. (SOF at ¶ 97, 99.)   Then, *on the day after the FCC released its Report and Order*, Wi-LAN issued a News Release proclaiming that the V-Chip Mandate requires a license under the '402 Patent.  (SOF at ¶ 100.)  The repercussions were immediate.

**D.    The CEA Notifies The FCC That Wi-LAN And Mr. Collings Failed To Disclose Their Financial Interest In The '402 Patent And The FCC Regulations.**

On November 3, 2004, less than two months after the FCC released its V-Chip Mandate, the CEA submitted its *Petition for Clarification and/or Reconsideration* ("Petition"), requesting that the FCC more explicitly set forth what its V-Chip Mandate requires for compliance.  (SOF at ¶ 101.)   But the CEA Petition served an additional, perhaps more important, purpose, it exposed Mr. Collings and Wi-LAN for withholding information relating to their ownership of the purportedly required '402 Patent.  (SOF at ¶ 100, 101.)  According to the CEA:

> It is critical for the Commission to consider that Tim Collings, a Canadian inventor who participated in this proceeding, holds a patent for the technology that may be necessary to enable television manufacturers to implement the new rules.  Licenses for this technology are being offered to manufacturers through Tri-Vision International Limited, a Canadian company in which Mr. Collings serves as a Director.  ***During the course of this proceeding, Mr. Collings participated but did not disclose to the FCC the fact that he claims an essential patent for the technology that the Commission ultimately adopted***.

(SOF at ¶ 101 (emphasis added).)  The CEA urged the FCC to take the necessary steps to ensure that Wi-LAN licenses the '402 Patent on "reasonable and non-discriminatory" terms.  (SOF at ¶ 10.)

The CEA also singled out Mr. Collings and Wi-LAN in its comments submitted in a related FCC docket, *Violent Television Programming and Its Impact on Children*.  (SOF at ¶ 103.)  Noting that Mr. Collings had suggested in an earlier comment that V-Chip should be available in all electronics used by children, the CEA, again, admonished Wi-LAN: "CEA urges caution against those parties who fail to disclose financial interests, while advocating mandatory action."  (SOF at ¶ 103.)  Mr. Collings and Wi-LAN's attorney, Mr. Richard Parr, met with FCC officials on November 19, 2004, to discuss the licensing issue raised in the CEA's Petition.  (SOF at ¶ 102.)  According to Mr. Collings, " ████████████████████████████████████

5

██████████████████████████████████████████

████████████████████████████████" (SOF at ¶ 102.)

On November 22, 2004, Wi-LAN and Mr. Collings submitted their *Opposition To Petition For Clarification And/Or Reconsideration By The Consumer Electronics Association* ("Opposition"), finally disclosing their relationship and ownership of the '402 Patent to the FCC. (SOF at ¶ 104.)  Wi-LAN agreed to "do whatever is necessary to ensure that the terms of the resultant licenses are reasonable, non-discriminatory and fair and, to the greatest extent possible, mutually agreeable."[3]  (SOF at ¶ 104.)

The Coalition For Independent Ratings Services ("Coalition") also submitted an opposition to the CEA Petition to the FCC.  (SOF at ¶ 106.)  What the FCC did not know, however, was that the Coalition had prepared and submitted its opposition *at Wi-LAN's request and with Wi-LAN's input*.  (SOF at ¶ 106–07.)  The Coalition's Opposition, of course, did not disclose to the FCC that Wi-LAN had not only requested it, but also edited its submission.  (SOF at ¶ 106–07.)  The similarities between Wi-LAN's and the Coalition's Oppositions were not lost on the CEA.  (SOF at ¶ 108.)  In the CEA Reply to Oppositions, filed with the FCC on January 31, 2005, the CEA noted that both the Coalition and Wi-LAN offered identical positions.  (SOF at ¶ 109 ("Tri-Vision's assertion is effectively the same as CFIRS and is equally incorrect.").)  To date, the FCC has not ruled on the CEA's Petition.  (SOF at ¶ 110.)

---

[3]     Rather than simply accept the fact that the CEA caught Wi-LAN red-handed trying to conceal its relationship with Tim Collings and the '402 Patent, Wi-LAN instead touted its Opposition to the CEA Petition as its "IP Proffer," to potential licensees as if such information was voluntarily disclosed and not at the behest of the CEA. (SOF at ¶ 105.)

6

**E.      While Wi-LAN Was Secretly Influencing The FCC's 2004 V-Chip Mandate, It Was Also Misrepresenting Its Interests To The Advanced Television Systems Committee To Obtain More Favorable Standard Language.**

Wi-LAN began participating in the Advanced Television Systems Committee, Inc.'s[4] ("ATSC") T3/S8 subcommittee discussions regarding the A/65[5] standard in August of 2003. (SOF at ¶ 112.)   Shortly thereafter, Wi-LAN joined the ATSC as an official member in September of 2003.  (SOF at ¶ 113.)  At the time, the ATSC had a patent policy that required its members to disclose patents that may be necessary to practice a proposed standard.  (SOF at ¶ 114.)  Despite this policy, Wi-LAN continued to withhold the disclosure of the '402 Patent from the ATSC for well over a year—all the while participating in the T3/S8 subcommittee and continuing to tell potential licensees that a '402 Patent license was necessary to comply with the FCC's 2004 V-Chip Mandate.  (SOF at ¶ 112, 118.)  It was only after the CEA blew Wi-LAN's cover that Wi-LAN contemplated disclosing the '402 Patent to the ATSC.  In a November 12, 2004, email, Mr. Collings acknowledged that "██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████"  (SOF at ¶ 117 (emphasis added).)  Wi-LAN finally disclosed its ownership of the '402 Patent to the ATSC on December 8, 2004, more than a year after joining the ATSC and four months after the FCC V-Chip Mandate had already issued, adopting the A/65 standard.  (SOF at ¶ 119.)

---

[4]      "The Advanced Television Systems Committee, Inc. is an international, non-profit organization developing voluntary standards for digital television.  The ATSC member organizations represent the broadcast, broadcast equipment, motion picture, consumer electronics, computer, cable, satellite, and semiconductor industries. (SOF at ¶ 24.)

[5]      The A/65 or PSIP standard "defines the standard protocol for transmission of the relevant data tables [e.g., RRT and EIT tables] contained within packets carried in the Transport Stream multiplex."  (SOF at ¶ 111.)

**F.**   **Wi-LAN Hires Dominic Perri And His Coalition For Independent Ratings Services To Act As Its Secret Lobbyist To Push Its Agenda On The FCC, Obtain Favorable CEA Standard Language, And to Exact Revenge On LG.**

Once the FCC, CEA, and ATSC learned that Wi-LAN failed to disclose its '402 Patent while advocating for standards and regulations purportedly requiring its use, Wi-LAN sought out the help of Dominic Perri of CFIRS to act as Wi-LAN's secret mouthpiece.  In Wi-LAN's own words:



- "████████████████████████████████████████
  ████████" (SOF at ¶ 132);

- "████████████████████████████████████████
  ████████████████████████████████" (SOF at ¶ 132);

- "████████████████████████████████████████
  ████████████████████████████████████████████" (SOF at ¶ 132);

- "████████████████████████████████████████
  ████████████████████████████████████████" (SOF at ¶ 132);

- "████████████████████████████████████████
  ████████████████████████████████" ((SOF at ¶ 132))

- "█████████████████████████████████████████
  ██████████████." (SOF at ¶ 132)

Wi-LAN perceived the likelihood of not being taken seriously by these organizations, having defrauded them once already—and thus recruited Mr. Perri to act as its ostensibly independent front.

---

[6]   "Mike" refers to Mike Fortkort, Wi-LAN's attorney.
[7]   "Tvl" refers to Tri-vision.
[8]   "Harris" refers to the Harris, Wiltshire & Grannis LLP law firm, of which Patricia Paoletta was a partner. Ms. Paoletta was counsel for the Coalition.

*1.     Background On The Coalition For Independent Ratings Services.*

The Coalition was not registered as an Illinois Educational/Political Not For Profit Corporation until November 20, 2007.  (SOF at ¶ 120.)  Notably, the Coalition has no current standing members.  (SOF at ¶ 121.)  Mr. Perri (conveniently) could not recall exactly when the Coalition's last standing members withdrew and it is reasonable to believe that there were no standing members after Wi-LAN began paying Mr. Perri.  (SOF at ¶ 121.)

. (SOF at ¶ 126.)

*2.     Wi-LAN And The Coalition Join Forces.*



." (SOF at ¶ 122.)

. (SOF at ¶ 123.)  I

. (SOF at ¶ 125.)

, ((SOF at ¶ 124,)

, (SOF at ¶ 135–36,)                              , (SOF at ¶ 135,)

.

*3.     Mr. Perri Is A Member Of The Wi-LAN V-Chip Team.*

Wi-LAN treats Dominic Perri as it does any other employee.  Wi-LAN personnel and Mr. Perri communicate regularly by phone and/or email.  (SOF at ¶ 127.)  Mr. Perri receives internal email from Wi-LAN employees designated not for general distribution.  (SOF at ¶ 128.)  As with other employees, Mr. Perri reports his goals and objectives for review ***and approval*** by his superiors.  (SOF at ¶ 129.)  Indeed, other Wi-LAN personnel refer to Mr. Perri as part of the Wi-LAN V-Chip team.  (SOF at ¶ 129.)

9

But in several key aspects, Wi-LAN does treat Mr. Perri differently than its other employees—to preserve the appearance of independence between the two entities.  (SOF at ¶ 131.)  For example, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  (SOF at ¶ 123.)   Further, in internal correspondence sent to other Wi-LAN personnel not intimately involved in its V-Chip licensing program, Dominic Perri is referred to simply as Wi-LAN's "lobbyist" and/or "consultant."  (SOF at ¶ 132.)  Wi-LAN has also referred to the Coalition as "our coalition" in internal Wi-LAN correspondence.  (SOF at ¶ 130.)

> **4.      *To The Outside World, Wi-LAN Took Painstaking Efforts To Preserve The Appearance Of Independence Between Itself And Mr. Perri And The Coalition.***

Wi-LAN admits that it attempted to conceal its relationship with the Coalition.  (SOF at ¶ 131) ("████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████.").)  ████████████████ ████████████████████████████████████████.  (SOF at ¶ 133.)  ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████.  (SOF  at  ¶ 133.)  ████████ ████████████████████████████████████████████████████ ████████████████████████████.  (SOF at ¶ 134.)

> **5.      *Wi-LAN And Mr. Perri Conspire To Defraud The FCC.***

Wi-LAN drafted and/or edited talking points and *ex parte* letters for the Coalition's meetings with FCC officials.  (SOF at ¶ 135–37.)  For example, Wi-LAN drafted talking points

for the Coalition's December 12, 2006, meeting with the FCC.  (SOF at ¶ 135.)  ███████████

███████████████████████.  (SOF at ¶ 135.)  After the meeting, Mr. Perri, as usual,

provided a detailed summary of what took place at the meeting to Wi-LAN.  (SOF at ¶ 135.)

The December 13, 2006, *ex parte* letter submitted by Patricia Paoletta on behalf of the Coalition,

to which Wi-LAN was invited to contribute, does not disclose any relationship between the

Coalition and Wi-LAN.  (SOF at ¶ 136–37.)

 At the meeting, the FCC "████████████████████████████████

████████████████████████████████."  (SOF at ¶ 136.)  Sensing

an opportunity, ***Wi-LAN*** had the idea to draft correspondence ***for the Coalition to send back to***

***Wi-LAN*** requesting its licensing and royalty rate information.  (SOF at ¶ 138.)  Of course, Wi-

LAN was careful to "clean" any documents sent to the Coalition to ensure that the documents did

not reflect any Wi-LAN metadata.  (SOF at ¶ 138.)  Once Wi-LAN "received" the

correspondence from the Coalition, it responded as if it had no connection to the Coalition.

(SOF at ¶ 138.)  On December 21, 2006, Mr. Perri sent an email to FCC officials summarizing

his "independent inquiry" into Wi-LAN's licensing practices.  (SOF at ¶ 138.)[9]

 But there is more; Wi-LAN conspired with the Coalition to (1) draft and ███ for a V-Chip

survey with the help of an independent surveying company, (2) have the results published as

those of the ████████████████████████████[10], and (3) have the

███████ submit the results to the FCC without the FCC's knowledge of Wi-LAN's involvement.

(SOF at ¶ 139.)  Wi-LAN then submitted comments to the FCC citing the ███████ survey results

as supporting a need for new or improved ratings and for "[e]xpansion of V-Chip capabilities

---

[9] Mr. Perri appended Wi-LAN's response to the Coalition's fraudulent inquiry to his email sent to the FCC.
(SOF at ¶ 138.)

[10] ████████████████████████████████████████████████████████.
(SOF at ¶ 139.)

with a simple download"—again, without ever disclosing that it drafted and ████████ the

survey.  (SOF at ¶ 139.)  The Coalition submitted comments to the FCC explaining that there is a

"need for data in a continually changing media environment"—again without disclosing its

relationship to the ██████ or Wi-LAN or even mentioning the survey in its comments.  (SOF at

¶ 139.)

<div style="margin-left:2em;">

    a.    <u>Wi-LAN Worked Through the Coalition To Enlist Third Party<br>Support For An RRT-05 Test To Try To Bolster Its '402 Patent<br>Infringement Position.</u>

</div>

Wi-LAN further conspired with the Coalition to obtain an RRT 5 broadcasting test to

bolster its infringement position with prospective licensees, including LG.  (SOF at ¶ 140.)  Wi-

LAN hoped to wield a public service announcement relating to the upcoming digital television

transmission "████████████████████████████████████████████████

████████."  (SOF at ¶ 140.)  Further, Wi-LAN drafted comments for the Coalition to give to

████████████ (to submit to the FCC) that supported testing "████████████████████

████████████████████."  (SOF at ¶ 140.)  As usual, Dominic Perri and Wi-LAN

concealed their relationship from third parties involved in the RRT 5 testing.  (SOF at ¶ 141.)

<div style="margin-left:2em;">

    b.    <u>Wi-LAN Directed the Coalition To Report Non-Compliant LG<br>DTV Receivers To The FCC.</u>

</div>

Wi-LAN understood that the FCC V-Chip Mandate could be "████████████████████

██████."  (SOF at ¶ 162.)  If nothing else, the CEA Petition reflected industry-wide confusion

regarding what the FCC's V-Chip Mandate actually required.  Armed with such knowledge, Wi-

LAN nonetheless directed the Coalition to report allegedly noncompliant DTV receivers to the

FCC, in the hope of convincing the FCC into enforcing its 2004 V-Chip Mandate against LG,

among others.  (SOF at ¶ 143–44.)  Towards that end, Wi-LAN drafted, edited, and/or reviewed

emails and letters for the Coalition to send to the FCC regarding LG's non-compliance (SOF at

<div align="center">12</div>

¶ 144.)  Further, Wi-LAN instructed Mr. Perri to report to the FCC his experiences in trying to upgrade an LG DTV using a software patch and also provided LG user manuals to the Coalition to show to the FCC.  (SOF at ¶ 144.)  With these efforts occurring in the background, Wi-LAN forwarded to LG a "very important filing to FCC by Coalition Group (we found this letter at FCC website)" indicating that the FCC directed the Coalition to report non-compliant DTV manufacturers to it.  (SOF at ¶ 146.)

> c.    <u>The Coalition Never Disclosed Its Relationship With Wi-LAN To The FCC.</u>

In spite of the extensive activities undertaken by the Coalition at Wi-LAN's behest, at no point did Mr. Perri or Patricia Paoletta ever register as a lobbyist on behalf of Wi-LAN.  Rather, Ms. Paoletta registered solely on behalf of certain Coalition member-entities, some of which were defunct by the time she registered.  (SOF at ¶ 147.)

Indeed it appears that Mr. Perri was less than truthful when appearing before and interacting with government officials, including those at the FCC.  ███████████████ ████████████████████████████████████████████████████ ███████████████████████████████:

- "███████████████████████████████ ████████████"
- "███████████████████████████████ ███████████"
- "███████████████████████████████ ██████████"
- "███████████████████████████████████████"
- "███████████████████████████████████ ███████"
- "███████████████████████████████████" (SOF at ¶ 148.)

> 6.     *Wi-LAN And The Coalition Conspire To Defraud The CEA In Direct Contravention of CEA Policy Requiring Them To Disclose Their Relationship and the '402 Patent.*

Wi-LAN was also intimately involved in all aspects of the Coalition's CEA activities. For instance, ▮▮▮▮▮▮▮ Mr. Perri to attend the CEA's Winter Technology and Standards Forum held in San Antonio, Texas, on February 28, 2007.  (SOF at ¶ 149.)  During the Forum, Mr. Perri suggested to Brian Markwalter of the CEA that they meet with Julie Kearney, head of policy for the CEA, back in Washington, after the conference, to discuss the availability of RRT-5 to independent ratings groups.  (SOF at ¶ 149.)  While Murray Eldon expressed concern that Wi-LAN was "▮▮▮▮▮▮▮▮▮▮▮" by having him meet with the CEA, Tim Collings assuaged Mr. Eldon's fears, noting:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(SOF at ¶ 149.)

Following the San Antonio Forum, the Coalition participated heavily in discussions and negotiations regarding CEA-766-B language.  On at least two occasions, the Coalition submitted spreadsheets of proposed changes to CEA-766 language that were authored by Wi-LAN and copied and submitted to the CEA by Mr. Perri.  (SOF at ¶ 150–51.)  For example, in an email to Tri-Vision concerning comments that would be discussed at the CEA's February 21, 2007, meeting, Mr. Perri stated: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"

(SOF at ¶ 150.)  From the other participants' perspectives, they were negotiating with Mr. Perri of the Coalition.  (SOF at ¶ 150.)  In reality, Wi-LAN was directing Mr. Perri as to what to submit and how to respond.  (SOF at ¶ 150.)  For example, after Mark Eyer of Sony Electronics

offered a particular phrase to include in CEA-766-B, Mr. Perri forwarded Mark Eyer's email to Mr. Collins and Mr. Eldon of Wi-LAN with the subject line "███████" Mr. Collings responded with Mr. Perri's marching orders.  (SOF at ¶ 150.)

In spite of the extensive relationship between the two parties, neither Wi-LAN nor Mr. Perri ever disclosed their relationship to the CEA, even as both parties "independently" worked to obtain changes to the CEA-766-A standard that would read on Wi-LAN's '402 Patent.  (SOF at ¶ 152.)  As noted above, Tri-Vision and Mr. Perri went so far as to make sure that documents drafted by Tri-Vision, but submitted by the Coalition to the CEA, were independently entered into excel spreadsheets by the Coalition to prevent any Wi-LAN metadata from reaching the CEA and exposing their relationship.  (SOF at ¶ 150–51.)  In Mr. Perri's words, "███████ ████████████████████████████████████████████████ ██████████████████████" (SOF at ¶ 152.)  Instead, Mr. Perri  thought it preferable to give the false impression that there was no relationship at all between Wi-LAN and the Coalition.

CEA policy requires that "[c]onsultants who participate in a CEA Technology & Standards formulating, working or task group … declare an affiliation from among the following options: a) single-member affiliated; OR b) independent."  (SOF at ¶ 153.)[11]  CEA policy further requires that "all [meeting] attendees shall indicate their affiliation (company, organization or client whose interests are represented for purposes of that meeting)…."  (SOF at ¶ 153.)  The CEA also has a patent disclosure policy, requiring "that formulating group members … disclose any knowledge they may have of existing relevant patents."  (SOF at ¶ 156.)  The CEA also maintains a Special Guide Applicable To Standardization Programs.  (SOF at ¶ 153.)  According

---

[11]     A single-member affiliate consultant is one who "represent[s] a single company or organization for purposes of all of the consultant's work related to a single formulating group."  (SOF at ¶ 153.)

to this policy, "[a]ll CEA standardization programs … shall be carried on in good faith" and "[t]hey shall not be proposed for or indirectly result in … giving a competitive advantage to any manufacturer…."  (SOF at ¶ 153.)

Both Wi-LAN and Mr. Perri failed to disclose their relationship and the '402 Patent in violation of CEA policy.  (SOF at ¶ 152–53.)  Wi-LAN directed and ██████ Mr. Perri's CEA activities.  (SOF at ¶ 149–51.)  Mr. Perri has ████████  █████████████ with respect to communications with Wi-LAN attorneys.  (SOF at ¶ 154.)  And, of course, Mr. Perri knew that Wi-LAN had a patent related to V-Chip technology. (SOF at ¶ 157.)

### G.   Since 2004, Wi-LAN Has Attempted, Unsuccessfully, To "Hold-Up" The Entire Digital Television Receiver Market Using Bad Faith Patent Licensing Tactics.

In addition to the numerous bad faith activities undertaken by Wi-LAN discussed above, Wi-LAN further conducted its '402 Patent licensing program in bad faith.  For example, over the course of Wi-LAN's licensing campaign, Wi-LAN was fully aware that its infringement claims with respect to Claim 7 of the '402 Patent were objectively baseless because:  (1) Wi-LAN could not show that every step of the method claimed in Claim 7 of the '402 Patent was actually performed to demonstrate infringement (SOF at ¶ 161); (2) Claim 7 requires receipt of two sets of configuration information, not just RRT1 (SOF at ¶ 10); (3) the FCC has never required RRT-1 to be broadcast since the 2004 FCC V-Chip Mandate (SOF at ¶ 160); (4) the patentee disclaimed the application of the '402 Patent to receivers with advance knowledge of the received configuration information describing an informational scheme in the specification and during prosecution (SOF at ¶ 10, 12); (5) most manufacturers hardwired RRT-1 in their DTV receivers (SOF at ¶ 162); (6) most consumers do not use V-Chip, much less store their user preferences (SOF at ¶ 162); (7) the FCC's 2004 V-Chip Mandate does not read on Claim 7 of the '402 Patent (SOF at ¶ 162.); and (8) Wi-LAN attempted to change its infringement theory to

16

require only one RRT (RRT-1), which renders Claim 7 not infringed and invalid, based at least upon the above-mentioned public use of the alleged invention in Buffalo, New York in the 1993–1996 timeframe.  (SOF at ¶ 94.)

In spite of all of the above, Wi-LAN made the following bad faith, objectively baseless, and insupportable licensing representations to various potential and actual '402 Patent licensees including LG:

- Wi-LAN asserted to potential licensees that compliance with the FCC regulations requires a '402 Patent license because there is no way to design around the '402 Patent and still comply with FCC regulations (SOF at ¶ 100, 161);

- Wi-LAN offered potential licensees a '402 Patent license at the same time it offered licenses to the much broader Canadian counterpart to the '402 Patent (which included apparatus claims unlike the '402 Patent), thereby improperly tying the '402 Patent to its Canadian counterpart (SOF at ¶ 164);

- Wi-LAN intentionally misrepresented the scope of Claim 7 of the '402 Patent by arguing that a DTV receiver need only have the "capability" of infringing to infringe (SOF at ¶ 161);

- Wi-LAN misrepresented the scope of the '402 Patent in licenses by expanding the definition of products covered under its '402 Patent license agreements so that it would have a breach of contract claim threat—even though it did not have an actual infringement claim (SOF at ¶ 212);

- Wi-LAN attempted to improperly expand the scope of the '402 Patent by collecting or attempting to collect double royalties on the same product through its licenses with OEMs, brands, and component manufacturers (SOF at ¶ 165);

- Wi-LAN offered '402 Patent licenses on unfair, unreasonable, and discriminatory terms notwithstanding its purported proffers to the FCC, CEA, and ATSC (SOF at ¶ 166);

### H.   Wi-LAN Intentionally Withheld Indisputably Material Information From The United States Patent And Trademark Office During The '402 Patent Reexamination.

The declaration of Wi-LAN's expert, Craig Tanner, submitted as part of the '402 Patent Reexamination, contains outright falsehoods that contradict Mr. Tanner's own previous statements.  During his tenure as Executive Director of the ATSC, Mr. Tanner sent a letter to

Intel Corporation on October 10, 1998, discussing the ATSC's disclosure policies.  (SOF at ¶ 25.)  In that letter, Mr. Tanner block-quotes the ATSC non-disclosure agreement that meeting attendees must sign.  (SOF at ¶ 25.)  After quoting the non-disclosure agreement, Mr. Tanner summarized the ATSC's policy: "In summary, the ATSC meetings and websites and mailing lists are open to all ATSC members, ***and to interested parties who are non-members***.  They simply are not open to the press." (SOF at ¶ 25.)

Yet, Mr. Tanner reaches the exact ***opposite*** conclusion regarding the GI *System Information Description* Proposal ("GI Reference")[12] that was distributed to the ATSC in his reexamination declaration, relying on the ***same*** non-disclosure policy that he quoted in his October 1998 letter.  (SOF at ¶ 25, 36.)  In attempting to disqualify the GI Reference as prior art, Mr. Tanner unequivocally asserts in his reexamination declaration that the GI Reference "was a private discussion document ***only for ATSC members***."  (SOF at ¶ 36.)  Elsewhere in his declaration Mr. Tanner explains that the GI Reference "was an internal ATSC document subject to strict privacy and confidentiality requirements, and therefore was not available to interested members of the general public."  (SOF at ¶ 36.)  In support of his conclusion, Mr. Tanner block quotes the ***identical*** non-disclosure agreement language that he quoted in his October 10, 1998, letter—but without his summary.  (SOF at ¶ 36.)

Wi-LAN has likewise withheld other material information from the PTO during the '402 Patent Reexamination relating to the publication status of the GI Reference.  Wi-LAN retained ██████████, ████████████████████████████████████████████████████████ ████████, to research the disclosure history of the GI Reference to the ATSC. (SOF at ¶ 29.) Wi-LAN's agreement with ████████ contains ██████████████████████.  (SOF at ¶ 30.) ***Wi-LAN retained*** ████████ ***to prevent him from disclosing information to other parties that***

---

[12]     The publication status of the GI Reference is at issue in the '402 Patent reexamination.

*would serve to invalidate the '402 Patent*. (SOF at ¶ 30.) On or about November 6, 2006, ███ ███ submitted his *Report on Disclosure/Publication of General Instrument System Information Protocol* to Wi-LAN. (SOF at ¶ 29.) ██████ ██████ ████████



████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ██████████. (SOF at ¶ 29.)

Wi-LAN did not disclose ████████ Report to the PTO nor, apparently, to Mr. Tanner, as Mr. Tanner never mentioned ████████ or his conclusions in his '402 Patent reexamination declaration. (SOF at ¶ 36.) To the contrary, Mr. Tanner declares that he has "seen no direct evidence that such a distribution [of the GI Reference] to the [T3/S8] Specialist Group members actually occurred" and that "there is no indication that [the GI Reference] was available for discussion at the June 19, 1995, Meeting. (SOF at ¶ 36.) ████████ *conclusions, clearly known to Wi-LAN, state otherwise*—yet they were not disclosed to the PTO. (SOF at ¶ 29.)

## I. Wi-LAN's Pattern Of Deceitful Behavior Has Carried Over Into The Current Litigation.

### 1. Wi-LAN's Woefully Deficient Privilege Log

As the Court is aware, Wi-LAN used its privilege log as a "document protection program" for non-privileged, discoverable documentation that, amongst other things, enabled it to pose gross misrepresentations to the Court and Defendants—misrepresentations that it truly would not have been able to make had those documents been produced in the ordinary course of discovery. As of October 26, 2010, Wi-LAN had provided a one-foot tall stack of more than 2,600 pages of privilege log entries, shielding from production 26,029 documents (more than

125,000 pages) under the guise of privilege.  (SOF at ¶ 167.)  At the October 29, 2010, hearing, only after LG had brought the privilege log issue to the Court's attention, Wi-LAN finally admitted that it had mis-designated a large number of documents on its privilege log.  (SOF at ¶ 168.)  On November 8, 2010, Wi-LAN served its Amended 319 page privilege log, which had shrunk almost 90% from its original 2,651 pages, shrinking the number of documents designated as privileged from 26,029 to 3,224, and produced 127,133 pages of documents off of its privilege log—a production that constituted approximately one-third of Wi-LAN's total document production to date.  (SOF at ¶ 168.)

### 2.  *Wi-LAN's Numerous Attempts To Vitiate The Court's Protective Order*

As the Court is also aware, Wi-LAN has ignored the Prosecution Bar set forth in the Court's Protective Order at its own choosing.  On five separate occasions, the Court has ruled that persons involved in the '402 Patent reexamination may not have access to Defendants' CONFIDENTIAL ATTORNEYS' EYES ONLY materials: (1) The Court's initial entry of the Protective Order (Dkt. 54); (2) the Court's denial of Plaintiff's Motion for Reconsideration (Dkt. 66); (3) The Court's December 21, 2010, telephonic ruling that Mr. Meyer and Mr. Tanner be precluded from access to Defendants' AEO materials during a third-party deposition (SOF at ¶ 169); (4) the Court's January 3, 2011, order precluding Mr. Meyer from accessing Defendants' AEO materials (Dkt. 99); and (5) Judge Kaplan's February 25, 2011, affirmation of Magistrate Judge Peck's January 3, 2011, order (Dkt. 138).  Notwithstanding the Court's clear position, Wi-LAN proceeded to violate those very orders.  (SOF at ¶ 169.)

### 3.  *Wi-LAN's Refusal To Agree To A Formal Claim Construction.*

Knowing that its claims are objectively baseless, Wi-LAN has gone to great lengths to avoid having the Court construe the claims of the '402 Patent, insisting that a formal claim construction would be "burdensome and unnecessary."  (SOF at ¶ 170.)

20

III.    ARGUMENT

    A.    **Summary Judgment**

A grant of summary judgment pursuant to Rule 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

    B.    **Wi-LAN's Fraudulent Conduct With Respect To The Acquisition And Licensing Of The '402 Patent Rises To The Level Of Unclean Hands And Patent Misuse.**

"[H]e who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The doctrine of unclean hands requires that a party who comes to the court shall have acted fairly and without fraud, bad faith, inequitableness, or deceit relative to the subject matter of the suit. *Id.*; *See also Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933) (affirming dismissal based on unclean hands where patentee purchased the silence of a person who would have provided grounds to invalidate the patents-in-suit in a prior case). Moreover, when a suit concerns the public interest as well as the private interests of the litigants, the unclean hands doctrine assumes more significant proportions. *Precision*, 324 U.S. at 815 (holding that the assertion of patent is affected with a public interest and that in such a suit the facts must be measured by both public and private standards of equity).[13]

The doctrine of patent misuse is an extension of the equitable doctrine of unclean hands to the patent field and "relates generally to the use of patent rights to obtain or coerce an unfair

---

[13] Fraud before the Patent Office, litigation misconduct, and patent misuse can also bar a litigant under the doctrine of unclean hands. *See, e.g., Windbond Elecs. Corp. v.* ITC, 262 F.3d 1363, 1372 (Fed. Cir. 2001) (misconduct before the Patent Office); *Aptix Corp. v. Quickturn Design Systems, Inc.*, 269 F.3d 1369, 1376–77 (Fed. Cir 2001) (litigation misconduct); *Molding Corp. v. BW Photo Utilities*, 319 F.2d 347, 351 (9th Cir. 1963) (misconduct before the Patent Office, concealment of evidence from the court, and patent misuse).

commercial advantage." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998). The "policy of the patent misuse doctrine is to prevent a patentee from using the patent to obtain market benefit beyond that which inures in the statutory patent right." *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1339 (Fed. Cir. 2006).  Patent misuse can be established when "the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect," *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997), or when the patentee's conduct violates the public policies addressed by the patent laws. *See Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 494 (1942).

Wi-LAN is nothing if not consistent—its decade-plus history of bad faith and deceitful conduct intended to broaden the scope of its '402 Patent presents a tutorial on unclean hands and patent misuse.  Wi-LAN undertook each one of its fraudulent activities to achieve its ultimate goal of obtaining unjustified royalties from LG and the rest of the digital television receiver industry.  Wi-LAN withheld relevant information from the PTO in not one, but two, proceedings to preserve its patent.   Wi-LAN drafted numerous "third party" FCC submissions that encouraged the FCC to adopt apparently favorable regulations to Wi-LAN's licensing program, all without the FCC's knowledge.  At the same time, Wi-LAN was participating in the A/65 standard setting process for over a year before disclosing its patent in violation of ATSC policy. Indeed, Wi-LAN disclosed its patent to the ATSC only ***after*** the CEA exposed its dishonest behaviors in its Petition and after the FCC mandated the industry-wide adoption of A/65.  But Wi-LAN was not discouraged.  It proceeded to have its "independent lobbyist" negotiate for changes to CEA-766-B that were apparently favorable to Wi-LAN's licensing program, without the CEA's knowledge.  Wi-LAN even went so far as to have Mr. Perri's Coalition report LG's non-compliance with the V-Chip Mandate to the FCC.  As Mr. Perri seemingly understands,

given his ████████████████████████████████████████████████[14] Wi-LAN was wrong for, among other reasons, using the ostensibly independent Coalition to encourage the FCC to investigate LG to indirectly pressure it into paying royalties to Wi-LAN.  To this day, Wi-LAN continues to conceal its relationship with the Coalition from both the CEA and the FCC.

All the while, Wi-LAN falsely asserted to LG, among others, that a '402 Patent license was required to comply with the FCC Mandate, knowing that (1) there was industry-wide confusion regarding what the FCC V-Chip Mandate actually required and (2) it had no evidence of *actual* use of its patented method requiring LG, let alone any DTV manufacturer, to pay '402 Patent royalties.  To further induce royalty payments from its '402 Patent licensees, Wi-LAN broadened the definition of V-Chip DTV Receivers in its '402 Patent license agreements to cover products that are merely *capable* of infringing but do not necessarily infringe the '402 Patent. Wi-LAN's actions impermissibly enlarged the "physical" scope of the '402 Patent, giving Wi-LAN an unfair commercial advantage.[15]

---

[14]     A non-party's assertion of the Fifth Amendment right against self-incrimination in the course of civil litigation warrants an adverse inference against the party itself. *Libutti v. U.S.*, 107 F.3d 110, 124 (2d Cir. 1997). ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[15]     Further, by knowingly and falsely asserting that there is no "design around" for the '402 Patent, Wi-LAN has engaged in false advertising in violation of section 43(a) of the Lanham Act.  15 U.S.C § 1125(a); *Zenith Elecs. Corp. v. Touchsys., Inc.*, 182 F.3d 1340, 1354-55 (Fed. Cir. 1999) (recognizing a § 43(a) violation for bad faith assertions of patent infringement, such as "statements to the effect that a competitor is incapable of designing around the patent").  Internally, Wi-LAN admitted that the FCC regulations are subject to multiple interpretations, yet told licensees that the FCC regulations require use of the '402 Patent's technology.  Wi-LAN told these falsehoods to induce licensees to pay royalties for products not within the scope of the '402 Patent.

Wi-LAN's baseless claims and dishonest behaviors carried over into this litigation, where it had no qualms withholding nearly 130,000 pages of relevant documents evidencing the scheme outlined above, not to mention burdening both LG and the Court with the associated privilege log dispute.  If there ever was a litigant deserving of unclean hands and patent misuse rulings, it is Wi-LAN.

### C.   Wi-LAN's Intentional Failure To Disclose Indisputably Material Documents To The PTO Constitutes Inequitable Conduct.

"Applicants for patents are required to prosecute patent applications in the PTO with candor, good faith, and honesty."  *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995) (citing *Precision Instrument*, 324 U.S. at 818).   Applicants have a duty to disclose information material to patentability to the PTO.  37 C.F.R. § 1.56(b) (2006).  When an applicant makes an affirmative representation of material fact or fails to disclose material information with an intent to deceive the U.S. Patent and Trademark Office, its patent is unenforceable due to inequitable conduct.  *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1363 (Fed. Cir. 2007). "[I]nformation is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.'" *Cargill*, 476 F.3d at 1364 (quoting 37 C.F.R. § 1.56(a) (1991)).   "Intent rarely can be, and need not be, proven by direct evidence.  Instead, an intent to deceive is usually inferred from the facts and circumstances surrounding the conduct at issue."  *Id.* at 1364 (internal citations omitted).

The applicant's intentional failure to disclose the *Violence and Television: The Canadian Example* ("VT") paper written by the inventor himself, as well as any documentary evidence of the V-Chip usage of several different rating systems in Buffalo, NY in the 1993-1996 timeframe, constitutes inequitable conduct that renders the '402 Patent unenforceable.  The Examiner in the '402 Patent reexamination noted that the combination of VT along with the other references cited

in the reexamination raised a substantial new question of patentability.  (SOF at ¶ 35.)  Of course, documentary evidence of V-Chip usage in Buffalo, NY, in the 1993-1996 timeframe is material to patentability because such public use would have occurred more than one year before the filing of the '402 Patent application and would therefore operate as a statutory bar to patentability.  *See In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983).

Wi-LAN intended to deceive the PTO when it failed to disclose VT and any documentary evidence of public usage of the V-Chip.  At the outset, the high materiality of these documents suggests that the applicant intended to deceive the PTO by failing to disclose them.  Also, the mere fact that Mr. Collings was invited to present this paper at the Sorbonne in Paris, France, suggests that he would not likely have simply forgotten about the VT document.  Similarly, the public usage in Buffalo, NY took place over a three year time period and was not a single isolated event susceptible to an innocent bout of forgetfulness before the PTO.

Wi-LAN's submissions during the '402 Patent reexamination further evidence its continued intent to deceive the PTO.  Craig Tanner's conclusion that the GI reference does not qualify as a printed publication based on his new re-interpretation of the ATSC's disclosure policy directly contradicts his own statements made several years prior in view of the ***very same policy***.  According to a letter Mr. Tanner wrote back in 1998, the ATSC disclosure policy did not prevent the distribution of ATSC documents to interested parties other than the press.  Yet, according to his reexamination declaration, the very same disclosure policy prevented interested parties from obtaining the GI reference.  Mr. Tanner's opinions are totally incompatible, casting doubt on the truthfulness of Mr. Tanner's assertions in the '402 Patent reexamination.

Further, Wi-LAN has withheld more information and at least one additional indisputably relevant document from both the PTO and Mr. Tanner.  ███████████ November 2006 report on

25

the publication of the GI reference was never disclosed to the PTO despite containing highly material information regarding the prior art status of the GI reference—information that directly contradicts the assertions made by Mr. Tanner in his declaration. ***Wi-LAN retained*** ███████ ***under a*** ███████████████████████ ***to prevent him from disclosing to other parties his knowledge regarding the publication status of GI.*** Wi-LAN's silencing of ███ ███ to conceal highly relevant information from the PTO, among others, shows a blatant, indeed troubling disregard for the duties of candor and good faith that Wi-LAN owes to the Patent Office.

Unquestionably, the highly relevant nature of these undisclosed documents and information, coupled with the underhanded tactics employed by Wi-LAN to shield information from the PTO, tips the balance of equities in favor of a finding of inequitable conduct.

### D. Wi-LAN's Failure To Disclose Its Ownership Of The '402 Patent While It Participated In The A/65 Standard Setting Process Is An Equitable Estoppel That Renders The '402 Patent Unenforceable.

Where a disclosure duty exists in the standard-setting context, a member's failure to disclose its intellectual property rights gives rise to the equitable defense of equitable estoppel, which prevents patent enforcement and serves as an absolute bar to a claim for infringement. *See Qualcomm v. Broadcomm*, 548 F.3d 1004, 1022–1024 (Fed. Cir. 2008). Although a finding of equitable estoppel leads to a patent being held unenforceable, this defense need be proven only by a ***preponderance of the evidence.*** *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1045–46 (Fed. Cir. 1992) (adopting and applying preponderance of evidence standard to defense of equitable estoppel). Equitable estoppel is established when a patent holder's misleading conduct demonstrates an intent not to enforce its patent, and an accused infringer would be materially prejudiced if the patent holder was permitted to proceed with its infringement allegations. *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310

(Fed. Cir. 2010).[16]   A patentee's misleading conduct or apparent intent not to enforce its patent may be shown by statements or conduct, as well as by silence or inaction where there is an obligation to speak or act.  *A.C. Aukerman*, 960 F.2d at 1028, 1041; *Aspex Eyewear*, 605 F.3d at 1310 ("misleading 'conduct' may include specific statements, action, inaction, or silence when there was an obligation to speak"); *Molins*, 48 F.3d at 1180 ("[T]he natural consequences of [actions] are presumably intended by the actor"); *Hynix Semiconductor, Inc. v. Rambus Inc.*, No. CV-00-20905, 2006 U.S. Dist. LEXIS 48028, at *18 (N.D. Cal. July 6, 2006) (A "patentee's course of conduct" can "support[] an inference that the patentee did not intend to press an infringement claim," whether or not a participant  knew of the patent).

For more than a year, Wi-LAN participated as a member of the ATSC T3/S8 subcommittee, vying for A/65 standard language that it purports to read on the '402 Patent without disclosing the '402 Patent to the ATSC in violation of its patent policy.  Even after the FCC adopted the A/65 standard, Wi-LAN withheld its patent from the ATSC until after the CEA exposed Wi-LAN.  Zenith, LG's exclusive licensee, disclosed LG's patents in accordance with ATSC policy.  (SOF at ¶ 115.)  LG reasonably expected that other ATSC members would follow suit.  As such, A/65 discussions proceeded under the assumption that all allegedly essential patents had been disclosed.  Not so.  Wi-LAN was silent when it had an obligation to disclose the '402 Patent, which leads to but one conclusion: it had no intent to enforce the '402 Patent.  Any other conclusion would materially prejudice LG as evidenced by Wi-LAN's current position that the FCC regulations adopting the A/65 standard reads on the '402 Patent.

---

[16]      *See also Potter Instr. Co. v. Storage Tech. Corp.*, 207 U.S.P.Q. 763, 769 (E.D. Va. 1980), *aff'd*, 641 F.2d 190 (4th Cir. 1981) ("Equity will rarely, if ever, permit one to waive by acquiescence its alleged patent rights, for a long period of time and attempt to assert them after they have been adopted as the industry standard"); *Stambler v. Diebold Inc*., No. 85 CV 3014, 1988 U.S. Dist. LEXIS 10132, at *19 (E.D.N.Y. Aug. 30, 1988) (holding that a patent holder "could not remain silent while an entire industry implemented the proposed standard and then when the standards were adopted assert that his patent covered what manufacturers believed to be an open and available standard").

## IV.    RELIEF REQUESTED

For the reasons stated herein, Defendants respectfully request that this Court grant Defendants' Motion For Summary Judgment Of Unenforceability Based On Unclean Hands, Inequitable Conduct, Patent Misuse, and Equitable Estoppel.

Dated: April 1, 2011                    Respectfully submitted,

GREENBERG TRAURIG, LLP

**/s/ _Richard D. Harris_**
Richard A. Edlin (RE 1998)
Daniel I.A. Smulian (DS 4746)
200 Park Avenue
New York, New York 10166
(212) 801-6528 (*telephone*)
(212) 801-5528 (*facsimile*)
edlinr@gtlaw.com
smuliand@gtlaw.com

Richard D. Harris (*pro hac vice*)
Jeffrey G. Mote (*pro hac vice*)
James J. Lukas, Jr. (*pro hac vice*)
Eric J. Maiers (*pro hac vice*)
Matthew J. Levinstein (*pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 456-8400 (*telephone*)
harrisr@gtlaw.com
motej@gtlaw.com
lukasj@gtlaw.com
maierse@gtlaw.com
levinsteinm@gtlaw.com

Attorneys for Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 1, 2011, the foregoing **Defendants' Memorandum Of Law In Support Of Their Motion For Summary Judgment Of Unenforceability Based On Unclean Hands, Inequitable Conduct, Patent Misuse, and Equitable Estoppel** was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel that have appeared for any party in this matter.


*/s/ **Richard D. Harris**_____
Richard D. Harris