CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

**WI-LAN INC.,**                                          **10 CV 432 (LAK) (AJP)**

       Plaintiff,

v.

**LG ELECTRONICS, INC. and LG
ELECTRONICS U.S.A., INC.,**

       Defendants.

------------------------------------------------------------- x

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT ON THE ISSUES OF FRAUDULENT INDUCEMENT AND STANDING

Richard A. Edlin (RE 1998)
Daniel I.A. Smulian (DS 4746)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-6528 (*telephone*)
(212) 801-5528 (*facsimile*)
edlinr@gtlaw.com
smuliand@gtlaw.com

Richard D. Harris (*pro hac vice*)
Jeffrey G. Mote (*pro hac vice*)
James J. Lukas, Jr. (*pro hac vice*)
Eric J. Maiers (*pro hac vice*)
Matthew J. Levinstein (*pro hac vice*)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 456-8400 (*telephone*)
harrisr@gtlaw.com
motej@gtlaw.com
lukasj@gtlaw.com
maierse@gtlaw.com
levinsteinm@gtlaw.com

Attorneys for Defendants LG Electronics, Inc.
and LG Electronics U.S.A., Inc.

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   FACTUAL BACKGROUND ..................................................................................... 2

    A.   Background Pertinent To The Rule 12(c) Motion ........................................ 2

    B.   Statement of Relevant, Undisputed Facts Pertinent To Motion For Summary
        Judgment ....................................................................................................... 2

        1.   The '402 Patent And Plaintiff's Licensing Program .......................... 2

        2.   Tri-Vision's Negotiations And License Agreement With LG. .................... 4

        3.   Wi-LAN's Licensing Activities After The LG License Agreement .......... 6

III.  PERTINENT LEGAL STANDARDS ........................................................................ 7

    A.   Judgment On The Pleadings Standard .......................................................... 7

    B.   Summary Judgment Standard ....................................................................... 7

IV.   ARGUMENT ........................................................................................................... 8

    A.   Wi-LAN Lacks standing to assert its patent infringement claim .................. 8

        1.   Standing Is Required At The Time The Complaint Is Filed. .................... 8

        2.   Wi-LAN Alleges Facts Establishing That LG Was Licensed At The Time The
            Original Complaint Was Filed. ....................................................... 10

    B.   LG Is Entitled To Summary Judgment On Wi-LAN's Fraudulent Inducement Claim
        Pursuant To Fed. R. Civ. P. 56(c) ............................................................. 14

        1.   Wi-LAN Cannot Establish An Actionable Affirmative Misrepresentation By LG.. 15

            a.   LG received a lower "effective" royalty rate because Wi-LAN first suggested, and
               then, unilaterally withdrew, an advertising agreement. ........................... 17

            b.   LG never promised Tri-Vision it would use the patented technology. ..................... 18

            c.   LG never promised to sell a particular "volume" of licensed products or pay a
               minimum amount of royalties to Tri-Vision. ...................................... 20

            d.   There is no evidence whatsoever that LG did not intend to perform its obligations
               at the time it executed the License Agreement. .................................. 21

        2.   Wi-LAN Cannot Establish Reasonable Reliance. ................................ 22

V.    CONCLUSION ....................................................................................................... 24

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

## **TABLE OF AUTHORITIES**

### **Federal Cases**

*Agreement. Osan Limited v. Accenture LLP*,
    454 F.Supp.2d 46 (E.D.N.Y. 2006). ........................................................................ 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................................... 8

*Ashcroft v. Iqbal*,
    129 S.Ct. 1937 (2009) .................................................................................................. 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 570 (2007) ............................................................................................ 7

*C3 Media & Marketing Group, LLC, v. Firstgate Internet, Inc.*, 419 F.Supp.2d 419, 430
    (S.D.N.Y. 2005) ........................................................................................................... 16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................................... 8

*Colorado v. New Mexico*,
    467 U.S. 310 ................................................................................................................. 16

*County Materials Corp. v. Allan Block Corp.*,
    431 F. Supp. 2d 937 (D. Wis. 2006) ........................................................................... 20

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010) ....................................................................................... 7

*Dow Chem. Co. v. United States*,
    226 F.3d 1334, 1346 (Fed. Cir. 2000) ....................................................................... 11

*Dow Jones & Co. v. Ablaise Ltd.*,
    606 F.3d 1338 (Fed. Cir. 2010) .................................................................................. 9

*Fax Telecommunicaciones, Inc. v. AT&T*,
    138 F.3d 479 (2d Cir. 1998) ....................................................................................... 23

*Ferguson v. Lion Holding, Inc.*,
    312 F. Supp. 2d 484 (S.D.N.Y. 2004) ............................................................ 11, 12, 13

*Hilgraeve Corp. v. Symantec Corp.*,
    265 F.3d 1336 (Fed. Cir. 2001) .................................................................................. 10

*Johnson v. Rowley,*,
    569 F.3d 40 (2nd Cir. 2009) ....................................................................................... 7

*Katara v. D.E. Jones Commodities, Inc.*,
    835 F.2d 966 (2d Cir. N.Y. 1987) ............................................................................... 14

*Keene Corp. v. United States*,
    508 U.S. 200, 207, 124 L. Ed. 2d 118, 113 S. Ct. 2035 (1993) ................................. 9

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

*Ladenburg Thalmann & Co. v. Imaging Diagnostic Systems, Inc.*,
176 F. Supp. 2d 199 (S.D.N.Y. 2001)........................................................................ 11

*Leatherman Tool Group Inc. v. Cooper Indus., Inc.*,
131 F.3d 1011 (Fed. Cir. 1997)................................................................................ 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538  (1986)......................................... 8

*May Department Stores Co. v. International Leasing Corp.*,
1 F.3d 138 (2d Cir. 1993)......................................................................................... 14

*McKenna v. Wright*,
386 F.3d 432 (2d Cir. 2004)..................................................................................... 10

*Medimmune Inc. v. Genentech, Inc.*,
549 U.S. 118 ............................................................................................................ 14

*Monsanto Co. v. Scruggs*,
459 F.3d 1328 (Fed. Cir. 2006)................................................................................ 10

*Newman-Green, Inc. v. Alfonzo-Larrain*,
490 U.S. 826, 104 L. Ed. 2d 893, 109 S. Ct. 2218  (1989)........................................ 9

*Nisselson v. Lernout*,
469 F.3d 143 (1st Cir. 2006).................................................................................... 10

*Pandrol USA, LP v. Airboss Ry. Products, Inc.*,
320 F.3d 1354 (Fed. Cir. 2003).................................................................................. 9

*Paradise Creations, Inc. v. UV Sales, Inc.*,
315 F.3d 1304 (Fed. Cir. 2003)............................................................................ 9, 10

*Pixton v. B & B Plastics, Inc.*,
291 F.3d 1324 (Fed. Cir. 2002).................................................................................. 9

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 ......................................................................................................... 9, 19

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)..................................................................................... 15

*Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*,
263 F.3d 26 (2d Cir. N.Y. 2001)............................................................................... 11

*Syntellect Tech. Corp. v. Brooktrout Tech., Inc.*, No. C 96-2789, 1998 WL 24921 (N.D.
Tex. May 11, 1998)................................................................................................... 10

*U.S. Philips Corp. v. Int. Trade Comm.*,
424 F.3d 1179 (Fed. Cir. 2005)................................................................................ 19

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
395 U.S. 100 ............................................................................................................ 20

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

## State Cases

*Stone v. Schulz,*
   231 A.D.2d. 707, 647 N.Y.S.2d 822 (2d Dep't 1996) ............................................................. 23

*Sutton Assocs. v. Lexis-Nexis,*
   196 Misc.2d 30, 761 N.Y.S.2d 800, 803 (N.Y. Sup. Ct., Nassau Co. 2003) ........................... 20

## Federal Statutes

28 U.S.C. § 1338 ........................................................................................................................ 8, 9

35 U.S.C. § 154(a)(1) ..................................................................................................................... 19

Error! No table of authorities entries found.**Federal Rules**

Fed. R. Civ. P. 12(b)(6) ..................................................................................................................... 7

Fed. R. Civ. P. 12(c) ..................................................................................................................... 1, 7

Fed. R. Civ. P. 56(a) .......................................................................................................................... 8

## State Rules

Fed. R. Civ. P. 12(h)(3) ..................................................................................................................... 9

## Federal Regulations

47 C.F.R. § 15.120 ............................................................................................................................. 3

Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively, "LG") submit this memorandum in support of their motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) or, alternatively, for summary judgment under Fed. R. Civ. P. 56(c).

## I.   PRELIMINARY STATEMENT

As a threshold matter, Wi-LAN lacks standing to assert its patent infringement claim because it has, in effect, pled itself out of court by alleging facts that conclusively establish LG's affirmative defense of license.  Here, Wi-LAN's pleadings conclusively demonstrate that LG was licensed under the '402 patent at the time the lawsuit was filed.  Because Wi-LAN did not have a patent enforceable against LG when it filed suit, Wi-LAN lacks standing to assert a patent infringement claim, thereby depriving the Court of subject matter jurisdiction over that claim. Even if Wi-LAN's fraudulent inducement claim survives the second portion of this motion, Wi-LAN still lacks standing because, under New York law, fraud in the inducement merely renders a contract **voidable**, not void.   While Wi-LAN could  disaffirm a voidable contract, the agreement remained binding until such an election was made.  Wi-LAN made no such election until its sent LG written notice of termination on April 7, 2010—**long after it filed this lawsuit**.

In addition, the Court should grant summary judgment to LG on Wi-LAN's fraudulent inducement claim because Wi-LAN has offered no evidence at all on several key elements of its claim and, therefore, cannot establish a material issue of fact.  Accordingly, no reasonable juror could conclude that Wi-LAN has satisfied the clear and convincing evidentiary burden necessary to prove its fraudulent inducement claim.

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

## II.     FACTUAL BACKGROUND

### A.     Background Pertinent To The Rule 12(c) Motion

Insofar as this motion seeks judgment on the pleadings, documents relevant to the Rule 12(c) motion include Wi-LAN's Second Amended Complaint ("SAC")[1] and the following documents that were either incorporated by reference or integral to the SAC:

- January 19, 2010 Original Complaint (Mote Decl. ¶3, Exhibit B);
- May 17, 2006 License Agreement between Wi-LAN and LG (See SAC ¶¶ 21, 32 and Mote Decl. ¶4, Exhibit C);
- Tri-Vision November 3, 2004 initial license letter to LG (SAC ¶ 22 and Mote Decl. ¶5, Exhibit D);
- LG January 31, 2005, letter to Tri-Vision (SAC ¶¶ 24, 25 and Mote Decl. ¶6, Exhibit E);
- February 28, 2006, signed LOI from LG to Tri-Vision (SAC ¶¶ 27 and Mote Decl. ¶7, Exhibit F);
- Plaintiff's Reply and Answer to LG Electronics, Inc.'s Counterclaims to Plaintiff's Second Amended Complaint (Mote Decl. ¶8, Exhibit G).[2]
- January 20, 2010 email from Wi-LAN General Counsel William Middleton to LG Manager Y. Jung April 7, 2010, Wi-LAN notice of termination.   (Mote Decl. ¶9, Exhibit H); and
- Civil Cover Sheet and file stamped copy of Plaintiff's Complaint that was attached to the 1/20/10 email at Exhibit H (Mote Decl. ¶10, Exhibit I).

### B.     Statement of Relevant, Undisputed Facts Pertinent To Motion For Summary Judgment

#### 1.     The '402 Patent And Plaintiff's Licensing Program.

In June 1996, Tim Collings filed the original application leading to the '402 Patent, which was substantially identical to, and sought priority from, an application he filed in Canada the previous day.  See LG's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("SUF") at ¶10.  The Canadian patent (the "'474 Patent") issued with 168 claims, including both

---

[1] Wi-LAN's Second Amended Complaint is attached as Exhibit A to the Declaration of Jeffrey G. Mote ("Mote Decl.") filed contemporaneously with, and in support of, this motion.
[2] LG does not believe Exs. G-I are pertinent to a Rule 12(c) motion but includes these documents in anticipation of Plaintiff's argument that that these materials are somehow incorporated into its SAC.

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

apparatus and method claims, and is substantially broader than the U.S. '402 Patent, which issued with only 19 method claims.  Id.  Although the Canadian '474 Patent issued in January 2001 (long after the '402 Patent issued in October 1998), Plaintiff first focused its licensing efforts in Canada where substantially all of television receiver market was licensed by early 2004.  SUF ¶158.  ███████████████████████████████████████████████████. Id.

Although it signed up a few early licensees, Plaintiff did not begin actively licensing the '402 Patent until **after** the FCC announced certain rule changes to its V-chip regulations in a September 2004 Report & Order, which provided that effective March 15, 2006, "[d]igital television receivers shall be able to respond to changes in the content advisory rating system." SUF ¶161, 171; *see also* 47 C.F.R. § 15.120 (d)(2).  Plaintiff claimed that this new language added to 47 C.F.R. § 15.120 (d)(2) mandated the use of its '402 Patent.  Id.  Plaintiff submitted several IP proffers to standards setting organizations, including the Consumer Electronics Association ("CEA") and Advanced Television Systems Committee ("ATSC"), in which it promised to license the patent on fair and non-discriminatory terms.  SUF ¶¶116, 119.  Plaintiff made a similar pledge during communications with the FCC after the FCC's 2004 rule changes. SUF ¶104.  Wi-LAN admits that it was obligated to license all potential licensees pursuant to its IP proffers to CEA/ATSC and the FCC.  SUF ¶190.

After the 2004 rules change, U.S. standards setting organizations approved a future downloadable RRT (RRT-05) for use in broadcasting downloadable ratings systems.  SUF ¶225. To date,  there are no approved ratings system for use in RRT-05 and RRT-05 has never been broadcast in the United States.  Id.  The only RRT that has been approved in the U.S. is  RRT-01, which is a fixed RRT that cannot be fully represented in a PSIP broadcast, is not configurable,

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

downloadable or upgradeable and requires that a receiver be pre-coded with the RRT-01 rating system, to block programming with ratings directed to RRT-01. SUF ¶¶220-224.

2.      *Tri-Vision's Negotiations And License Agreement With LG.*

Tri-Vision, Wi-LAN's predecessor, first offered a license to LG under the '402 patent in November 2004.  SUF ¶171.  In all of its negotiations with LG prior to executing the License Agreement, Tri-Vision's sole basis for demanding the license was based on the FCC's 2004 rule change that Tri-Vision claimed mandated the use of the '402 Patent, which it (inaccurately) asserted covered 'downloadability' for V-Chip (content rating systems) in digital television receivers." SUF ¶¶171-172. ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

LG initially responded that although it might be interested in licensing the '402 Patent, LG did not believe FCC rules required DTV products to implement the technology generally covered by the '402 Patent, and that the royalty rate offered by Wi-LAN was too high in view of the uncertainty as to how the U.S. would implement the new V-Chip rules . SUF ¶174.

In late 2005 or early 2006, after conferring with outside industry experts, Tri-Vision decided to entice LG into entering into a license by offering LG, an advertising agreement that would effectively lower LG's royalty rate, under which LG would promote Tri-Vision's technology in its licensed products. SUF ¶178-179. ████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████Tri-Vision eventually determined that it would not go through with the advertising agreement because of administrative and legal issues, and it

4

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

unilaterally withdrew the advertising agreement.  SUF ¶189.  ██████████████████

████████████████████████████████████████████████████████████████████

During the license negotiations and prior to executing the License Agreement:

- Tri-Vision repeatedly represented to LG that the FCC changes mandating "downloadability" functionality required a license under its '402 patent. SUF ¶171.

- Tri-Vision never disclosed to LG an "RRT-01 only" theory of infringement prior to executing the License Agreement. SUF ¶163, 226.

- LG explained repeatedly in writing that if it didn't use the licensed technology it did not want to report the fact that zero royalties were due.  SUF ¶¶ 180, 183.

- Tri-Vision and LG never discussed whether any specific LG products were covered under the license or practiced the claims of the '402 patent. SUF ¶¶176, 186, 195.

- LG never promised to use the '402 Patent technology.  SUF ¶¶180, 182, 183, 186.

- LG never promised Wi-LAN that it would sell any specific number of licensed products or pay any minimum amount of royalties.  SUF ¶185.

- LG never represented that it would pay any minimum amount of royalties to Tri-Vision.  SUF ¶185.

Wi-LAN concedes that, in hindsight, it was a mistake not to confirm with its licensees, an

agreement concerning the actual products believed covered under the license agreement at the

time of execution. SUF ¶195.  █████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████

Tri-Vision and LG executed a license agreement under the '402 patent on May 17, 2006

(the "License Agreement").  SUF ¶191.  ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████ Wi-

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

LAN notified LG that it was in breach of the Agreement in November 2007.  SUF ¶200; SAC¶46.  Wi-LAN filed this lawsuit on January 19, 2010.  SUF ¶14.  Wi-LAN sent a written notice to LG on  April 7, 2010, purporting to terminate the License Agreement.  SUF ¶200; SAC ¶46.

3.    *Wi-LAN's Licensing Activities After The LG License Agreement*

After entering into the License Agreement with LG until well after the filing of its

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

complaint, Wi-LAN advertised and promoted its '402 licensing program by advertising LG as a licensee, in written communications to prospective licensees and on its website.  SUF ¶203. Besides Funai, LG was the only Tier 1 manufacturer that Wi-LAN ever licensed.  SUF ¶¶212 (see Riley Report Ex. 8), 213. ██████████████

████████████████████████████████████████████████████

████████████████

### III.   PERTINENT LEGAL STANDARDS

#### A.   Judgment On The Pleadings Standard

After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) involves "the same . . . standard applicable to dismissals pursuant to Fed.R.Civ.P. 12(b)(6)."  *Johnson v. Rowley*,  569 F.3d 40, 43 (2nd Cir. 2009).  Under Rule 12(b)(6), Wi-LAN's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (*quoting Twombly*, 550 U.S. at 570). The court may consider the facts alleged in the complaint and documents attached as exhibits to, or incorporated by reference by, the complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  In addition, even documents that are not incorporated by reference, but which are relied upon heavily for their "terms and effect," thereby rendering the documents "integral" to the complaint, may be considered.  *Id*.

#### B.   Summary Judgment Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  To defeat summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  Rather, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec*., 475 U.S. at 587.   A fact is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

## IV.    ARGUMENT

### A.    Wi-LAN Lacks standing to assert its patent infringement claim.

Wi-LAN lacked standing to assert any patent infringement claim against LG at the time it filed this lawsuit because it pled facts confirming that LG was still licensed under the patent-in-suit at that time.   Thus, this Court does not have the subject matter jurisdiction it would otherwise have under 28 U.S.C. § 1338, and Wi-LAN's patent infringement claim must be dismissed.

#### 1.    *Standing Is Required At The Time The Complaint Is Filed.*

The question of standing to sue is a jurisdictional one. *Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1551 (Fed. Cir. 1995) (*en banc*) (citation omitted).  All jurisdictional requirements must be in place at the time the complaint is filed.  *See Keene Corp. v. United States*, 508 U.S.

8

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

20)0, 207, 124 L. Ed. 2d 118, 113 S. Ct. 2035 (1993); *see also Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830, 104 L. Ed. 2d 893, 109 S. Ct. 2218 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts ***as they exist when the complaint is filed***.") (emphasis added).  Federal Rule of Civil Procedure 12(h)(3) requires a court to dismiss an action whenever it appears that the court lacks jurisdiction of the subject matter.  The parties or the court can raise the issue of standing at any stage in the litigation. *Pandrol USA, LP v. Airboss Ry. Products, Inc*., 320 F.3d 1354, 1367 (Fed. Cir. 2003)).

The district courts of the United States have original jurisdiction over any civil action arising under any Act of Congress related to patents, and this jurisdiction is exclusive of the courts of the states.  28 U.S.C. § 1338 (2000).  To determine whether section 1338 jurisdiction attaches, the court must look to see whether the plaintiff has stated, in a well-pleaded complaint, a claim arising under the patent laws.  *Pixton v. B & B Plastics, Inc*., 291 F.3d 1324, 1326 (Fed. Cir. 2002) (emphasis supplied).   Standing to assert a patent infringement claim requires the plaintiff demonstrate that it held **enforceable** title in the patent at the inception of the lawsuit. *Paradise Creations, Inc. v. UV Sales, In*c., 315 F.3d 1304, 1309 (Fed. Cir. 2003).  A covenant not to sue for patent infringement, existing at the inception of the lawsuit, divests the trial court of subject matter jurisdiction over a patent infringement claim because the covenant eliminates any case or controversy between the parties on that date. *See Dow Jones & Co. v. Ablaise Ltd*., 606 F.3d 1338, 1346 (Fed. Cir. 2010) (citations omitted).   An amended complaint cannot overcome a constitutional jurisdictional defect. *Paradise*, 315 F.3d at 1310 (stating that an Article III defect in standing resulting from a lack of enforceable patent rights at the time of filing suit cannot be cured after the inception of the suit).

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

> 2.    *Wi-LAN Alleges Facts Establishing That LG Was Licensed At The Time The Original Complaint Was Filed.*

Wi-LAN has effectively plead itself out of court by alleging facts that conclusively establish LG was licensed under the '402 patent at the time Wi-LAN filed this lawsuit. Accordingly, Wi-LAN lacked standing to bring a patent infringement claim against LG, thereby depriving the Court of subject matter jurisdiction.

A patent owner may not bring an infringement action against a licensee if it has not terminated the agreement. *Syntellect Tech. Corp. v. Brooktrout Tech., Inc*., No. C 96-2789, 1998 WL 249212, at *2 (N.D. Tex. May 11, 1998). A patent license is "considered as nothing more than a promise by the licensor not to sue the licensee." *Hilgraeve Corp. v. Symantec Corp*., 265 F.3d 1336, 1346 (Fed. Cir. 2001). A patent license agreement is an affirmative defense to a patent infringement claim. *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1334 (Fed. Cir. 2006). An affirmative defense may provide grounds to dismiss under Rules 12(b)(6) and 12(c) "as long as the defense is based on facts appearing on the face of the complaint." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). The facts establishing the defense must: (1) be "definitively ascertainable from the complaint and other allowable sources of information," and (2) "suffice to establish the affirmative defense with certitude." *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006).

In *Dow Chem. Co. v. United States*, the Federal Circuit reversed a district court's award of infringement damages from the moment the defendant party had breached the license agreement, reasoning that the government's "repudiation of the license gave Dow the right to either terminate the license or continue to treat it as outstanding." 226 F.3d 1334, 1346 (Fed. Cir. 2000). Only contract remedies were available to Dow until it actually terminated the agreement. *Id*. Relying on *Dow*, the district court in *Syntellect Tech. Corp. v. Brooktrout Tech.*,

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

*Inc.*, reasoned that the plaintiff corporation, having failed to terminate its licensing agreement, could not bring an infringement action against a defendant that was party to that agreement. No. C 96-2789, 1998 WL 249212, at *2 (N.D. Tex. May 11, 1998).

Here, the factual allegations conclusively establish that Wi-LAN did not have enforceable title to the '402 patent against LG when this lawsuit was filed on January 19, 2010.  See Dkt. No. 1, Ex. B.  The parties executed a license under the '402 patent on May 17, 2006.  SAC ¶¶ 21 and 32; Ex. C.  "On April 7, 2010, Wi-LAN officially gave notice of termination of the License." SAC ¶ 46.    Thus, LG's affirmative defense of license is established on the face of Wi-LAN's complaint and Wi-LAN's patent infringement claim must be dismissed for lack of standing and subject matter jurisdiction pursuant to Rules 12(b)(1) and (c).

Even if Wi-LAN's fraudulent inducement claim survives, the patent infringement claim still must be dismissed because Wi-LAN did not disaffirm the License Agreement until April 7, 2010—months after it filed the lawsuit.  See SAC ¶ 46.  Where a party alleges fraud in the inducement, the contract is merely voidable, not void. *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 31 (2d Cir. N.Y. 2001).  "Faced with a voidable contract induced by fraud, the defrauded party has the option to either disaffirm or affirm the contract." *Ladenburg Thalmann & Co. v. Imaging Diagnostic Systems, Inc.*, 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001).  The defrauded party must make a choice, because the alternative rights to affirm or disaffirm lead to inconsistent remedies.  *Ferguson v. Lion Holding, Inc.*, 312 F. Supp. 2d 484, 498 (S.D.N.Y. 2004).  Inaction by a defrauded party can result in tacit affirmance, particularly in a situation where the defrauded party has an opportunity to avoid a voidable contract. *Id.* (*citing* Restatement (Second) of Contracts, §§ 380, 383).  Here, the License Agreement was not disaffirmed, if at all, until April 7, 2010—long after the lawsuit was filed.

11

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

Likewise, Wi-LAN cannot argue that it somehow rescued its defective complaint through allegations in its Reply to LG's counterclaims.  Mote Decl. ¶8, Ex. G, Wi-LAN 10/4/10 Reply to LG Counterclaims.  The court applies the Rule 12(b)(6) standard to motions for judgment on the pleadings under Rule 12(c).  A Rule 12(b)(6) motion must be raised at or before the time the defendant answers and the court must accept as true all well-pleaded factual allegations of the **complaint**.  By definition, a reply to the defendant's counterclaims cannot be considered part of the complaint because it would never have been filed before the defendant was obligated to file its Rule 12(b)(6) motion.  Just as it is improper to consider the defendant's answer in deciding a Rule 12(b)(6) motion, it is likewise improper to consider the plaintiff's reply to counterclaims raised in defendant's answer.

But even if Wi-LAN could use its Reply to LG's Counterclaims (the "Reply") to rescue its complaint, it still fails because the communication referenced in Wi-LAN's Reply definitively shows that it failed to terminate the License Agreement prior to filing the lawsuit.  Wi-LAN's Reply states:

> Wi-LAN's termination of the License Agreement was proper, as communicated to LGE simultaneously with the filing of the initial Complaint on January 19, 2010, because LGE breached the License Agreement and became an infringer by marketing in the U.S. television receivers, which infringe, or the use of which infringes, the '402 patent, without paying any royalties.  Moreover, the License Agreement was void *ab initio* due to Defendants' fraudulent inducement.

Mote Decl. ¶8, Ex. G, Wi-LAN 1/4/10 Reply, pp. 1-2.  But the **email** communication forwarding the original complaint to LG was sent **after** the complaint was filed and specifically states ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY



The Notice provision of the License Agreement in Section 12.1 provides that:



Thus, even considering the Reply, Wi-LAN cannot demonstrate standing.

First, Wi-LAN admits that it sent the email forwarding the "courtesy" Complaint after it had filed the lawsuit.  Next, notice of termination can only be provided by the methods set forth in Section 12.1, namely "facsimile, courier, or registered or certified mail."  Email is not one of the approved methods for providing notice.  Finally, Wi-LAN itself recognizes that its email is ineffective for providing proper notice by stating ████████████████████████ ██████████████████████  Accordingly, Wi-LAN's patent infringement claim must be dismissed because Wi-LAN lack's standing and, thus, this Court lacks subject matter jurisdiction over that claim.  The Court retains, however, jurisdiction over LG's declaratory judgment counterclaims for non-infringement, invalidity and unenforceability.  *See Medimmune Inc. v. Genentech, Inc.*, 549 U.S. 118, 137, 127 S. Ct. 764 (2007) (holding that a patent licensee does

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

not need to terminate or breach a license agreement in order to challenge the patent's validity or enforceability).

### B.     LG Is Entitled To Summary Judgment On Wi-LAN's Fraudulent Inducement Claim Pursuant To Fed. R. Civ. P. 56(c)

The Court should grant summary judgment to LG on WI-LAN's fraudulent inducement claim because its claim is based on nothing more than its assertion that LG failed to perform as it should have under the License Agreement.  But even if such claims were actionable in fraud, the undisputed facts directly contradict key factual allegations in Wi-LAN's complaint directed to its fraudulent inducement claim.  Not the least of the incontestable contradictions, is the fact that LG repeatedly told Wi-LAN, in writing, that it would not report royalties if it did not use Wi-LAN's technology.  In sum, Wi-LAN simply cannot establish the elements of its fraudulent inducement claim under a preponderance standard let alone satisfy the clear and convincing burden it bears under New York law.  *Katara v. D.E. Jones Commodities, Inc*., 835 F.2d 966, 971 (2d Cir. N.Y. 1987).

There are five elements necessary to sustain a claim in fraud under New York law: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud;  (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *May Department Stores Co. v. International Leasing Corp*., 1 F.3d 138, 141 (2d Cir. 1993); *Katara v. D.E. Jones Commodities, Inc*., 835 F.2d 966, 970-71 (2d Cir. 1987). The Second Circuit has interpreted Rule 9(b) to require that allegations of fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)(internal quotations and citations omitted).

14

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

Wi-LAN summarizes LG's alleged fraudulent misrepresentations in Paragraph 50 of its

Second Amended Complaint, which states:

> 50. LG also made fraudulent representations collateral to the contract by representing that (1) the FCC rules required the implementation of the Collings patent; (2) LG would comply with the FCC rules; (3) LG would use the technology of the Collings patent; and (4) LG would have volumes of licensed products that justified the lowered royalty rate to LG and existing and future licensees.

Wi-LAN then summarizes the specific LG misrepresentations upon which Wi-LAN

purportedly "reasonably relied" in providing LG a lower royalty rate in Paragraph 52, which

states:

> 52. Tri-Vision **reasonably relied** on LG's fraudulent representations of its **intention to use the technology** of the Collings patent **and pay royalties**, without knowledge of their falsity, in entering into the License, and in thereafter reducing its license rates to its other licensees. But for LG's misrepresentations, Tri-Vision would not have executed the License. Further, but for LG's misrepresentations and the License induced by those representations, Tri-Vision would not have reduced its license rates to its other licensees, as there would not have been any contractual requirement to do so. Mote Decl. ¶3 Ex. B at ¶52 (emphasis provided).

As set forth below, Wi-LAN cannot establish an actionable misrepresentation by LG or

Wi-LAN's reasonable reliance on such a misrepresentation.

     *1.*     *Wi-LAN Cannot Establish An Actionable Affirmative Misrepresentation By LG.*

To prevail on a fraudulent inducement claim, WI-LAN must demonstrate by clear and

convincing evidence that LG made a knowingly false representation of a material fact before the

formation of the License Agreement, and that WI-LAN justifiably relied upon such

representation when it entered into the Agreement. *Osan Limited v. Accenture LLP*, 454

F.Supp.2d 46, 52 (E.D.N.Y. 2006).  Clear and convincing evidence exists when the movant

"place[s] in the ultimate fact finder an abiding conviction that the truth of its factual contentions

are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1994).  Further, New York

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

law "clearly distinguishes between a promissory statement as to what **will be done in the future**, which gives rise **only to a breach of contract claim**, and a false representation of present fact, which gives rise to a separable claim of fraudulent inducement." *Id*. at 54 (internal quotations omitted, emphasis added).  Finally, it is well-settled that "a party cannot maintain a claim for fraud predicated on a breach of contract merely by alleging that the breaching party never intended to perform." *C3 Media & Marketing Group, LLC v. Firstgate Internet, Inc.*, 419 F.Supp.2d 419, 430 (S.D.N.Y. 2005).  As a threshold matter, Wi-LAN's fraudulent inducement does not pass the "smell" test because it is nonsensical.  Why would LG go to the trouble of negotiating a lower royalty rate for a license under which, according to Wi-LAN, LG never intended to pay royalties when the effect of taking such a license would be to lower the royalty rate for all of LG's licensed competitors?  The irrational motivation necessary to support Wi-LAN's fraud claim confirms the absurdity of Wi-LAN's claim.

LG's alleged false representations include: (1) LG agreed that the FCC rules required the implementation of the Collings patent; (2) LG would comply with the FCC rules; (3) LG would use the technology of the Collings patent; and (4) LG would have volumes of licensed products that justified the lowered royalty rate to LG and existing and future licensees.  SAC ¶ 42.

Not only is LG's fraudulent motive absurd, but the undisputed facts demonstrate that WI-LAN's fraud claim is based solely on WI-LAN's belief that LG never intended to perform under the Agreement.  See SAC¶ 40.  Wi-LAN claims that it "reasonably relied on LG's fraudulent representations of its intention to use the technology of the Collings patent and pay royalties." See SAC ¶52.  Such representations are not actionable, but even if they were, Wi-LAN has no evidence that LG ever made such representations.  To the contrary, the undisputed evidence directly contradicts Wi-LAN's allegations that it lowered LG's royalty rated based on LG's

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

promises to use its technology and pay royalties on sufficient volumes of licensed products to justify reducing the royalty rate to LG and Wi-LAN's existing and future licensees.

          a.      <u>LG received a lower "effective" royalty rate because Wi-LAN first suggested, and then, unilaterally withdrew, an advertising agreement.</u>

As a threshold matter, Wi-LAN cannot establish that LG was provided a lower royalty rate based on any LG representation. Rather, the undisputed evidence confirms that LG received a lower "effective" royalty rate because Wi-LAN first proposed, and then unilaterally backed out of a contemporaneously negotiated advertising agreement that would have provided LG with a $.25 credit or offset to the $.90/unit royalty rate for promoting Wi-LAN's technology.

On or about February 28, 2006, ████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████. In March 2006, ██████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████.

Wi-LAN came up with the advertising component after consulting with outside industry experts, as a way to induce LG, a major "Tier 1 manufacturer," to enter into a license under the '402 patent.

Under the advertising agreement, ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████. Wi-LAN determined that it could not go through with the negotiated advertising agreement because of administrative and legal concerns. Yet Wi-LAN unilaterally decided to provide LG with the

17

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

lower "effective" royalty rate anyway.  Accordingly,  there is no material issue of fact that LG's lower royalty rate was the product of Wi-LAN's unilateral decision to lower the rate even after Wi-LAN withdrew the advertising agreement.  LG is clearly entitled to summary judgment on Wi-LAN's fraudulent inducement claim.

But even if LG's received a lower royalty rate than that which was established at the time it executed the License Agreement, ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████  Thus, there is simply no basis from which to determine that LG actually received a "lower royalty rate."

> b. **LG never promised Tri-Vision it would use the patented technology.**

Notwithstanding its conclusory  allegations (see SAC ¶27, 29), Wi-LAN has no evidence at all that LG ever had promised to use Tri-Vision's technology during the parties license negotiations.  All of the record evidence confirms incontestably that LG made no such promise. For example, in a March 19, 2006, email to Tri-Vision, LG specifically states that it does not want to issue and provide royalty reports when there is no licensed products sold during the particular reporting quarter. During a March 21, 2006 meeting with Tri-Vision, LG specifically repeated that it did not want to have to make royalty reports if it was not using Tri-Vision's technology.  Moreover, during that same meeting, LG told Tri-Vision that it would send a template for reporting no sales during a particular reporting quarter. ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

18

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

████████████████████████████████████████

████████████████████████████████████████

Thus, Wi-LAN is left with no factual basis to support the key allegations in Wi-LAN's Second Amended Complaint, which remain refuted by LG's and Wi-LAN's own documents.

Wi-LAN could not, as a matter of law, require LG to use its patented technology or condition the grant of a license on such use without running afoul of the doctrine of patent misuse.[3]  A nonexclusive patent license, like the one to LG in this case, is simply a promise not to sue for infringement.  *Rite-Hite v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995)(*en banc*). In conveying a non-exclusive license, Wi-LAN could not obligate LG to do anything affirmatively; Wi-LAN simply provided LG with a guarantee that it would not be sued for engaging in conduct that would infringe the '402 patent.  Specifically, Wi-LAN could not bar LG from adopting or using some alternative technology without raising antitrust concerns. *See U.S. Philips Corp. v. Int. Trade Comm.*, 424 F.3d 1179, 1190 (Fed. Cir. 2005).

Thus, as a matter of law, Wi-LAN could not have been induced into entering into the License Agreement based on LG's alleged representation that it would use Wi-LAN's patented technology and pay royalties because Wi-LAN could not condition the grant of its non-exclusive patent license on such a promise without running afoul of the patent misuse doctrine.[4] Moreover, Wi-LAN did not even have that right to offer.

---

[3] The grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude. *See id. citing* 35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States . . . ."); *see also Leatherman Tool Group Inc. v. Cooper Indus., Inc*., 131 F.3d 1011, 1015 (Fed. Cir. 1997) ("In fact, the federal patent laws do not create any affirmative right to make, use, or sell anything. . . . [T]he Supreme Court made clear that the patent laws provide a limited right to exclude others from making, using, or selling a claimed invention for a limited period of time, but afford no affirmative right to make, use, and sell a patented invention.").

[4] *See generally County Materials Corp. v. Allan Block Corp*., 431 F. Supp. 2d 937, 948 (D. Wis. 2006) (and cases cited therein); *Zenith Radio Corp. v. Hazeltine Res., Inc*., 395 U.S. 100, 135-36 (1969).

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

> c.   <u>LG never promised to sell a particular "volume" of licensed products or pay a minimum amount of royalties to Tri-Vision.</u>

Notwithstanding its allegations to the contrary (see SAC ¶27, 29), Wi-LAN has no evidence that LG ever promised to pay any minimum amount of royalties under the License Agreement, let alone an amount "that would more than make up for the reduction in royalties due to a decreased royalty rate."  See SAC ¶27.  To the contrary, Wi-LAN knew that LG had requested the option to not have to report royalties at all, during those calendar quarters in which it sold no royalty-bearing products and intended to prepare a template for reporting zero sales, conclusively demonstrating Wi-LAN's knowledge that LG anticipated that there would be quarters in which it reported no royalty bearing sales.

But even if it had such evidence, LG's alleged, oral misrepresentation that it "would have volumes of licensed products that justified the lowered royalty rate to LG and existing and future licensees" (SAC ¶42) constitutes non-actionable puffery.  *See Sutton Assocs. v. Lexis-Nexis*, 196 Misc.2d 30, 761 N.Y.S.2d 800, 803 (N.Y. Sup. Ct., Nassau Co. 2003) (addressing statements such as "the rates offered were the 'lowest' then available and that comparable rates were being paid by similarly situated business[es]" were "at best . . . nonactionable 'puffery,' and/or commendatory sales representations on which a sophisticated commercial entity could not reasonably rely.")  As an initial matter, the statement itself is so vague as to render a determination of what LG is allegedly representing impossible.  For example, what specific "volume of licensed products" would have been necessary to satisfy this alleged misrepresentation (or to justify Wi-LAN lowering its royalty rate for LG)?  It is impossible to determine.  Irrespective of LG's alleged vague, representations concerning the "volumes" of licensed products it anticipated selling under the License Agreement, Wi-LAN was not constrained to enter into the license if it believed the proposed royalty rate was unfair or too low.

20

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

Wi-LAN simply cannot now argue that the License Agreement was fraudulently induced and must be rescinded based on LG's alleged puffery.

> d.    <u>There is no evidence whatsoever that LG did not intend to perform its obligations at the time it executed the License Agreement.</u>

There exists no evidence at all that LG did **not** intend to perform its obligations at the time it executed the License Agreement.  The sole basis for Wi-LAN's assertion that LG never intended to perform is its *post-execution* royalty reporting of no covered sales.  The fact that LG consistently prepared royalty reports showing no sales of royalty bearing products is irrelevant to establishing LG's *pre-execution* intent not to perform.  Rather, LG's reporting of zero royalties merely confirms its compliance with the reporting obligations under the License Agreement.  As LG repeatedly explained to Wi-LAN, the zero royalty reports are based on LG's understanding of what is necessary to practice the methods covered by the '402 patent.



LG has consistently informed Wi-LAN in post-execution negotiations that no LG DTV receiver could possibly practice the method claimed in the '402 patent until, at a minimum, a downloadable ratings system was approved and broadcast in RRT-05.  Wi-LAN concedes that in the United States, RRT-05 is the only authorized RRT for broadcasting "downloadable" ratings systems.  Wi-LAN also admits that no RRT-05 has ever been broadcast in the United States.

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

Wi-LAN further admits that numerous other prospective licensees, including all but one of the Tier 1 major television competitors of LG, have refused to take a license under the '402 patent on the grounds that, *inter alia*, no RRT-05 has been broadcast.  Wi-LAN's attempt to interpret its License Agreement as requiring LG to pay royalties just because its products are purportedly **capable** of infringing the methods of the '402 patent are unreasonable and violate basic patent law, which precludes a patentee from seeking to extend its patent monopoly by requiring a licensee to pay royalties on products that do not practice the patented technology. But regardless of whether LG's, and others', understanding of the scope of the '402 patent ultimately prevails, Wi-LAN simply has no evidence that LG attempted to defraud Wi-LAN, by entering into a License Agreement under which it never intended to pay royalties.

Tellingly, Wi-LAN concedes that its RRT-01-based theory of infringement asserted in this case was never discussed with LG during the license negotiations, and for good reason - it's a relatively new theory.  Wi-LAN also admits that it never discussed whether with LG during the license negotiations whether any of LG's current products were covered under the License Agreement.  It was only after LG was reporting no royalty bearing sales that Wi-LAN created and informed LG of its new RRT-01 based theory of infringement.   This new infringement theory contradicted Wi-LAN's pre-license representations concerning the scope of the '402 patent, which Wi-LAN uniformly couched in terms of the FCC's "downloadability" requirement, effective March 15, 2006.

2.     *Wi-LAN Cannot Establish Reasonable Reliance.*

Under New York law, reasonable reliance is an essential element of fraudulent inducement. *See Fax Telecommunicaciones, Inc. v. AT&T, 138 F.3d 479, 490* (2d Cir. 1998); *Stone v. Schulz*, 231 A.D.2d. 707, 708, 647 N.Y.S.2d 822, 823 (2d Dep't 1996).  The crux of Wi-

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

LAN's reasonable reliance is outlined in ¶ 52 of the SAC: "Tri-Vision reasonably relied on LG's fraudulent representations of its intention to use the technology of the Collings patent and pay royalties." But even assuming *arguendo* that LG's future-based promissory statements were actionable, Wi-LAN has **no** evidence, let alone clear and convincing evidence, necessary to establish its reasonably reliance on LG's alleged misrepresentations.

Wi-LAN can only point to a single alleged **oral** misrepresentation by LG that is linked to Wi-LAN's decision to lower the royalty rate provided to LG, that Wi-LAN alleges resulted in its injury (i.e. by lowering the rates provided to Wi-LAN's existing and future licensees), namely that "LG would have volumes of licensed products that justified the lowered royalty rate to LG and existing and future licensees." See SAC ¶42. As discussed above, such representations of future performance are not actionable and, even if they were, Wi-LAN has no evidence that LG ever made such a representation. But even assuming *arguendo* that such statements were actionable and Wi-LAN could prove LG made such a representation, Wi-LAN cannot establish reasonable reliance.

Wi-LAN simply has no evidence supporting the factual predicates necessary to demonstrate reasonable reliance. To the contrary, the undisputed facts confirm any reliance by Wi-LAN was patently unreasonable and include:

- Tri-Vision's standard licensing policy was to include a confidentiality clause in the license agreement.
- Tri-Vision was required to obtain its existing licensees prior approval before disclosing the terms of their licenses with potential licensees.
- Tri-Vision never sought or obtained such approval from any of its existing licenses.
- Tri-Vision did not share copies of its existing license agreements with LG prior to executing the License Agreement on May 17, 2006.
- Tri-Vision never disclosed to LG the terms of its license agreements with other licensees under the '402 Patent during the negotiations leading to the

23

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

execution of the May 2006 License Agreement, including the royalty rates applicable to, or the royalties paid by, Wi-LAN's other licensees, or whether a particular licensee had a most favored nations term in its license.

- The License Agreement does not require LG to use the technology covered by the '402 patent or pay any minimum royalties.
- Wi-LAN was obligated to offer all television receiver manufacturers a license under the '402 patent on fair and non-discriminatory terms.

Without this information, even if Wi-LAN could provide evidence that LG made the vague promise of "volumes of licensed products," Wi-LAN could not reasonably rely on such statements because it knew that LG could not possibly know how many royalty-bearing sales were necessary to justify lowering LG's royalty rate.  Perhaps most damning to its claim, Wi-LAN has no evidence and does not even allege that it ever informed LG of the specific number of licensed products required to justify a "lower" royalty rate or the amount of diminished revenue it anticipated from its existing and future licensees by providing a "lower" royalty rate. In sum, the undisputed facts confirm that the License Agreement was the product of an arms length transaction between two sophisticated commercial entities, each of whom was represented by counsel throughout the negotiations.

## V.   CONCLUSION

In view of the foregoing, Wi-LAN's patent infringement claim must be dismissed for lack of standing.  In addition, the Court should enter summary judgment in favor of LG on Wi-LAN's fraudulent inducement claim.

Dated: April 1, 2011                              Respectfully submitted,

                                                  **GREENBERG TRAURIG, LLP**

                                                  /s/ Richard D. Harris

24

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

Richard A. Edlin (RE 1998)
Daniel I.A. Smulian (DS 4746)
200 Park Avenue
New York, New York 10166
(212) 801-6528 (*telephone*)
(212) 801-5528 (*facsimile*)
edlinr@gtlaw.com
smuliand@gtlaw.com

Richard D. Harris (*pro hac vice*)
Jeffrey G. Mote (*pro hac vice*)
James J. Lukas, Jr. (*pro hac vice*)
Eric J. Maiers (*pro hac vice*)
Matthew J. Levinstein (*pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 456-8400 (*telephone*)
harrisr@gtlaw.com
motej@gtlaw.com
lukasj@gtlaw.com
maierse@gtlaw.com
levinsteinm@gtlaw.com

Attorneys for Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc.

CONFIDENTIAL--OUTSIDE ATTORNEYS' EYES ONLY

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on April 1, 2011, the foregoing Defendants' Memorandum of Law in Support of Their Motion to Dismiss or, Alternatively for Summary Judgment was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel that have appeared for any party in this matter.


<u>/s/ Matthew J. Levinstein</u>

Matthew J. Levinstein