# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

**WI-LAN INC.**,                                          10 CV 432 (LAK) (AJP)

        Plaintiff,

v.

**LG ELECTRONICS, INC. and LG
ELECTRONICS U.S.A., INC.**,

        Defendants.

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Richard A. Edlin (RE 1998)
Daniel I.A. Smulian (DS 4746)
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
(212) 801-6528 (*telephone*)
(212) 801-5528 (*facsimile*)
edlinr@gtlaw.com
smuliand@gtlaw.com

Richard D. Harris (*pro hac vice*)
Jeffrey G. Mote (*pro hac vice*)
James J. Lukas, Jr. (*pro hac vice*)
Eric J. Maiers (*pro hac vice*)
Matthew J. Levinstein (*pro hac vice*)
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 456-8400 (*telephone*)
harrisr@gtlaw.com
motej@gtlaw.com
lukasj@gtlaw.com
maierse@gtlaw.com
levinsteinm@gtlaw.com

Attorneys for Defendants LG Electronics, Inc.
and LG Electronics U.S.A., Inc.

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York, defendants' LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively "LG"),  submit this statement of material facts as to which there is no genuine issue to be tried.

Defendants set forth the following undisputed facts:

### A.      Parties and Jurisdiction

1.       Plaintiff, Wi-LAN Inc. ("Wi-LAN") is a corporation formed under the laws of the country of Canada with its principal place of business at 11 Holland Avenue, Ottawa, Ontario, Canada K1Y 4S1.  (Dkt. 1 at ¶ 2, Wi-LAN's Second Amended Compl., filed 8/23/10.)

2.       Defendant LG Electronics, Inc. ("LGE") is a corporation formed under the laws of the country of Korea, with its principal place of business at LG Twin Towers 20, Yeouido-Dong, Yeongdeungpo-Gu, Seoul, South Korea 150-721.  (Dkt. 72 at ¶ 3., LG Electronics, Inc.'s Answer and Countercls. to Pls. Second Amended Compl., filed 9/9/10.)

3.       Defendant LG Electronics U.S.A., Inc. ("LGEUS") is a corporation formed under the laws of the State of Delaware with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.  (Dkt. 73 at ¶ 4, LG Electronics U.S.A., Inc.'s Answer and Countercls. to Pls. Second Amended Compl., filed 9/9/10)

4.       Wi-LAN filed this lawsuit on January 19, 2010, alleging three claims against LG: (a) fraudulent inducement in Count I; (b) breach of contract in Count II; and (c) patent infringement in Count III.  (Dkt 1 at ¶¶ 34-51, Wi-LAN's Compl.)

5.       Wi-LAN has charged LG with infringing Wi-LAN's U.S. Patent No. 5,828,402 ("'402 Patent"), a true and accurate copy of which, entitled "Method and Apparatus for Selectively Blocking Audio and Video Signals," is attached hereto as Exhibit 1. (Dkt 67 at ¶ 55, Wi-LAN's Second Amended Complaint, filed August 23, 2010.)

6.      Wi-LAN filed a Second Amended Complaint on August 23, 2010, dropping its breach of contract claim and alleging that numerous LG digital television ("DTV") and non-digital television ("non-DTV") products infringe method claims 7–11 ("Asserted Claims") of the '402 Patent and that LG fraudulently induced Wi-LAN into signing a '402 Patent license agreement with LG, executed on May 17, 2006 ("License Agreement").  (Dkt. 67 at ¶ 21, ¶¶ 47–59.)

7.      LG has filed declaratory judgment counterclaims asserting that the '402 Patent is not infringed, invalid, unenforceable due to inequitable conduct, and unenforceable for failure to disclose to standard setting organizations, and that the License Agreement is effective and not terminated.  (Dkt. 72 at p. 15-26.)

8.      The Court has jurisdiction under the Complaint and counterclaims under 35 U.S.C. §§ 1 et seq., and 28 U.S.C. §§ 1331, 1338 and 1367.  (Dkt. 72 at ¶ 6-7.)

9.      Venue is proper under 28 U.S.C. §§1391(b) and 1400(b).  (Dkt. 72 at ¶ 8.)

   **B.      The Patent-In-Suit.**

10.      The '402 Patent application was filed on December 5, 1996 as a continuation-in-part of U.S. Application Serial No. 08/667,030 (the "Parent Application"), filed on June 20, 1996.  (Ex. 1 at 1.)  The disclosure appearing between col. 21, line 47 to col. 27, line 43 of the '402 was not included in the Parent Application.  The Asserted Claims of the '402 Patent are all method claims.  (Ex. 1 at Claims 7-11.)  The '402 Patent also claims priority to Canadian Patent No. 2179474, filed on June 19, 1996 ("'474 Patent").  *Id.*  The '474 Patent issued with 168 claims, including both apparatus and method claims. (Canadian Patent No. 2179474, Ex. 2)

11.      The '402 Patent generally teaches methods for downloading new or revised rating systems, and the selective blocking of video signals in response to ratings information which is

encoded in the video signal.  (*See generally id.*) Specifically, independent Claim 7 of the '402 Patent requires receiving two sets of configuration information. (*Id.* at Claim 7.)

12.     During prosecution of the parent application to the '402 Patent, the Patentee disclaimed the application of the '402 Patent to receivers with advance knowledge of the informational scheme.  (Prosecution History of U.S. Ser. No. 08/667,030, Ex. 3 at LG082038-40)

13.     In its 2/25/98 Office Action Response, Patentee stated  "[N]one of the cited references deals with the main problem addressed by this application, which is how to accommodate changing rating (or 'classification') schemes in apparatus for selectively blocking video signals.  None of the cited references even mention this problem, which arises, in part, because many advisory bodies, acting independently, are creating many different classification schemes.  Each of the cited references shows a video blocking system in which a blocking device is constructed with a priori knowledge of the rating scheme to be used."  (Ex. 3 , 2/25/98 Resp. to Office Action, LG82036-43, at LG082038.)

14.     In its 2/25/98 Office Action Response, Patentee stated that the alleged invention "relates to systems which involve transmitting particular configuration information and using that information in particular ways."  (Ex. 3, 2/25/98 Resp. to Office Action, LG82036-43, at LG82040.)

15.     In its 2/25/98 Office Action Response, Patentee stated "The West system is apparently programmed with advance knowledge of all rating schemes which might be applied to programming in the received video signal.  (Ex. 3, 2/25/98 Resp. to Office Action, LG82036-43, at LG082039; *See also Id.* at LG082043.)

16.     Patentee claimed the following in the original claims of application no. 08/667,030: "either a number of levels in one or more multi-level categories _or_ a number of labels in one or more groups of labels" (original independent Claims 1, 13); "either a category comprising a graduated plurality of levels _or_ one or more labels in one or more groups of labels" (original independent Claim 16); "at least either a multi-level category and a plurality of levels in said category _or_ a plurality of labels" (original independent Claim 18).  (Ex. 3, Original App. 08/667,030, filed June 20, 1996, at LG081996-LG082004.)

### C.     The Prior Art

17.     Mr. Collings presented a paper on parental control technology titled: _Violence and Television: The Canadian Example_ ("VT"), attached hereto as Exhibit 7, at an international conference on television violence held at the Sorbonne in Paris, France between June 16 and 18, 1994.  (Ex. 8; Collings Dep., Ex. 121 at 25:9–20.)

18.     Between March 6-10, 1995 (i.e. 95/03/06-10), the Digital Audio Visual Council (DAVIC) held its Seventh Meeting in London, England.  (Decl. of Jeffrey S. Hamilton, Ex. 9 at Ex. 3.)   At that meeting, representatives of General Instrument Corporation ("General Instrument") submitted a proposal for "System Information for Broadcast Services" under the document number DAVIC/TC/SYS/95/03/16, together with a corresponding cover letter.  (_Id._ at ¶¶ 7-8., Ex. 2.)  Notably, the cover letter also states that "[t]he attached draft document is in the advanced stages of approval by the ATSC and ABSOC to define [System Information] … in North America."  (_Id._ at Ex. 2.)

19.     After the London DAVIC meeting, DAVIC published a London Meeting Report, indicating that document number DAVIC/TC/SYS/95/3/16, entitled "Systems Information for Broadcast Services," and supplied by "GI," was one of the "various documents … considered during the Course of the system TC meeting.  (Hamilton Decl., Ex. 9 at Ex. 3 at 9, 13.)

20.     General Instrument's "Digicipher II System Information Description, Rev. 1.2" ("DC2"), attached hereto as Exhibit 10, includes a cover page that in turn includes a date stamp of April 28, and the document number DAVIC/TC/SYS/95/03/16.   (Digicipher II, System Information, Ex. 10.)

21.     Between May 4-8, 1995 (i.e. 95/05/04-08), the Digital Audio Visual Council (DAVIC) held its eighth meeting in Cagliari, Italy.  (Ex. 9 at Ex. 5.) DC2 was distributed at that meeting as part of the standards development process.  (Ex. 10; Ex. 9 at ¶ 15.) Specifically, DC2 was distributed, or "allocated," to three separate technical committees within DAVIC: the Applications Technical Committee (Application TC), the Systems Integration Technical Committee (Systems TC), and the Set-Top Unit Technical Committee (STU TC).  (Ex. 10; Ex. 9 at ¶ 15.)

22.     The DAVIC general membership as of September, 1996 included 219 member companies and organizations representing more than 20 countries from all around the world. (Ex. 9 at ¶ 5.)  According to the Cagliari Meeting Report, the Application TC and the Systems TC had 25 and 34 participants, respectively.  (Ex. 9 at Exh. 5 at 8, 14).

23.     Article 4, Section 8.1 of the DAVIC Statutes, attached hereto as Exhibit 11, states that "[a]ll material presented to DAVIC or its committees shall be deemed of non confiden-tial [*sic*] nature and hence for public distribution."

24.     General Instrument's "System Information Description, Rev. 1.3" ("GISID"), attached hereto as Exhibit 12, and bearing a date stamp of May 17, 1995 and document number stamp of "T3/S8 Doc.-079," was submitted to the Advanced Television Systems Committee (ATSC) in 1995 as part of the standards development process of an ATSC Specialist Group known as both the "Specialist Group on Transport" and "T3/S8".  (Decl. of Craig K. Tanner, Ex.

13 at ¶¶ 9, 15.) 65.   The ATSC is "an international, non-profit organization developing voluntary standards for digital television.  The ATSC member organizations represent the broadcast, broadcast equipment, motion picture, consumer electronics, computer, cable, satellite, and semiconductor industries.  (ATSC Standard: PSIP for Terrestrial Broadcast and Cable (Revision B), Ex. 14.)

25.   The ATSC general membership as of October 29, 1996 included approximately 56 organizations, including AT&T, CBS, Dolby Laboratories, Fox, General Instrument, Hitachi, HBO, IEEE, Intel, Lucent, MIT, Mitsubishi, MPAA, the National Association of Broadcasters, the National Cable Television Association, Panasonic, Philips, Pioneer, PBS, Scientific Atlanta, Sharp, Sony, Texas Instruments, Thomson (RCA), Toshiba, Universal City Studios, Viacom and Zenith. (Ex. 13 at ¶17, Ex. 3.)  As of September 13, 1995, the T3/S8 Specialist Group had 65 members, including representatives from NBC, Scientific Atlanta, Panasonic, the National Association of Broadcasters, Philips, Thomson (RCA), General Instrument, the FCC, the Electronics Industries Association, Nielsel, Texas Instruments, Hitachi, Toshiba, Dolby Laboratories, Sharp, Sony and PBS.  (*Id.* at Ex. 5.)  Moreover, ATSC meetings, websites and mailing lists are open not just to ATSC members, but also to interested parties who are non-members, except the press.  (Letter from Tanner to Richmond of 1/10/98, Ex. 15; Help Wanted Article and Draft Tanner letter, Ex. 114; Decl. of Bernard J. Lechner, Ex. 16 at ¶ 6.)

26.   The ATSC has a regular system of tracking documents related to each Specialist Group's business in which each Specialist Group retains a sequential document log of all documents submitted to, reviewed by, or created by that Group.  (Ex. 13 at ¶ 34.  Ex. 15 at ¶ 5.) The T3/S8 Specialist Group did, in fact, catalog documents, including standards submissions, in such a document log.  (Ex. 13 at ¶ 21; Ex. 15 at ¶ 5.)  Every entry of the T3/S8 document log

includes, at a minimum, a document number, a date and a title. (Ex. 13 at Ex. 4.) The document log entry for Doc. No. 79—the same document number indicated on the face of GISID—includes a date of May 17, 1995, and a title of "System Information Description (General Instrument)." (*Id.* at Ex. 4.) Any non-member could receive a copy of any document listed on the T3/S8 document log by contacting the ATSC office or the Chairman of the T3/S8 Group. (Ex. 15 at ¶ 6.)

27.    On May 5, 1995, Paul Hearty of General Instrument sent a letter to Bernard Lechner, Chair of the T3/S8 Specialist Group, with which he enclosed "Revision 1.2 of General Instrument's Digicipher II System Information Description" and offered to "handle distribution" of same. (Ex. 13 at Ex. 7.) Mr. Hearty further indicated that General Instrument "will not impose any additional liability on those who might elect to implement the data so disclosed [in the enclosed document]." *Id.* Then, on May 23, 1995, Paul Hearty sent another letter to Bernard Lechner in which he enclosed a "different version" of "General Instrument's proposal for the ATSC System (Service) Information" than was previously submitted on May 5, 1995. (Ex. 13 at Ex. 8.) This letter similarly stated that General Instrument "will not impose any additional liability on those who might elect to implement the data so disclosed [in the enclosed document]." (*Id.*)

28.    According to the June 19, 1995 Minutes of the Eighth Meeting of ATSC Specialist Group on Transport Systems Documentation (T3/S8), "Paul Hearty and Paul Maroney from General Instrument briefly summarized their proposal for System Information tables (T3/S8-079)" at that meeting. (Ex. 13 at Ex. 6.)

29. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

30. ████████████████████████████████████████

██████████████████████████████████

31.     General Instrument also released GISID to DAVIC.  (GISID (with Melbourne cover page), Ex. 19.  The copy of GISID released to DAVIC includes a cover page that in turn includes a May 17, 1995 date stamp and the document number DAVIC/TC/SYS/95/03/16. (*Id.*)

32.     Around June 5-9, 1995 (i.e. 95/05/04-08), DAVIC held its ninth meeting in Melbourne, Australia.  (Ex. 9 at Exh. 7.)  GISID was distributed at that meeting as part of the standards development process.   (Ex. 19; Ex. 9 at ¶¶ 17, 19.)    Specifically, GISID was distributed, or "allocated," to three separate technical committees within DAVIC: the Applications Technical Committee (Application TC), the Systems Integration Technical Committee (Systems TC), and the Set-Top Unit Technical Committee (STU TC).  (Ex. 19; Ex. 9 at ¶ 19.)  According to the Melbourne Meeting Report, the Application TC and the Systems TC had 25 and 50 participants, respectively.  (Ex. 9 at Exh. 7 at 24-25, 51.)

33.     ATSC Standard Doc. A/56, entitled "System Information for Digital Television" ("A/56"), attached hereto as Exhibit 20, was published to the general public on January 3, 1996.

34.     U.S. Pat. No. 5,550,575 ("West"), attached hereto as Exhibit 132, was filed on May 4, 1994, and issued to inventors Brett West and John P. Gardner on August 27, 1996.

**D.     Reexamination of the '402 Patent**

35.     Prior to the filing of the present actions, an unknown party filed a request for *ex parte* reexamination with the USPTO based upon, *inter alia*, GISID and VT.  (12/24/09 Request for Reexamination, Ex. 21.)  The USPTO granted the request.  (3/2/10 Order Granting *Ex Parte*

Reexamination, Ex. 21.) On July 29, 2010, the USPTO issued a non-final rejection for all Asserted Claims, concluding that the Asserted Claims were anticipated by GISID. (7/29/10 Office Action, Ex. 23 at 3-8.)

36.     In response to the office action, Wi-LAN submitted, among other things, a declaration from Craig Tanner. (Ex. 13.) Mr. Tanner's report did not mention, nor did Wi-LAN otherwise disclose to the PTO, Paul Hearty's Report, discussed in ¶ 29 *supra*.

### E.     Wi-LAN's Infringement Contentions

37.     Wi-LAN's infringement contentions and application of the Asserted Claims are set forth in its Third Supplemental Response to LGE's Interrogatory No. 1, including the attached "EXHIBIT A - PRELIMINARY, REPRESENTATIVE CLAIM CHART FOR LG'S DIGITAL TV RECEIVERS WITH V-CHIP CAPABILITY" (collectively attached hereto as Exhibit 24) and the January 28, 2011 Rebuttal Report of Craig K. Tanner to the Expert Report on Invalidity of Adam Goldberg (Ex. 118). Wi-LAN defined LG's Accused Products as all LG television receiver devices that include "V-Chip" parental control functionality or similar technology to block programming based upon a content advisory descriptor or program rating included with the program of infringing the Asserted Claims. (Wi-LAN's First Set of Interrogatories, Ex. 116 at Definitions.) Wi-LAN alleges that each accused product infringes because it "includes the *capability* of selectively blocking video signals." (Wi-LAN's 3rd Supplemental Responses to LG's 1st Set of Interrogatories, served 9/20/10, Ex 24 at Ex. A, p. 1 (emphasis added).)

38.     In his deposition Mr. Dolan stated that "selectively block a video signal" means "the video signal would be blocked based on some selection criteria." (Dolan Dep., Ex. 125 at 91.)

39.     In his deposition Mr. Tanner stated that "selectively blocking video signals" refers to "the belief that parents in -- particularly may wish to have some control over the kinds of programs that are seen in their home, and they should have the ability according to their preferences, to block display of that programming on their TVs, according to their own tastes and judgments"  (Deposition of Craig Tanner, Ex. 126 at 72-73) and "the parent, let's say, who owns the TV, having the ability to make some decisions and have them implemented about what gets blocked or what gets allowed on that television." (Ex. 126 at 148.)

40.     In response to the question "[d]o you believe an intended use of an informational scheme is to enable a user to selectively block programming rated in accordance with that scheme?" Mr. Tanner stated in his deposition that "[i]t's part of a system that can be used to do that, yes."  (Ex. 126 at 76.)

41.     In the deposition of Wi-LAN's expert, Mr Tanner, Mr. Tanner stated  "I'd have to look at my report in detail, but since -- claim 7 is a method claim.    It requires certain steps to be taken.  So the product alone cannot immediately infringe.  At least, the TV must be turned on and the channel changed.  There may be other steps required, but at a minimum, it involves those issues, turning on the TV and changing channels."  (Ex. 126 at 127.)

42.     Mr. Tanner stated in his opening report that "All LG Accused Products…literally infringes and has literally infringed…when the [Accused Products] are turned on and receive or have been turned on and received over-the-air television signals including RRT1"  (Tanner Op. Rpt., Ex. 118 at ¶ 1.)  Similarly, Mr. Tanner admitted in his deposition that in order to infringe claims 7 through 11, the accused products need to be plugged in and turned on at the minimum. (Ex. 126 at 129.)

43.     Yet, it is Wi-LAN's position that a user does not need to be involved in the performance of the method of the Asserted Claims.  (Ex 125 at 170; *See also Id.* at 46, 150.)

44.     Mr. Tanner stated in his opening report that the RRT1 table was first defined in 1997 and  has "not been materially altered by the revisions to the A/65 and CEA-766."  (Ex. 118 at ¶ 30.)

45.     Wi-Lan's expert witness Mr. Wallace stated that RRT1 was receivable between September 10, 2010 and October 3, 2010.  (Wallace Rpt., Ex. 119 at 1, 4; Wallace Dep., Ex. 127 at 61-64.)

46.     In response to the question "Okay.  But beyond all the evidence you just discussed, you have no direct evidence of RRT-1 being broadcast beyond the Wallace report which shows, according to Wallace, broadcasting of RRT during 2010?" Mr. Tanner stated in his deposition "Well, we did not present any direct evidence that -- based on field surveys that we done in that time period, but I think it's pretty compelling evidence despite that."  (Ex. 126.)

47.     Mr. Tanner further confirmed that "[t]he relevant tables for purposes of my analysis are RRT and the EIT."  (Ex. 118 at ¶ 30.)

48.     However, Mr. Tanner stated in his deposition that in order to receive a second configuration according to Claim 7, "a second television channel is tuned to."  (Ex. 126 at 190.)

49.     McGraw-Hill Electronics Dictionary defines "television signal" as: "[t]he general term for the audio and visual signals that are broadcast together to provide the sounds and pictures of a television program."  (McGraw-Hill Electronics Dictionary, Ex. 117 at 463.)

50.     Mr. Tanner stated in his deposition that "[u]nless otherwise indicated, the term 'channel' when used in this report refers to the RF signal whose modulation contains the entire ATSC transport stream."  (Ex.126 at 151.)

51.     Mr. Tanner stated in his deposition that a "first television channel" can be the same channel as a "second television channel."  (Ex. 126 at 33.)

52.     In his deposition Mr. Dolan stated that ██████████████████████████ ██████████████████████. (Dolan Dep. Ex. 125 at 170-71.) Further, he "███████████ ███████████████████████████████████████████████████████████ ███████████████████████████." (Ex. 125 at 140.)

53.     In an ex parte letter to the FCC, Mr. Collings stated "I explained that the RRT for rating region 0x01 [RRT1] (as defined in section 4.1 of EIA-766-A) can not be fully interpreted by DTV receivers using the RRT syntax specified in PSIP alone."  (Ex. 128, 10/24/03 Ex Parte Letter from T. Collings to FCC at WL0279085.) In his deposition Mr. Tanner agreed with Mr. Collings' statement in the above statement of fact.  (Tanner Dep., Ex. 126 at 213-14.)

54.     Mr. Tanner's proposed construction for "informational scheme" is "a set of kinds of information that may be transmitted about a program, a set of values that may be transmitted for the different kinds of information and the meanings of those values."  (Ex. 118, Tanner Op. Rpt. at ¶ 40.)

55.     Mr. Tanner stated in his deposition that the "first informational scheme" must be different from the "second informational scheme."  (Ex. 126 at 33-34.)

56.     Regarding the claimed first and second informational schemes, Mr. Tanner stated: "[i]t's my opinion that, according to the definition in claims 7(a) and 7(c), which define what configuration information is, that RRT-1 meets that definition for all three of the informational schemes contained therein.  (Ex. 126 at 180; see also Id. at 51-52; 190-91.)  In response to the question "[c]an first configuration information be the same as second configuration information?" Mr. Tanner stated in his deposition that "[n]o, I don't believe so.  To the extent

that the second configuration information describes a second and different informational scheme, I believe the configuration information is intended to be different.  (Ex. 126 at 34.)

57.     In response to the question "[w]ith just this data in this table [RRT1] being transmitted, how is LG able to create the on-screen display where they break up MPAA, TV general audience and TV Children?" Mr. Tanner stated in his deposition that "I don't know how LG did it, but it was likely not relying upon an RRT transmission since they were in Korea when they did it."  (Ex. 126 at 211-12; see also Ex. 125 at 120.)

58.     In response to the question " ███████████████████████████ ████████████████████████████ " Mr. Tanner stated in his deposition " ████████ ███████ "  (Ex. 126 at 144.)

59.     In his deposition Mr. Dolan stated that Table 3 from CEA-766 is not included in the RRT1 that is encoded and broadcast and that "[n]ot everything in the [CEA-]766 is in the RRT[1]." (Ex. 125 at 99, 122-123; *See also* Ex. 126 at 201-204.)

60.     In his deposition Mr. Tanner stated "[i]n addition, there are no mechanisms in GI such as -- that would allow you to address one information scheme for the other -- or the other. Remember, that's implemented by CEA-766's table of 54 allowed messages.  There is no such thing in GI." (Ex. 126 at 275.)

61.     In his deposition Mr. Dolan stated that " ██████████████████████████ ████████████████████████ "  (Ex. 125 at 220-21.)

62.     In his deposition Mr. Tanner stated that "receiving" is "receiving from a transmitted signal."  (Ex. 126, at 155.)

63.     Mr. Tanner states in his report that the terms 'dimension' and 'category' (and their plural forms) are used interchangeably in this report").   (Ex. 118, Tanner Op. Rpt. at 13.)

Mr. Tanner also states in his report that "TV Parental Guidelines contains seven dimensions or multilevel categories of labels."  (Ex. 118, Tanner Op. Rpt. at 14.)

64.     McGraw-Hill Electronics Dictionary  defines "store" as "[t]o transfer an element of information to memory or storage in a computer for later extraction."  (Ex. 117 at 445.)

65.     Microsoft Computer Dictionary defines "memory" as "[c]ircuitry that allows information to be stored and retrieved."  (Microsoft Computer Dictionary, Ex. 65 at 225.)

66.     Mr. Dolan stated in his deposition that, in accordance with the claim, user preference information has to be stored in non-volatile memory.  (Ex. 125 at 69.)

67.     McGraw-Hill Electronics Dictionary  defines "non-volatile memory" as memory in which data is retained even when power is disconnected from the storage medium.  (Ex. 117 at 313.)

68.     Mr. Tanner testified in his deposition that the "clear meaning" of "user" is "somebody who is operating the television" and that the "main purpose of the invention [of the '402 Patent] is to allow a parent, an individual user, to set user preferences."  (Ex. 126 at 223, 285.)

69.     Mr. Tanner stated in his deposition that his infringement opinion is not based on a person or user setting "user preferences."  (Ex. 126 at 183, 185, 218, 285.)

70.     Mr. Tanner and Mr. Dolan stated in their depositions that according to Step (e) a user must store preferences for each category in each of the informational schemes.  (Ex. 126 at 219; Ex. 125 at 73-74.)

71.     Mr. Tanner stated during his deposition "[t]hese products come shipped to the consumer with a set of user preferences.  All right?  And before the box is ever opened and when the TV is turned on, its my understanding there are user preferences.  It clearly didn't come from

14

the individual user of the TV.  They came from LG, from the factory, from some initial settings."
(Ex. 126 at 185; See also Ex. 125 at 168.)

72.     Mr. Tanner stated during his deposition that Accused Products are "shipped to the
consumer in a kind of no-blocking state" and that  "default settings…allow all the programs to be
viewed."  (Ex. 126 at 186, 188;  *See also* Id. at 224, 226.)

73.     Mr. Dolan stated in his deposition that the "informational schemes referenced in
Step "(e) refers to the schemes above in (a) and (c)."  (Ex. 125 at 164; *see also id.* at 162-165.)

74.     Mr. Shin of LG stated in his deposition that ███████████████████████
████████████████████████████████████████████████████
████████████████████████████. (Shin Dep, Ex. 113 at 89; *See also* Ex. 126 at
185-86, 189; Ex. 125 at 158-59, 168.)

75.     Mr. Tanner and Mr. Dolan stated in their depositions that they relied on factory
default settings in order to opine that LG's Accused Products satisfy the "storing user
preferences" limitation of Step (e).  (Ex. 126 at 186; Ex. 125 at 168.)

76.     In its 10/29/2010 Office Action Response, Patentee stated "[a]gain, even
assuming arguendo that GISID discloses storing user preference information for each category in
a first informational scheme, GISID fails to disclose storing user preference information for each
category in each of said first and second informational schemes."  (10/29/2010 Resp. to Office
Action, Ex. 134 at WL0305032; *see also id*. at WL0305040.)

77.     Mr. Dolan stated in his deposition that in order to meet limitation (e), user
preference information must be stored for each category in each of the first and second
informational schemes and that limitation (e) would not be met if user preference information for
only one of four categories of a certain informational scheme were stored.  (Ex. 125 at 73.)  Mr.

Dolan also stated that ███████████████████████████████████

████████████████████████████████████████████████████████████

███.  (Ex. 126 at 74.)

78.     The Microsoft Computer Dictionary defines "video" as: "the visual (rather than the audio) component of a television signal."  (Ex 132 at 361.)

79.     Digital television (DTV) broadcasts are electronically transmitted in a stream of data packets that is known as the ATSC Transport Stream ("TS"). (Ex. 13 at ¶ 21, Figure 1.)  The ATSC TS includes a video data stream, an audio data stream, and a Program and System Information Protocol (PSIP) data stream, as well as other data streams.  *Id.*

80.     Mr. Dolan stated in his deposition that "[b]ecause of the qualifier at the end of the sentence of 'displayed on a video display,' it's probably only video."  (Ex. 125 at 182-183.)

81.     In response to the question "…It's your opinion, that in (h) and (i), when the claim refers to video signal, it's referring to audio and video?", Mr. Tanner stated in his deposition "[n]o.  I was really referring to what one of ordinary skill might implement.  If you follow the plain meaning of claim steps 7 (h) and (i), there's no mention of audio.  So, it's not my opinion that the claim requires it.  I was only saying that it's a choice one might make."  (Ex. 126 at 245-46.)

82.     Mr. Tanner and Mr. Dolan offered the following definitions for the term "video signal" in their depositions "(1) "displayable component signal of the television channel signal"; (2) "displayable and audible components of the television channel signal"; and (3) "the entire ATSC transport stream."  (Ex. 125 at 181-183; Ex. 126 at 244-46; 149-53.)

83.     Mr. Tanner and Mr. Dolan state that they interpret the embedded information in the limitation  "video signal comprising embedded information" to be the CAD.  (Ex. 125 at 153, 180-181; Ex. 118 at ¶ 31, 49.)

84.     The Microsoft Computer Dictionary defines "video" as  "the visual (rather than the audio) component of a television signal."  (Ex. 132 at 361.)

85.     Mr. Dolan stated in his deposition that Step (g) requires that the program rating information or CAD embedded in a video signal be compared against user preference information for "said informational scheme" which finds its original antecedent basis in Steps (a) and (c) – the steps which require the receiving of a first and second informational scheme.  (Ex. 125 at 162-165; 177-78.)

86.     Mr. Tanner stated during his deposition that factory default settings would not permit Step (h) to ever occur.  (Ex. 126 at 226-27.)

87.     Mr. Shin of LG stated that factory default settings allow all programs to be viewed.  (Ex. 113 at 86-88.)

88.     Mr. Tanner stated in his deposition that when he used an Accused Product he did not set all of the categories.  (Ex. 126 at 114-116.)

89.     Mr. Tanner stated in his deposition that he did not do an element-by-element analysis of any LG testing and did  not offer any opinions on LG's testing on an element-by-element basis.  (Ex. 126 at 119-122; *see also* Ex. 118 at ¶ 190.)

90.     Mr. Dolan stated in his deposition that "I believe my opinion has been clear in the report that the devices infringe [Step] E and [Steps] G through I."  (Ex. 125 at 46.)   Mr. Dolan also states that he "didn't rely on any evidence of an actual user inputting his or her user preferences."  (Ex 125 at 64, 66-67; 81-82; 84-85; 143-145, 174.)

**F.   Tim Collings And Tri-Vision's Activities Leading Up To The Filing Of The Application For U.S. Patent No. 5,828,402.**

91. ███████████████████████████████████████

████████████████████████████████████████████

███

92. ███████████████████████████████████████

███████████████████████████ (Ex. 26.)

93. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

94.   A Wi-LAN document states the following under the "████████████████

███████" heading:

████████████████████████████████████████████

(████████████████████████████████████ Ex. 29 at 1.)

18

**G.      Tri-Vision Cloaked Its Financial Interests In Favorable V-Chip Mandates When Dealing With The Federal Communications Commission.**

95.      Between 1997 and 2003, Tim Collings made at least the following submission to the FCC—all without ever disclosing Tri-Vision, the '402 Patent, or any financial interest that Mr. Collings and/or Tri-Vision might have in the rules under consideration:

- A March 19, 1997, cover letter and comment on Simon Fraser University Letterhead regarding "Video Programming Ratings Proposal."  (T. Collings Comments to FCC of 3/19/97, Ex. 30.)

- An October 1, 1997, cover letter and comment on Simon Fraser University Letterhead regarding "CS Docket No. 97-95, Industry Proposal for Rating Video Programming."  (T. Collings Comments to FCC of 10/1/1997, Ex. 31.)

- April 7, 2003, comments to Marlene H. Dortch of the FCC regarding, among other things, "'…whether the Commission should adopt the provisions of PSIP that require all digital television broadcasters to transmit v-chip rating information using PSIP.'"  (T. Collings Comments to FCC of 4/4/03, Ex. 32 at ¶ 2.)

- May 21, 2003, "Reply Comments of Tim Collings," in which he stated that "the V-Chip can provide flexibility, expandability and selectivity."  (Reply Comments of Tim Collings submitted to the FCC on May 21, 2003.)

- An October 24, 2003, *ex parte* letter to Marlene Dortch of the FCC noting that he met with FCC staff on October 21, 2003 to discuss issues "related to the implementation of parental controls in DTV receivers using the ATSC A/65-B ("PSIP") and EIA-766-A standards."  (Ex Parte Letter From T. Collings to FCC of 10/24/03, Ex. 33 at ¶ 2.)

96.      Additionally, on January 29, 2003, U.S. Representative Edward Markey sent a letter to FCC Chairman Michael K. Powell requesting that the FCC "revise the PSIP Standard to restore the 'dynamic' capability in the U.S."   (Letter from Congressman E. Markey to FCC Commissioner M. Powell of 1/29/03, Ex. 222.) ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ Rep.

Markey's letter to the FCC did not disclose ████████████████████████

██████████████████████

97.     There is no evidence that Collings disclosed his connection to Tri-Vision, the '402 Patent, nor any financial interest that he and/or Tri-Vision might have had in the rules under consideration.

98.     On September 7, 2004, the FCC released its 04-192 Report and Order which states that "receivers must be able to process newer RRT version numbers or use new rating region codes as suggested by ATSC."  The Report and order cites to "Tim Collings [April 7, 2003] Comments at 2-4; Letter from Tim Collings to Marlene Dortch, FCC, dated October 24, 2003 at 2" and "Letter from Rep. Edward J. Markey to Chariman Michael K. Powell, FCC, dated January 29, 2003."  (FCC 04-192 Report and Order of 9/7/04, Ex. 35)

99.     During Wi-LAN's December 7, 2010, Deposition, Defendants' counsel asked: "[Y]ou never did specifically disclose your financial interest in the '402 patent to anybody at the FCC prior to the August 2004 report and ruling, correct?"  In response, Wi-LAN ████████████ "[█████████████████████.]"  (Ex. 119 at 374:9-13.)

100.    On September 8, 2007, one day after the FCC Report and Order was released, Tri-Vision issued a News Release, noting that the FCC Report and Order "included several key requirements that will provide all Americans with the valuable Tri-Vision V-Chip technology." (Tri-Vision Press Release of 9/8/04, Ex. 36 at ¶ 1.)

101.    On November 3, 2004, less than two months after the FCC released its Report and Order, the Consumer Electronics Association submitted a *Petition for Clarification and/or Reconsideration* ("CEA Petition"), disclosing that Tim Collings holds a patent related to the

recently released regulations, and that licenses to this patent are being offered through Tri-Vision, of which Mr. Collings is a director.   (CEA Petition for Clarification and/or Reconsideration to FCC of 11/3/2004, Ex. 37 at 7.)

102.    On November 19, 2004, Tim Collings and Richard Parr met with Rick Chessen and other FCC officials to discuss the 2004 FCC rule changes and the CEA Petition.  (Collings 30(b)(6) Dep., Ex. 119 at 416:6–11.)  According to Tri-Vision, Mr. Chessen said that he was "██████████████████" and that he had "█████████████████" The FCC also indicated to Tri-Vision that other consumer electronics manufacturers were "███████" with Tri-Vision's offered royalty rate.  (Wi-LAN Document re: FCC Meeting Minutes, Ex. 38.)  An internal Wi-LAN document that summarizes Tri-Vision's November 19, 2004, meeting with the FCC states: "██████████████████████████████████████████████████████████████████████████████████████████████████████" (Ex. 38.)

103.    The CEA submitted reply comments in the FCC's related *Violent Television Programming and Its Impact on Children* matter, noting that the "CEA urges caution against those parties who fail to disclose financial interests, while advocating mandatory action."  (CEA Reply Comments to FCC of 11/15/04, Ex. 39 at 4.)

104.    On November 22, 2004, Tri-Vision and Mr. Collings submitted their opposition to the CEA Petition, stating that Tri-Vision would "do whatever is necessary to ensure that the terms of the resultant ['402 Patent] licenses are reasonable, non-discriminatory and fair."  (T. Collings and Tri-Vision Opposition to Petition for Clarification and/or Reconsideration by the CEA to FCC of 11/22/04, Ex. 40 at 5.)

105.   After Tri-Vision submitted its Opposition to the CEA Petition, ██████

████████████████████████████████████████████████████████████████████

███ . (*See, e.g.*, Letter from N. Siddiqui to ███████ and █████ of 5/30/07, Ex. 41; Letter

from N. Siddiqui and B. Middleton to █████ of 7/16/07, Ex. 42; Letter from N. Siddiqui and B.

Middleton to █████ of 3/28/08, Ex. 43; Collings 30(b)(6) Dep., Ex. 119 at 349:3–350:1.)

106.   The Coalition for Independent Ratings Services ("Coalition") also submitted an

Opposition to the CEA Petition on January 21, 2005.  (Coalition Comments and Opposition to

the CEA Petition to FCC of 1/21/05; Ex. 44.) ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████" (████████████████████

████████████████████████████████ On January 7, 2005, Mr. Parr informed Tri-Vision that

"████████████████████████████████████████████████████████████████

████████████████" (Letter from R. Parr to N. Siddiqui of 1/7/05; Ex. 46 at ¶ 1.) ████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

107.   During his March 15, 2011, deposition, Dominic Perri acknowledged that "███

████████████████████████████" to the Coalition's Opposition to the CEA Petition.  (Perri

Dep., Ex. 123 at 254:9–13.)

108.   Upon receiving the Coalition's Opposition, ██████████████ of the CEA sent an

internal email noting that "████████████████████████████████████████████████

███████████████████████████████████████████" (Email

from ████████ to ████████████████ of 1/24/05; Ex. 48.)

109.    Likewise, in the CEA's Reply to Oppositions, submitted to the FCC on January

31, 2005, the CEA noted that "Tri-Vision's assertion is effectively the same as CFIRS and is

equally incorrect."  (CEA Reply to Opposition to FCC of 1/31/05; Ex. 49 at 4.)

110.    According to Mr. Perri, his "███████████████████████████████

████████████████" (Perri Dep., Ex. 123 at 254:14–21.)

**H.    While Tri-Vision Was Secretly Influencing The FCC's 2004 V-Chip
Mandate, It Was Also Misrepresenting Its Interest To The ATSC To Obtain
More Favorable A/65 Standard Language.**

111.    The A/65 standard "defines the standard protocol for transmission of the relevant

data tables [e.g., RRT and EIT tables] contained within packets carried in the Transport Stream

multiplex."  (Ex. 14.)

112.    Mr.  Collings  was  "████████████████████████████████████

████████████████████████" (Email from T. Collings to N. Siddiqui of

8/9/03, Ex. 50; Collings 30(b)(6) Dep., Ex. 119 at 368:13-17.)

113.    Tri-Vision became an ATSC member around September 9, 2003. (Minutes of

ATSC Meeting, 9/9/03, Ex. 25 at 4, identifying "Tri-Vision Electronics" as a "New Member[]").

114.    According to the ATSC's patent policy: "If the ATSC receives notice or

otherwise becomes aware that a proposed ATSC Standard may require the use of a patented

invention, the ATSC shall receive from the patent holder … either: assurance in the form of a

general disclaimer to the effect that the patentee does not hold and does not anticipate holding

any invention whose use would be required for compliance with the proposed ATSC Standard or

assurance that: … (b) A license will be made available to applicants under reasonable terms and

conditions that are demonstrably free of any unfair discrimination." (ATSC Patent Policy of 1/31/02, Ex. 51.)

115.    On July 28, 2003, Zenith Electronics Corporation submitted a letter to the ATSC "confirm[ing] that pursuant to the ATSC Patent Policy, to the extent any such inventions are approved as a part of the ATSC Standard, Zenith will make available to applicants a license to practice such inventions for compliance with the ATSC Standard under reasonable terms and conditions that are demonstrably free of any unfair discrimination." (Ex. 25 at ATSC18384.)

116.    Tri-Vision had previously submitted an IP proffer to the CEA, agreeing to license the '402 Patent on "reasonable terms and conditions that are demonstrably free of any unfair discrimination." (Tri-Vision IP Proffers to CEA, 6/4/2003, Ex. 137 at 3.)

117.    In an email dated November 12, 2004, Tim Collings acknowledged that: "███

████████████████████████████████████████████████████████████

██████" (Email from T. Collings to C. Moffat, N. Siddiqui of 11/12/04, Ex. 52.)

118.    In the October/November 2004 timeframe, Tri-Vision sent correspondence to potential licensees stating: "████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████" (*See, e.g.,* Letter from N. Siddiqui to ██████ of 10/25/04, Ex. 53; Letter from N. Siddiqui to S.Y. Kang of 11/3/04, Ex. 54.)

119.    Tri-Vision submitted IP Proffers to the ATSC on December 8, 2004 and on May 11, 2005.  (Letter from N. Siddiqui to M. Richer of 12/8/04, Ex. 55; Letter from N. Siddiqui to M. Richer, of 5/11/05, Ex. 56.)

**F.    Tri-Vision Hires Dominic Perri Of The Coalition To Act As Its "Secret Lobbyist" To Push Its Agenda On The FCC and CEA.**

**1.    Background On The Relationship Between Wi-LAN and the Coalition**

120.    The Coalition was founded in the spring of 2004 (Perri Dep., Ex. 123 ,at 302:13–14), but it was not registered as an Illinois Educational/Political Not For Profit Corporation until November 20, 2007.  (Coalition for Independent Ratings, Articles of Incorporation, Ex. 57.)

121.    The Coalition has no current standing members.  (Perri Dep., Ex. 123 at 297:14–17.) When asked whether the Coalition had standing members after January 1, 2008, Mr. Perri stated: "███████████████████████████████████████"  (Perri Dep. Ex. 123 at 300:10–301:6.)

122.    In  May  of  2006,  ██████████████████████████ ████████████████████████████████████████████████ ████████" (Email from N. Siddiqui to M. Eldon, of May 28, 2008, Ex. 58.)

123.    ███████████████████████████████████████ ██████████████████████████████████.

124.    ███████████████████████████████████████ ███████████████████████. (Email from N. Siddiqui to D. Nuhn et al. of 10/25/09, Ex. 59.)

125.    ██████████████████████████████████████. (*See* Ex. 60.)

126.    From  2007  through  2010,  the  Coalition  did  not  "█████████████ █████████████████████████. (Perri Dep, Ex. 123 at 176:3–9.)

127.    ███████████████████████████████████████ ███████████████████████████████████████

128.   ███████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

129.   ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

130.   ███████████████████████████████████████████

██████████████████████████████████████████

2.   **Wi-LAN's And The Coalition's Efforts To Conceal Their Relationship.**

131.   Wi-LAN admitted during its December 7, 2010, deposition that "████████████

██████████████████████████████████████████████████

██████████████████████████████████████████" (Collings

Dep., Ex. 119 at 429:21–431:1.)

132.   In Wi-LAN's own words:

- "██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████" (Email from T.
Collings to M. Eldon of 10/26/06, Ex 70.)

- "████████████" (Email from M. Eldon to N. Siddiqui & M. Fortkort of 12/12/06, Ex. 71.)

- "██████████████████████████████████████████

██████████████████████████████" (Email from T.
Collings to M. Eldon of 12/15/06, Ex. 72.)

- "████████████████████████████████████████
████████████" (Email from T. Collings to M. Eldon of 3/1/07, Ex. 73.)

- In an October 13, 2009, email, Dominic Perri states to Murray Eldon: "███████████████████
████████████████████████" In response, Mr. Eldon states: "██████
████████████████" (Email from D. Perri to M. Eldon of 10/14/09, Ex. 138.)

- "████████████████████████████████████████
████████████████████████████████████████
████████████" (Ex. 59.)

133.   ████████████████████████████████████████

████████████████. (Email from D. Perri to M. Eldon of 6/1/01, Ex. 74; D. Perri

Dep., Ex. 123 at 163:13–14.)

134.   ████████████████████████████████████████

████████████████████████████████████████

████. (D. Perri Dep., Ex. 123 at 178:15–179:14.)

**3.      Wi-LAN And Dominic Perri Conspire To Defraud The FCC.**

135.   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

136.   On December 13, 2006, Patricia Paoletta of Harris, Wilsthire & Grannis LLP,

submitted an *ex parte* letter to Marlene Dortch of the FCC stating "[o]n 12 December 2006,

members of the Coalition for Independent Ratings Services ("Coalition") met with Commission

staff to discuss the status of Section 15.120(d)(2) and related issues."  Ms. Paoletta continued:

"The Commission also asked the Coalition if it had information regarding the royalty fees

required to be paid to the holder of the open V-chip technology…." (Letter from P. Paoletta to M. Dortch of 8/7/07, Ex. 76 at 4-5.)  The letter does not disclose any relationship between the Coalition and Wi-LAN.

137. ███████████████████████████████████████████
████████████████████████████

138. In response to the FCC's request indicated in Ms. Paoletta's letter, ███████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

139. ███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

140. ███████████████████████████████████████████

141. In a December 12, 2008, email bearing the subject "████████████████████ ████████████" Dominic Perri stated to Murray Eldon and Tim Collings: "████████████

███████████████████████████" (Email from D. Perri to M. Eldon & T. Collings of 12/12/08, Ex. 89.)

142.    Regarding promoting the use of new, downloadable ratings in the U.S., Wi-LAN believed that "████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████" (Email from M. Eldon to N. Siddiqui of 10/19/09, Ex. 90 at 2.)

143.    On August 22, 2007, Tim Collings emailed Murray Eldon stating "████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████" In response, Mr. Eldon stated: "████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████" In response, Mr. Collings states "████████ ████████████████████████████████████████████████████ ████████████" (Email from T. Collings to M. Eldon of 8/22/07, Ex. 91 at 1.)

144.    ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

145.    On October 17, 2007, Najmul Siddiqui emailed Wi-LAN personnel stating

"███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████" (Ex. 92.)

146.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

147.    Neither Mr. Perri nor Patricia Paoletta ever registered as a lobbyist on behalf of

Tri-Vision or Wi-LAN.  Rather, Ms. Paoletta registered solely on behalf of the Coalition and

other, at times defunct, Coalition members.  (Lobbying Registrations for P. Paoletta, filed 6/2/04

- 8/11/09, Ex. 101-111; Perri Dep., Ex. 123 at 283:17–22.)

148.    During his March 15, 2011, deposition, ████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████" (*See, e.g.,* Perri

Dep, Ex. 123 at 11:24–12:5; 64:19–21; 185:8–10; 185:23–186:1; 222:14–16; 269:23–24;

273:18–20; 284:19–21; 285:6–8; 285:22–24; 286:6–7; 286:12–14.)

**4.     Wi-LAN And The Coalition Conspire To Defraud The CEA.**

149.    Mr. Perri also interacted with the CEA ████████████████████.  For instance, ████

████████████ Mr. Perri to attend the CEA's Winter Technology and Standards Forum held in

San Antonio, Texas on February 28, 2007.  ████████████████████████████

███████████████████████████████████  During the Forum, Mr. Perri

suggested to Brian Markwalter of the CEA that they meet with Julie Kearney, head of policy for

the CEA, back in Washington after the conference to discuss the availability of RRT-5 to

independent ratings groups.  (Memo from D. Perri to T. Collings & M. Eldon of 2/28/2007, Ex.

136.)  ████████████████████████████████████████████████████

████████████████████████████████████

          "████████████████████████████████████████

████████████████" (Ex. 73.)

          150.    Following the San Antonio Forum, the Coalition submitted spreadsheets of

proposed changes to CEA-766 language  ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████For example, after

Mark Eyer of Sony Electronics offered a particular phrase to include in CEA-766-B,  ████████



151.    In a February 1, 2007, email, Dominic Perri stated to Murray Eldon: "

" In response, Mr. Eldon stated:

"

"

(Ex. 141.)

152.

(12/08/10 Deposition Tr. of Tim Collings at 430:17–431:22; Perri Dep, Ex. 123 at 238:11–16.)   Indeed, Mr. Perri made it clear that he "

" Perri Dep, Ex. 123 at 240:1–9.)

153.    CEA policy requires that "[c]onsultants who participate in a CEA Technology & Standards formulating, working or task group … declare an affiliation from among the following options: a) single-member affiliated; OR b) independent." (CEA Procedures, *Technology & Standards Procedures Manual*, CEA-EP-23, 9/06, Ex. 149 at 8.) A single-member affiliate consultant is one who "represent[s] a single company or organization for purposes of all of the consultant's work related to a single formulating group." (*Id.* at 9.) The CEA further maintains a special policy stating that all standardization programs "shall be carried on in good faith" and "they shall not be proposed for or indirectly result in … giving a competitive advantage to any manufacturer…." (Consumer Electronics Association, Legal Guides, Part II: Special Guides

Applicable to Standardization Programs, Section C. Basic Rules for Conducting Programs, Ex. 150.)

154.    During Tim Collings' October 14, 2010, deposition, he stated that " ██████

███████████████████████████████████████████████████████████

██████ " (Ex. 120 at 263:7–9.)  Mr. Perri likewise acknowledged that he met with Wi-LAN to

discuss " █████████████████████████████████ " (Ex. 123 at 101:3–4.)

Still further, during Mr. Perri's deposition, ██████████████████████████

███████████████████████████████████████████████ (Ex.

123 at 43:24–44:14.)

155.    Mr. Perri claimed that he was not aware of "any such requirement" to "be truthful

when participating in the [CEA's] standards process," nor was he aware of "any duties according

to the CEA to disclose relationships" amongst participants.  (Ex. 123 at 238:17–239:23.)

156.    CEA policy also requires members to disclose "any knowledge they may have of

existing relevant patents."  (Ex. 149.)

157.    By December 21, 2006, at the latest, Mr. Perri knew that Wi-LAN had a patent

relating to V-Chip.  (Ex. 80; Ex. 123 at 258:4–9.)

## I.    Wi-LAN's Attempts to "Hold-Up" The Entire Digital Television Receiver Market Using Bad Faith Patent Licensing Tactics.

158.    Although the '402 Patent issued in October 1998, Tri-Vision did not execute its

first '402 Patent license agreement until more than three years later in 2002.  (Draft Agreement

between Tri-Vision and ██████, ██████.)  Meanwhile, Wi-LAN had focused on licensing its

Canadian '474 Patent and had licensed substantially all of the Canadian TV manufacturers by

early 2004.  (Ex. 124, Siddiqui Dep at 42, 45).  ████████████████████████

██████████████████  (M. Riley Opening Ex. Rpt. of 1/14/11, Ex. 152 at Ex. 8.)

159.    Effective March 15, 2006, FCC Rule 47 C.F.R. 15.120 required digital television receivers to comply with ATSC A/65A.

160.    The then-current version of A/65 included Amendment No. 2, which states: "For regions (such as the US) where the definition of the rating system is unchangeable, transmission of that region's RRT is not required and is not recommended."   (Amendment No.2 to ATSC Standard, Ex. 159.)

161.    Wi-LAN always maintained that all receivers that were compliant with the FCC rule requiring the capability to respond to changes in the ratings system were covered by the '402 Patent, and it accordingly pursued its licensing program on the basis that mere capability of performing the claimed method, rather than actual performance of each step of the method, infringed the '402 Patent.  (Ex. 124 at 85:20–86:21, 100:22–101:10.)

162.    Wi-LAN concedes that " ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ " (Ex. 33,) and that the vast majority of consumers do not use V-Chip. (Email from T. Collings to D. Perri, et al of 1/12/10, Ex. 160; Ex. 161.) Wi-LAN further concedes that the FCC's 2004 V-Chip mandate " ████████████ ████████████ " (Email from T. Collings to M. Eldon of 7/7/07, Ex. 162.)

163.    Wi-LAN further concedes that it was not until at least ████████████ —after LG had already taken a license in the '402 Patent—t████████████████████ ████████████████████████████████ (Ex. 120 at 422-24, 458-464, 578–80; Wi-LAN US Patent '402 Licensing Strategy, Ex. 163;  Email from T. Collings to N. Siddiqui of 12/10/06, Ex. 164.)

164.   Wi-LAN would frequently attempt to license the '402 Patent together with the broader '474 Patent.   Wi-LAN shared its belief with potential licensees that the '474 Patent contained substantially broader claims than those granted in the '402 Patent.  (Ex. 124 at 42:15–18; Letter from Parr to Kang of 1/4/01, Ex. 165; Letter from Parr to Chueng of 5/24/01, Ex. 166.)

165.   Moreover, Wi-LAN acknowledged that █████████████████████ ███████████████████████████████████████████████████████████████████ (Email from Collings to Roberts, et. al. of 1/9/08, Ex. 167; (J. Roberts Dep. at 190:11–192:20.)

166.   In a one-month span in ████, Wi-LAN licensed the '402 patent to three different parties under respective royalty rates of US$████, US$████ and US$████ (███████████ License Agreement of ██████, Ex. 196; ██████ License Agreement of ██████, Ex. 170; ████████ License Agreement of ██████, Ex. 171.)

**I.    Wi-LAN's Pattern Of Deceitful Behavior Has Carried Over Into The Current Litigation.**

167.   Wi-LAN initially served a privilege log comprising over 2,600 pages and identifying over 26,000 privileged documents.  (11/16/10 Defendants' Letter to Judge Peck, Ex. 172.)

168.   During the October 29, 2010, status hearing before Judge Peck, Wi-LAN admitted that "[t]here was a mistake made" with respect to certain privilege designations it had made. (Hearing Tr., Ex. 173 at 26:3–7.)  After that hearing, Wi-LAN served an Amended privilege log, which had shrunk almost 90% from its original 2,651 pages down to 319, likewise shrinking the number of documents designated as privileged from 26,029 to 3,224, and produced 127,133 pages of documents off of its privilege log—a production that constituted approximately one-third of Wi-LAN's total document production to date. (Ex. 172.)

169.    On five separate occasions, the Court has ruled that persons involved in the '402 Patent reexamination may not have access to Defendants' CONFIDENTIAL ATTORNEYS' EYES ONLY materials: (1) The Court's initial entry of the Protective Order (Dkt. 54); (2) the Court's denial of Wi-LAN's Motion for Reconsideration (Dkt. 66); (3) The Court's December 21, 2010, telephonic ruling that Mr. Meyer and Mr. Tanner be precluded from access to Defendants' AEO materials during a third-party deposition (12/21/10 Hearing Tr. at 10:4–11); (4) the Court's January 3, 2011, order precluding Mr. Meyer from accessing Defendants' AEO materials (Dkt. 99); and (5) Judge Kaplan's February 25, 2011, affirmation of Magistrate Judge Peck's January 3, 2011, order (Dkt. 138).

170.    LG has repeatedly requested that the Court incorporate a claim construction protocol into the case scheduling order, believing that its determination—regardless of the outcome—would "perhaps serve as an impetus for settlement."  (*See, e.g.,* 05/21/10 Hearing Tr. at 31:17–23, 35:7–36:8; 08/23/10 Hearing Tr. at 4:24–7:10; 02/10/11 Hearing Tr. at 28:25–29:14, 61:16–19; 12/16/10 Harris Letter to Judge Peck.)  Wi-LAN, on the other hand, believes that a formal claim construction would be "burdensome and unnecessary."  (Joint Letter to Judge Peck of 03/04/11, Ex. 225)

### J.    The License Negotiations Between Wi-LAN And LG

171.    Tri-Vision first offered a '402 Patent license to LG on November 3, 2004.



" (Dkt. 67 at ¶ 22; Letter from N. Siddiqui to S. Kang of 11/3/2004, Ex. 174.)

(*Id.*)

172.    Indeed, correspondence with other potential licensees in the 2005 time frame confirms that Tri-Vision was not asserting its '402 Patent rights until the FCC's V-Chip Rule Change took effect in March 2006.  (Letter from J. Parr to ███ of 7/29/05, Ex. 175 ("███

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████".)

173.    ████████████████████████████████

███████████████████████████████████████████

███████████

                        ████████████████████████hip Corp (Tri
        ███████████████

                        █████████████████AN Japan Office (Tri
        ████████████████

                        █████████████████hip Corp (Tri
        ██████████

        ██████████████████████████████████

        █████████████████████████████████

        ██████████████████████████████████

        ████████████████████████████████

        ████████████████████████████████████

██████████████████████████

174.    As of January 31, 2005, Najmul Siddiqui, Tri-Vision's President, had knowledge that LG was unsure whether Tri-Vision could enforce the '402 Patent in the U.S. and that, therefore, LG would demand a lower royalty rate on that basis.

> As you know, however, except the FCC rule nothing is confirmed or in progress to force all the D-TV products sold in US to implement v-chip feature included in your patent.  We are still unsure if your patent will be able to be implemented in US cause it requires many steps to be preceded.  Under this circumstance, royalty rate suggested by your party seems too high considering the risk of uncertainty that we should take.

(Letter from S. Kang to N. Siddiqui of 1/31/05, Ex. 176.)

175.    On January 2, 2006, Tri-Vision ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to the lesser of $▮▮ or ▮▮% of t▮▮▮▮▮▮▮▮▮▮▮, as part of a time-limited discount offer which expired on February 28, 2006, just two weeks prior to the day that the FCC's V-Chip Rule Change would take effect.  (Letter from N. Siddiqui to A. Kang of 1/2/06, Ex. 177; Email from N. Siddiqui to A. Kang of 1/17/06, Ex. 178.)  According to Mr. Collings, Tri-Vision l▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ i▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮(Ex.120 at 420-22.) Tri-Vision had established the $▮▮/unit royalty rate prior to executing a license with LG.  (Ex. 120 at 426-29, 571-72.)

176.    On February 28, 2006, Najmul Siddiqui, Tri-Vision President, and Tim Collings, named inventor of the '402 Patent and Tri-Vision director, met with LG representatives to negotiate a '402 Patent license agreement.  (Dkt. 67 at ¶ 24.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (LG

Letter of Intent, 2/28/06, Ex. 179 (emphasis added).) ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████ (*Id.*)

     177.   ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████ ").)

     178.   On March 2, 2006, Tim Collings spoke with ██████████████████████

████████████, regarding the possibility of ██████████████████████████████

(Email from T. Collings to N. Siddiqui of 11/2/06, Ex. 182; Email from N. Siddiqui to A. Kang

of 3/9/06, Ex. 183; Email from N. Siddiqui to A. Kang of 3/21/06, Ex. 184; Ex. 121 at 472-73.)

██████████████ expressed his view that ███████████████████████████████(Ex.

182; Ex. 121 at 472-73.)

     179.   On March 9, 2006, Tri-Vision President Najmul Siddiqui informed Albert Kang

that ██████████████████████████ (Ex. 183.)  Tri-Vision instead proposed an

advertising agreement under which LG would promote Tri-Vision's V-Chip technology on its

DTVs or include the '402 Patent number in its DTVs manuals and which would effectively

lower the LG's royalty rate under the '402 Patent license agreement.  (Ex. 183; Ex. 120 at 524-

25; Ex. 121 at 472-473.)  Specifically, As part of the parties' licensing transaction, LG and Wi-

LAN negotiated two separate agreements: (1) a license agreement having a $██/unit royalty rate

and an advertising agreement that would offset the royalty rate by $██/unit.  (Ex. 120 at 524-25)

      180.    On March 19, 2006, LG informed Wi-LAN that ████████████████

████████████████████████████████████████████████ (Ex. 184.)

      181.    Tri-Vision and LG met in Toronto, Canada on March 21, 2006, to further

negotiate their '402 Patent license agreement and the advertising agreement.  (Dkt. 67 at ¶ 29.)

The only contemporaneous record of the March 21, 2006, meeting are handwritten attorney notes

taken by Wi-LAN's counsel Bereskin & Parr which indicate that ████████████████████

████████████████████████████ (Handwritten Attorney Notes of

3/21/06., Ex. 185 ("████████████████████████"); Handwritten Attorney

Notes of 3/21/06, Ex. 186 ("██████████████████").)

      182.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

      183.    ████████████████████████████████████████

████████████████████████████████████████████████████

██████

184.    Indeed, Wi-LAN has not offered an alternative interpretation of the handwritten attorney notes and has admitted that LG's interpretation is a reasonable one.  (Ex. 188 at 195; Ex. 120 at 448–54.)

185.    During the parties' '402 Patent license negotiations, LG never promised a specific volume of licensed products or that it would use Tri-Vision's technology.  (Ex. 121 at 464-70; Ex. 188 at 179–83; Ex. 124 at 177–80.) Rather, Wi-LAN's internal correspondence confirms that LG merely represented that, ██████████████████████████████████████████ ██████████████████(Email from N. Siddiqui to M. Eldon of 3/30/06, Ex. 189 (Mr. Siddiqui: "████████████████████████████████████████████████ ███████████████████████████████████████████████████" Mr. Eldon: "████████████████████████████████████████ ████████████████████████████████████████████ ████████████████").)

186.    In fact, Tri-Vision told LG during the license negotiations that ████████████ ██████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████

187.    ████████████████████████████████████████ ████████████████████████████████████████. (Email from T. Collings to N. Siddiqui of 2/11/07, Ex. 190 ("████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████"); Ex. 121 at 370, 382–83

("████████████████████████████████████████████████████████

████████████████████████████████████████"))

188.    Tri-Vision and LG met again on April 25, 2006, to flesh out the basic terms of the

'402 Patent license agreement and the advertising agreement.  (Dkt. 67 at ¶ 31.)

189.    Tri-Vision unilaterally concluded on or around April 30, 2006, that it would have

to withdraw the advertising agreement and license the '402 Patent to LG at a $████ per unit—the

same effective rate as if the advertising agreement were to be executed.  (Dkt 67 at ¶ 31; Email

from T. Collings to M. Eldon of 4/30/06, Ex. 191; Ex. 120 at 523–25; Email from A. Kang to N.

Siddiqui of 5/2/06, Ex. 192; Ex. 188 at 168–69, 179–83.)

190.    Wi-LAN was legally obligated to grant LG a license on reasonable and non-

discriminatory terms under the '402 Patent.  (Pltf. Resp. to LG RFA, Ex. 193 at No. 33, 34; Dkt

67 at ¶ 28.)

191.    On May 17, 2010, ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████.  (Dkt. 67 at ¶ 32; License Agreement; '402 Patent License Agreement

Between Tri-Vision and LG of 5/17/06, Ex. 194.)

192.    Tri-Vision did not provide Defendants with copies of any of its existing licenses

with other licensees under the '402 Patent prior to executing the May 2006 License Agreement

with LG.  (Ex. 193 at No. 15.) Tri-Vision never disclosed the identity of Wi-LAN's licensees

under the '402 Patent who had ████████████████████ in their licenses under the '402 Patent

prior to executing the May 2006 License Agreement with LG.  (Ex. 193 at 16.) Tri-Vision did

not identify to LG the royalty rates of any specific licensee prior to executing the May 2006 License Agreement with LG.  (Ex. 194, Ex. 193 at 17.)

193.    In licensing discussions with LG and others, Tri-Vision described its '402 patent as covering V-Chip 2.0 technology that offered a flexible open V-Chip, allowing reconfiguration of future ratings systems as opposed to the fixed V-Chip ratings systems under V-Chip 1.0.  (Ex. 124 at 44, 89-90.)

194.    Wi-LAN told potential licensees that they need to pay royalties only when TVs are built with "███████████" features.  (Ex. 124 at 134.)

195.    ██████████████████████████████████████████
████████████████████████████████████████████████
███████████████████ (Ex. 121 at 538-41.)

196.    ██████████████████████████████████████████
████████████████████████████████████████████████
██████████████████. (Ex. 121 at 538-41.)

### K.    Post-Execution Communications Between Wi-LAN And LG

197.    Beginning with its first quarterly royalty report on or around July 2, 2006, LG has consistently submitted royalty reports to Wi-Lan reflecting no royalty-bearing sales based on LG's understanding that no downloadable RRT has been approved or broadcast in the United States.  (LG Royalty Calculation Form of 7/3/06, Ex. 195; Email from A. Kang to J. Roberts of 10/31/06, Ex. 196; Ex. 188 at 128)

198.    On November 2, 2006, John Roberts inquired as to ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ █████████████████

██████████████████████ (Email from A. Kang to J. Roberts of 11/1/06, Ex. 197 at WL0196372.)

199.    In response to Mr. Roberts November 2, 2006, email, LG stated:



(Ex. 197 (emphasis added).)

200.    Between January 2007 and March 2008, Wi-LAN and LG participated in four meetings to discuss their respective positions concerning the License Agreement and the scope of the '402 Patent, which took place on January 22, 2007; May 28, 2007; October 30, 2007; and March 13, 2008. (Ex. 193 at No. 17)

201.    LG has consistently informed Wi-LAN that LG did not need to pay royalties because it was not using the patented technology.  (Ex. 188 at 234)

202.    Tim Collings believes that the misunderstanding between Wi-LAN and LG concerning the License Agreement resulted from the parties' failure to have a clear discussion about what LG products were covered under the license before the agreement was executed. (Ex. 121 at  389)

**L.    Wi-LAN'S '402 Patent License Agreements With LG And Others**

203.    During the period from May 17, 2006 until January 1, 2010, Wi-LAN promoted its '402 Patent licensing program to prospective licensees by representing that LG was a licensee under Wi-LAN's V-Chip patent on its website and through emails.  (Exhibit 193 at Nos. 26, 27)

204.    ███████████████████████████████████████████████
███████. (Ex. 194; Ex. 188 at 231–36; Middleton Dep, Ex. 198 at 130.)

205.    The Tri-Vision / LG '402 Patent License Agreement defines covered products as

"█████████████████████████████████████████████████████████████████

███████████████████████████████████████" (Ex. 194.)  It further provides that LG

███████████████████████████████████████████████████████████████████

█████████████ (*Id.*)

206.    Besides LG, no other '402 Patent license agreements contain a provision allowing

a licensee to █████████████████████████████████████████████████████████

██████████████████████. (Ex. 124 at 183–84.)

207.    █████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

208.    Wi-LAN admits that its standard '402 Patent license agreement contains █

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ (Ex.

198 at 113-15; Ex. 188 at 69-70, 142-43, 146-50; Ex. 194.) Pursuant to █████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████(Ex. 193 at No. 38); Ex.

198 at 114-115; Ex. 188 at 150-153.)

**M.**     **Wi-LAN Was Highly Motivated To Sign A Major "TIER I" Television Manufacturer, Such As LG, To A '402 Patent License**

209.     ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████. (Email from J. Roberts to T. Collings and N. Siddiqui of 5/1/09, Ex. 202; Ex. 168 at 167-171)

210.   On numerous occasions, ████████████████████

████████████████████████████████████. (Email from M. Eldon to Runco of 6/19/2006, Ex. 203; Email from N. Siddiqui to M. Jeon of 7/4/06, Ex. 204; Email from M. Eldon to D. Fligor of 6/16/06, Ex. 205; Ex. 124 at 191-192.)

211.     ████████████████████████████████████

████████████████████████████████████████████████

████████████████████. (Ex. 168 at 211; Ex. 121 at 466-69, 483-87 ; Ex. 124 at 163-66; Email from N. Siddiqui to B. Randhawa et al. of 11/4/01, Ex. 206; Wi-LAN Document re: Licensing Strategy of 4/4/07, Ex. 207.) ████████████████████

████████████████████████████████. (Wi-LAN Document re: Current Licensing Strategy, Ex. 208.)

**O.**     **Both Before And After LG's License, Wi-LAN Offered Other Television Receiver Manufacturers Different Royalty Rates Than It Provided To LG**

212.     ████████████████████████████████████

████████████████████████████████████████████████.

(Ex. 188 at 139; Ex. 121 at 417; Ex. 152 at Ex. 8.) ████████████████

████████████████████████████████████████████████.

(Ex. 152 at Ex. 8.)

213.   ███████████████████████████████████████████
███████████████████████████████████████.
('402 Patent License Agreement Between Tri-Vision and ████████████, Ex. 209; Ex.
188 at 157-59, 174-75, 188-90.) ███████████████████████████████
██████████████. (Ex. 168 at 161-62; Email from J. Roberts to T. Collings and M. Eldon
of 11/13/07, Ex. 210.)

214.   On or about December 18, 2006, Wi-LAN effectively offered ████████████
███████████████████████████████████████. (Ex. 121
at 483-86; Email from T. Collings to M. Eldon of 12/18/06, Ex. 211.) As of December 8, 2010,
███ still has not taken a license under the '402 Patent. (Ex. 121 at 485-86.)

215.   Sometime prior to December 2006,  Wi-LAN offered to license ███████████
██████████████████. (Email from M. Eldon to T. Collings of 12/18/06, Ex. 212; Ex.
120 at 483-85, 494-95, 499-500; Email from T. Collings to M. Eldon of 12/18/06, Ex. 213.) As
of December 8, 2010, ████ still has not taken a license under the '402 Patent. (Ex. 121 at 492.)

216.   Around 10/28/2008, Wi-LAN offered ██████████████████████
███████████████████████████████████████████.
(Email from T. Collings to T. Ikebe of 10/28/08, Ex. 214; Email from T. Collings to J. Skippen
of 7/9/08, Ex. 215; Email from T. Ikebe to T. Collings of 10/19/08, Ex. 216; Email from J.
Roberts to T. Collings and M. Eldon of 4/30/09, Ex. 217; Email from J. Skippen to T. Collings,
et al. of 7/16/08, Ex. 218; Ex. 120 at 506-07; Ex. 188 at 267-68.) ███████████████
███████████████████████████████████████████
██████████████████████████████. (Ex. 120 at 519.) As of
12/8/10 █████████ still has not taken a license under the '402 Patent. (Ex. 121 at Dep. at 496.)



217.    On or about April 3, 2008, Wi-LAN was considering whether to accept ████

offer of ████████████████████████████████████████. (Ex. 120 at 506-19;

Email from T. Collings to M. Fortkort and N. Siddiqui of 4/3/08, Ex. 219.) As of November 23,

2010, ████ still has not taken a license under the '402 Patent.  (Ex. 198 at 236.)

218.    To induce ████ to sign a '402 Patent license agreement, Wi-LAN agreed ████

████████████████████████████████████. (Email from T. Collings to M.

Eldon of 11/27/06, Ex. 220.) As of December 8, 2010, ████ still has not taken a license under

the '402 Patent.  (Ex. 121 at 495.)

219.    Despite having offered many Tier 1 manufacturers ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. (W-LAN V-Chip

Licensing Q1-10 Mid Quarter Report of 2/12/10, Ex. 221; Ex. 124 at 286-88, 290-93; Ex. 121 at

492, 494-96, 499; Ex. 198 at 184-187, 232-35, 275.)



### P.     Wi-LAN's Pre-litigation Communications Regarding the Scope of the '402 Patent Contradict its Litigation Inspired RRTx01 Based Theory of Infringement

220.    In 2003, Tim Collings, prepared a written summary of an *ex parte* meeting with

the FCC in which he admitted that RRTx01 was inflexible and not capable of being properly

interpreted by receivers through a PSIP broadcast.  (Ex. 128.)

221.    In connection with a separate *ex parte* meeting with the FCC in 2003, Collings

admits: "Perhaps A/65-B has proposed to use a new, different US RRT in order to ensure that the

older US 0x01 RRT remains in tact for digital receivers that have not been designed to process

newer versions of RRTs. If and when an extended RRT is implemented in the US, the older US

0x01 RRT could continue to be used by broadcasters so that existing digital receivers would not be rendered obsolete."   (Comments to the FCC, 4/7/03, Ex. 153.)

222.    Communications between Mr. Collings and Mr. Siddiqui in 1998 confirm that Tri-Vision believed the prior art covered t███████████████████████████████████. (Letter from T. Collings to N. Siddiqui of 11/27/98, Ex. 154.)

223.    Wi-LAN admits that RRT-01 version 0 is the only version of RRT-01 that has ever been approved or broadcast in the United States.  (Ex. 120, at 333-335.)

224.    It is not possible to reconfigure a receiver based on the receipt of RRT-01 information because the receiver must have prior knowledge of that rating system hard-coded in the receiver.   (Ex. 121,  at 413-14.)

225.    Wi-LAN was concerned ██████████████████████████████████████████████████████████████████████████. (Ex. 120 at 375-76.)

226.    When Wi-LAN first raised ███████████████████████████████████████████(Email from N. Siddiqui to M. Eldon of 5/8/07, Ex. 155  ("██████████████████████████████████████████████").)

227.    Other potential '402 Patent licensees, such as ██████ and ████, have expressed █████████████████████████████████████████ (Email from ██████ to M. Fortkort of 3/7/07, Ex. 158; Letter from ██████ to M. Fortkort of 10/2/07, Ex. 157; Email from ██████ to M. Forktkort of 8/14/07, Ex. 158.)

Dated:  April 1, 2011                              Respectfully submitted,

**GREENBERG TRAURIG, LLP**

/s/ Richard D. Harris
Richard A. Edlin (RE 1998)
Daniel I.A. Smulian (DS 4746)
200 Park Avenue
New  York, New York 10166
(212) 801-6528 (*telephone*)
(212) 801-5528 (*facsimile*)
edlinr@gtlaw.com
smuliand@gtlaw.com

Richard D. Harris (*pro hac vice*)
Jeffrey G. Mote (*pro hac vice*)
James J. Lukas, Jr. (*pro hac vice*)
Eric J. Maiers (*pro hac vice*)
Matthew J. Levinstein (*pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 456-8400 (*telephone*)
harrisr@gtlaw.com
motej@gtlaw.com
lukasj@gtlaw.com
maierse@gtlaw.com
levinsteinm@gtlaw.com

Attorneys  for  Defendants  LG  Electronics,
Inc. and LG Electronics U.S.A., Inc.

51

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 1, 2011, the foregoing Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel that have appeared for any party in this matter.

/s/ Matthew J. Levinstein
Matthew J. Levinstein