CONFIDENTIAL – ATTORNEYS' EYES ONLY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| WI-LAN INC., | ) |
| Plaintiff, | ) |
| v. | )    10 Civ. 432 (LAK) (AJP) |
| LG ELECTRONICS, INC. and LG ELECTRONICS U.S.A., INC., | ) |
| Defendants. | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE REPORTS OF WI-LAN'S OPINION WITNESSES MSSRS. [SIC] TANNER AND DOLAN AND TO PRECLUDE THEIR OPINION TESTIMONY**

David E. Sipiora
Matthew C. Holohan (admitted *pro hac vice*)
KILPATRICK TOWNSEND AND STOCKTON LLP
1400 Wewatta Street, Suite 600
Denver, CO 80202
(303) 571-4000
disipiora@kilpatricktownsend.com
mholohan@kilpatricktownsend.com

David A. Koenigsberg
MENZ BONNER & KOMAR LLP
444 Madison Ave., 39th Floor
New York, New York 10022
(212) 223-2100
dkoenigsberg@mbklawyers.com

ATTORNEYS FOR PLAINTIFF
WI-LAN INC.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................... 1

II.    BACKGROUND ...................................................................................... 2

III.   LEGAL STANDARDS ............................................................................ 4

   A.   Fed. R. Civ. P. 26 ............................................................................... 4

   B.   Fed. R. Evid. 702 ............................................................................... 4

   C.   Fed. R. Evid. 403 ............................................................................... 5

IV.   ARGUMENT ........................................................................................... 5

   A.   Messrs. Tanner and Dolan Satisfied the Claim Construction Requirement. ................... 5

   B.   Messrs. Tanner and Dolan's Analyses Are Reliable. ...................................... 8

      1.   The Tanner and Dolan Reports Contain Detailed, Explicit Infringement and Validity Analyses. ........................................................................................ 9

      2.   Messrs. Tanner and Dolan Properly Applied the Applicable Principles of Patent Law. 11

   C.   LG's Non-Infringement Arguments Do Not Show that Wi-LAN's Expert Opinions Are Unreliable. ..................................................................................................... 22

      1.   Wi-LAN's Experts Have Demonstrated Direct Infringement. ...................... 23

      2.   LG's Default Factory Settings Demonstrate Infringement. ......................... 23

      3.   LG Fails to Cite Any "Limitations and Concessions Made During Prosecution History." 25

V.    CONCLUSION....................................................................................... 25

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF AUTHORITIES

CASES

*American Medical Sys., Inc. v. Biolitec, Inc.,*
  618 F.3d 1354 (Fed. Cir. 2010).................................................................25

*Atkins v. County of Orange,*
  372 F. Supp. 2d 377 (S.D.N.Y. 2005)........................................................4

*Cohesive Technologies, Inc. v. Waters Corp.,*
  543 F.3d 1351 (Fed. Cir. 2008)...............................................................19

*Cordis Corp. v. Medtronic Ave, Inc.,*
  511 F.3d 1157 (Fed. Cir. 2008)...............................................................24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1993).........................................................................5, 9, 10

*Lucent Techs., Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009)..........................................................23, 24

*Micro Chem., Inc. v. Lextron, Inc.,*
  317 F.3d 1387 (Fed. Cir. 2003)................................................................5

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
  521 F.3d 1351 (Fed. Cir. 2008)................................................................6

*Oatey Co. v. IPS Corp.,*
  514 F.3d 1271 (Fed. Cir. 2008)...............................................................11

*Oxford Gene Tech. Ltd. v. Mergen Ltd.,*
  345 F. Supp. 2d 431 (D. Del. 2004)..........................................................8

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .................................................6

*United States v. Dukagjini,*
  326 F.3d 45 (2d Cir. 2003)......................................................................5

*Vita-Mix Corp. v. Basic Holding, Inc.,*
  581 F.3d 1317 (Fed. Cir. 2009)...............................................................23

STATUTES

35 U.S.C. § 112...........................................................................................10

CONFIDENTIAL – ATTORNEYS' EYES ONLY

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 .................................................................................................4

Fed. R. Evid. 403 .................................................................................................5

Fed. R. Evid. 702 .............................................................................................4, 5

CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.   INTRODUCTION

Defendants LG Electronics, Inc. and LG Electronics U.S.A., Inc. (collectively "LG")

have filed a frivolous motion to strike the expert reports of Plaintiff Wi-LAN Inc.'s ("Wi-LAN")

lead technical expert witnesses, and to preclude them from testifying (D.I. # 177).  In filing this

motion, LG regrettably has expanded its smear campaign against Wi-LAN to include two highly

skilled and respected professionals, Craig Tanner and Michael Dolan, each of whom has decades

of technical training and experience in the relevant field.  Consistent with its *ad hominem*, spew-

invective-and-mud-at-every-turn approach to litigation, LG has taken the extraordinary and

unjustified step of seeking to exclude Wi-LAN's infringement and validity experts from the case,

hoping thereby to avoid liability for its extensive, willful infringement of the asserted claims of

U.S. Patent No. 5,828,402 ("the '402 patent").

LG's Motion fails to show any reason to exclude Wi-LAN's experts and is borderline

sanctionable.  The motion arises from LG's wildly unsupported and fundamentally incorrect

claim construction positions, and then goes beyond to attack Wi-LAN's experts for disagreeing

with LG on substantive issues.  Such disagreement, however, can provide no basis to exclude

expert testimony.  Rather, the law is clear that the methodology, not results, of expert analysis is

what matters when determining whether to exclude expert testimony.  And Wi-LAN's expert

methodology is unassailable.  After careful and diligent review of source code, technical

documents produced by multiple parties, literature, statistical studies, and other data of the type

generally relied upon by experts in the field of digital television ("DTV") technology, Wi-LAN's

experts set forth detailed and exhaustive analyses of LG's Accused Products and the purported

prior art references identified by LG.  These analyses and conclusions were presented in almost

200 pages of expert reports, which more than satisfy the expert disclosure requirements.

Furthermore, Wi-LAN's experts are the most qualified individuals to offer these opinions,

CONFIDENTIAL – ATTORNEYS' EYES ONLY

having significant combined experience in the field of DTV technology, including leadership

positions in the industry and standard-setting organizations. Particularly when compared to LG's

technical experts and their analyses, Wi-LAN's experts are extremely qualified and have

presented their findings with far greater detail and clarity. Indeed, if LG's standards are to be

applied, then LG's experts would long ago have been banished. LG's desperate attempt to

remove Wi-LAN's experts from the litigation should be rejected out of hand.

## II.   BACKGROUND

Wi-LAN has produced a total of four expert reports by Mr. Tanner and Mr. Dolan. Mr.

Tanner, who is a broadcast television expert, submitted two expert reports concerning LG's

infringement of the '402 patent, and one expert report concerning the validity of the '402 patent.

Mr. Dolan, who is a software expert with deep experience with the relevant television standards,

submitted an expert report concerning certain discrete infringement issues, including analysis of

the source code used in LG's Accused Products and the operation of certain components of the

receiver chips used in those products.

As described in the reports of Messrs. Tanner and Dolan, both experts are extremely well

qualified in the field of DTV technology. Mr. Tanner served for more than two years as the

executive director of the Advanced Television Systems Committee ("ATSC"), the standard-

setting body responsible for the controlling DTV standards in this litigation. Holohan Dec. Ex. 2

¶ 3. Apart from his service as Executive Director, Mr. Tanner served for more than 20 years as

an active technical representative in ATSC technical standards proceedings representing various

prominent companies, including CBS, Sony, and SHARP. *Id.* Mr. Tanner has more than 34

years of experience in television technology and its related standards. *Id.* ¶ 5. He has served as

Vice President at CBS and SHARP, and held management positions in other companies. *Id.* ¶¶ 6

& 8. In short, Mr. Tanner is exceptionally qualified to opine on the technical issues in this case.

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Similarly, Mr. Dolan has extensive experience and knowledge concerning ATSC standards and related standards, as well as the C programming language used in LG's source code. Holohan Dec. Ex. 5 ¶¶ 3-4. Mr. Dolan is a Fellow of the Society of Motion Picture and Television Engineers ("SMPTE"), and currently serves on its Board of Governors. *Id.* ¶ 2. Mr. Dolan chairs a number of television-related technical committees in SMPTE and ATSC, and actively participates in numerous other technical television and media committees including the Consumer Electronics Association ("CEA"). *Id.* Mr. Dolan is also a recipient of the prestigious ATSC Bernard J. Lechner Outstanding Contributor Award. *Id.* LG's efforts to smear and disqualify Messrs. Tanner and Dolan reflect more on LG than on either individual.

Consistent with their knowledge, experience, and expertise, Messrs. Tanner and Dolan submitted extremely detailed expert reports concerning the infringement and validity issues in this litigation. Mr. Tanner's combined reports total more than 180 pages, with detailed analyses of prior art references and technical information extracted from LG and produced by third parties. Unlike LG's expert reports, Mr. Tanner's analysis applies the asserted claim limitations to the Accused Products and purported prior art references to reach conclusions as to infringement and validity.

Additionally, Mr. Dolan reviewed extensive amounts of source code and related materials produced by LG, and attended the depositions of certain of LG's technical witnesses. Mr. Dolan's report contains explicit and detailed analysis of source code and other technical data relevant to the infringement issues in this case. Further, because Mr. Dolan was asked to opine only on certain claim limitations, he relied upon Mr. Tanner's analysis where necessary to support his conclusions. Likewise, Mr. Tanner relied in part upon Mr. Dolan's analysis in support of his ultimate conclusions concerning infringement and validity.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

In sum, Messrs. Tanner and Dolan have provided extremely reliable and detailed expert testimony which in the form of trial testimony will assist the trier of fact in this litigation to determine issues of infringement and validity. LG has utterly failed in its frivolous motion to establish grounds to exclude any opinions of Messrs. Tanner and Dolan.

## III.    LEGAL STANDARDS

### A.    Fed. R. Civ. P. 26

Under Fed. R. Civ. P. 26, an expert disclosure must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." However, even if a Court finds that an expert disclosure does not satisfy Rule 26, the expert will not be precluded from testifying if the opposing party fails to object to the expert report or request that it be supplemented. *Atkins v. County of Orange*, 372 F. Supp. 2d 377, 397 (S.D.N.Y. 2005). Here, LG never objected to the sufficiency of any of Wi-LAN's expert reports before filing this motion. Therefore, LG cannot seek relief under Fed. R. Civ. P. 26 as a matter of law.

### B.    Fed. R. Evid. 702

The Court may properly admit testimony regarding scientific, technical, or other special knowledge if the testimony will assist the trier of fact to understand the evidence or to determine a fact at issue. *See* Fed. R. Evid. 702. The expert must possess knowledge, skill, experience, training, or education regarding the subject about which they propose to testify. *See id.* The expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) demonstrate that the witness has applied the principles and methods reliably to the facts of the case. *See id.* In short, the expert's testimony must be both "reliable" and "helpful." *See id.* (Advisory Committee Notes-2000 Amendments); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993). Judicial scrutiny in a *Daubert* challenge focuses upon principles and methodology, <u>not results</u>. *See id.* at 595.

63271984 v1                                    4

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Post-*Daubert* applications of Fed. R. Evid. 702 have emphasized the flexibility of the

*Daubert* analysis and have downplayed the importance of any single factor. *See, e.g., Micro*

*Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1392 (Fed. Cir. 2003). While the trial court serves

as a gatekeeper, it does not replace the adversary system. *Micron Chem.,* 317 F.3d at 1392.

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof" remain the appropriate means of attacking challenged evidence. *Daubert,* 509

U.S. at 596. Accordingly, the rejection of expert testimony is the exception, not the rule.

### C.  Fed. R. Evid. 403

"[E]xpert testimony, like other forms of evidence, 'may be excluded if its probative value

is substantially outweighed by the danger of unfair prejudice.'" *United States v. Dukagjini,* 326

F.3d 45, 51-52 (2d Cir. 2003) (quoting Fed. R. Evid. 403). As explained below, LG has not

shown any danger of prejudice, let alone a danger of prejudice that substantially outweighs the

probative value of Wi-LAN's experts' exhaustive analysis.

## IV.  ARGUMENT

### A.  Messrs. Tanner and Dolan Satisfied the Claim Construction Requirement.

LG wrongly asserts that Messrs. Tanner and Dolan did not apply a claim construction for

the "disputed Claims of the patent in suit." LG Mot. at 7. LG's use of the term "disputed

Claims" is unclear. The <u>asserted</u> claims in this litigation are Claims 7-11 of the '402 patent. On

that issue there is no dispute. To the extent that LG means to assert that Messrs. Tanner and

Dolan did not construe the asserted claim <u>terms</u>, this contention is likewise meaningless. There

never has been a mechanism for formal claim construction in the case, and thus there has never

been a formal identification of "disputed" claim terms. This is a fiction advanced by LG. In

fact, quite the contrary, the Court made clear, on several occasions, that absent stipulation of the

parties, claim construction would be addressed, as needed, in the context of summary judgment

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

motions – which is exactly what Messrs. Tanner and Dolan have done.

Additionally, LG's emphasis on expert construction of claim terms runs contrary to established Federal Circuit law, which holds that expert testimony regarding claim construction is "extrinsic evidence" that is less reliable than intrinsic evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (*en banc*). It is well-established that to the extent claims need to be construed, claim construction is a question of law to be resolved by the Court, not by a jury. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Accordingly, LG's concern over jury confusion concerning the claim construction positions of Wi-LAN's experts is a red herring. Any claims that need to be construed will be construed by the Court, and those constructions will be submitted to the jury.

Furthermore, as set forth in Wi-LAN's Opposition to LG's Motion for Summary Judgment of Non-Infringement ("Wi-LAN's NI Opposition"), the majority of LG's "disputed" claim terms require no construction at all. In such a case, "'the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.'" *O2 Micro*, 521 F.3d at 1360 (quoting *Phillips*, 415 F.3d at 1314). As a general matter, therefore, Messrs. Tanner and Dolan simply applied the ordinary meaning of the claim terms, which is apparent from the text of their expert reports.

Importantly, Mr. Tanner made this point clear throughout his deposition. When asked "In order to provide an infringement opinion, you agree with me that you need to construe the claims, correct?", Mr. Tanner responded:

> A        You know, my – what I did was <u>I gave them what I took to be their plain meaning</u>. I didn't do any special construing. So I just want to make that clear. <u>But obviously, yes, I had to decide what I thought the claims meant</u>.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

Holohan Dec. Ex. 6 at 31:10-17 (emphasis added). Indeed, LG resorts to taking Mr. Tanner's statements out of context in arguing that Mr. Tanner said "I have not offered any claim construction." LG Mot. at 7. What Mr. Tanner testified to was: "I have not offered any claim construction -- I don't believe I provided a chart, if you will, <u>but I think that it's clear from the context that I've used the plain and ordinary meaning.</u>" *Id.* at 133:6-9 (emphasis added). *See also id.* at 40:22-41:2 ("Yes, and the construing, if you will, the construction, was to follow their plain meaning."), 95:9-12 ("I have, for my analysis, you know, used the actual claim language and the plain meaning"), 119:20-120:1 ("It was actually fairly simple, using the plain meaning of the claims and comparing that with what [LG employee] John [Taylor] said is actually done with the products in the U.S."), 132:7-8 ("I think my approach was to use their plain meaning."), 157:6-7 ("The plain meaning of receive is to receive in the sense of receiving a transmitted signal.").

Furthermore, LG ignores the fact that Mr. Tanner provided explicit constructions of several claim terms that he deemed necessary to construe for the purposes of his analysis. Mr. Tanner's Opening Infringement Report contains detailed discussions of the meaning of at least the following terms: "informational scheme" (Holohan Dec. Ex. 2 ¶¶ 40-43); "configuration information" (*Id.* ¶ 46 n.9); and "memory" (*Id.* ¶¶ 94-96). Furthermore, Mr. Tanner's understanding of terms such as "receiving," "storing," "video signal," and "user preference information" are clear through his application of those terms to specific aspects of DTV signal transmission and processing. For example, Mr. Tanner makes it clear that the ATSC Transport Stream constitutes the "video signal" in DTV applications. *Id.* ¶ 105. Mr. Tanner's Validity Report contains additional discussions of the claim terms "first group of one or more multi-level categories of labels" (Holohan Dec. Ex. 3 ¶¶ 211-214) and "descriptive text [for labels]" (*Id.* ¶¶

CONFIDENTIAL – ATTORNEYS' EYES ONLY

215-217).  Mr. Tanner's Validity Report also provided a more general construction of "video signal," defining it as "the entire modulated signal, which may include video, audio and data components."  *Id.* at 36 n.6.

Similarly, Mr. Dolan testified that, "[f]or the claim[ element]s that are covered in [his] report, [he] made an independent determination of the meaning of those claims."  Holohan Dec. Ex. 7 at 53:3-5.  Mr. Dolan relied upon the patent specification in construing the claims as necessary.  *Id.* 54:1-4.  Mr. Dolan likewise testified that he used the ordinary meaning of particular claim elements.  *See, e.g., id.* at 71:10 ("Memory is memory."), 72:8 ("Storing is storing.").  Mr. Dolan also relied upon Mr. Tanner's analysis.  Holohan Dec. Ex. 5 ¶¶ 6-7.

Accordingly, LG's reliance on *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431 (D. Del. 2004), is misplaced.  There, the court rejected the contention that the expert's claim construction was "brought out in the paragraphs" of the report, finding without analysis that the expert "did not provide a clear construction of each disputed claim element."  *Id.* at 436.  Here, while there were no formally "disputed claim elements" at the time of expert discovery, Wi-LAN's expert reports contain clear analysis of each claim step such that their infringement and validity positions ring loud and clear.  The meaning applied by Messrs. Tanner and Dolan to each claim step is clear, in the form of both explicit construction analysis of certain terms and the overall application of the plain and ordinary meaning of claim terms.  Indeed, LG has demonstrated that it has no difficulty in understanding and attempting to dispute their positions in rebuttal expert reports, depositions and its ill-conceived summary judgment motions.

## B.    Messrs. Tanner and Dolan's Analyses Are Reliable.

In a striking display of improperly aggressive litigation tactics, LG takes the extraordinary position that the expert opinions of Messrs. Tanner and Dolan should be excluded simply because LG disagrees with them.  LG's baseless attacks on Messrs. Tanner and Dolan all

CONFIDENTIAL – ATTORNEYS' EYES ONLY

arise from LG's clearly erroneous claim construction positions, which are based on fundamental

misunderstandings and misrepresentations of the claims and law.  While LG is certainly free to

present its flawed claim construction, non-infringement, and invalidity positions to this Court,

LG is not entitled to deprive Wi-LAN of its chosen experts simply because their conclusions are

contrary to those of LG.  The law on this point is clear.  When assessing the admissibility of

expert opinions, "[t]he focus, of course, must be solely on principles and methodology, <u>not on</u>

<u>the conclusions that they generate</u>." *Daubert*, 509 U.S. at 595 (emphasis added).  In any case, as

explained below, Messrs. Tanner and Dolan's methodology <u>and</u> conclusions are reliable, and

therefore LG's motion should be denied.

       1.     **The Tanner and Dolan Reports Contain Detailed, Explicit Infringement and Validity Analyses.**

LG asserts, without any explanation whatsoever, that the conclusions reached in the

Tanner and Dolan Reports are *ipse dixit* and should be excluded.  LG's frivolous and

unsupported argument should be disregarded.

Mr. Tanner's Opening Infringement Report begins with a summary of asserted claims,

and detailed explanation of how DTV signals are constructed, transmitted, and processed

pursuant to the applicable standards. Holohan Dec. Ex. 2 ¶¶ 11-54.  Mr. Tanner's report likewise

opines, based on extensive statistical data procured by Wi-LAN as well as Mr. Tanner's own

expertise in the field, concerning the general prevalence of certain types of transmissions

throughout the United States. *Id.* ¶¶ 25-29.  Then, with exhaustive citations to deposition

transcripts and technical documents produced by LG and third parties, Mr. Tanner explains, on a

limitation-by-limitation basis, why various aspects of LG's Accused Products meet the claim

limitations of the '402 patent. *Id.* ¶¶ 55-175.  Mr. Tanner then provides additional evidence and

analysis concerning specific instances of direct infringement. *Id.* ¶¶ 176-190.  LG points to no

CONFIDENTIAL – ATTORNEYS' EYES ONLY

specific deficiencies in this analysis that would render it unreliable. On the contrary, Mr.
Tanner's infringement analysis unquestionably demonstrates the widespread infringement of the
asserted claims of the '402 patent using LG's Accused Products. Mr. Tanner's Rebuttal
Infringement Report is similarly detailed, explaining why one skilled in the art would find the
purported differences identified by LG to be insignificant.

Mr. Tanner's Validity Report is similarly detailed, much more so than the Invalidity
Report of Mr. Goldberg, LG's expert, which simply copies block quotes from various purported
prior art references and conclusorily declares that the claim limitations are met. Through nearly
100 pages of analysis, Mr. Tanner assesses the date of invention of the asserted claims, and
painstakingly distinguishes each and every purported prior art reference identified by LG.
Holohan Dec. Ex. 3 ¶¶ 23-202, 218-220. Mr. Tanner then provides a separate thorough analysis
as to why certain purported prior art references are not enabled and therefore cannot anticipate or
render obvious the asserted claims. *Id.* ¶¶ 202-210. Mr. Tanner then provides a detailed
explanation as to why the patent satisfies the disclosure requirements of 35 U.S.C. § 112. *Id.* ¶¶
211-217. Finally, Mr. Tanner explains, based in large part on his expertise in the procedures of
the ATSC and related standard-setting bodies, why certain purported prior art references do not
qualify as prior art at all. *Id.* ¶¶ 221-249.

Mr. Dolan's Infringement Report is similarly detailed, providing exhaustive citations to
source code modules to explain why the operation of LG's software in various exemplary
Accused Products satisfies certain claim limitations. Holohan Dec. Ex. 5 ¶¶ 6-57. Mr. Dolan
also independently created an experiment to analyze the operation of certain components in LG's
receiver chips, and provided a detailed explanation of his analysis and conclusions. *Id.* ¶¶ 58-61.

Thus, it is not surprising that LG's *ipse dixit* argument is so conclusory. There are simply

CONFIDENTIAL – ATTORNEYS' EYES ONLY

no deficiencies to be found in the extensive analysis provided by Wi-LAN's experts. LG's

improper attempt to escape the consequences of its infringement of the '402 patent by silencing

Wi-LAN's experts should be rejected out of hand.

> ### 2.   Messrs. Tanner and Dolan Properly Applied the Applicable Principles of Patent Law.

Continuing its pattern of making unsupported, conclusory arguments, LG provides a

sloppy bullet point list of statements by Messrs. Tanner and Dolan with which LG disagrees, and

declares without analysis that these out-of-context statements render all of Messrs. Tanner and

Dolan's opinions unreliable. All of LG's complaints arise from the "house of cards" that is LG's

erroneous claim construction analysis, and each complaint can be traced to the fact that LG

simply disagrees with the conclusions reached by Wi-LAN's experts. That Wi-LAN and the

Court should have to expend resources responding to these baseless allegations is unfortunate,

but sadly consistent with LG's pattern of conduct throughout this litigation.

> #### (a)   LG Has Not Shown That Mr. Tanner's Opinions are Unreliable.

Wi-LAN responds to each of LG's bullet points concerning Mr. Tanner in turn.

- "Mr. Tanner opined that the Claim terms 'first television channel' and 'second television channel' can be the same television channel. (Ex. 4, Tanner Dep. at 33.) Mr. Tanner's interpretation reads the 'second television channel' element out of the Claim and violates  fundamental tenets of patent law."

As explained in Wi-LAN's NI Opposition, the law is clear that a "first" element and

"second" element in a patent claim may refer to the same element. *See, e.g., Oatey Co. v. IPS*

*Corp.*, 514 F.3d 1271, 1277-78 (Fed. Cir. 2008) (construing "first" element and "second"

element as a single element where to construe the terms otherwise would exclude an embodiment

disclosed in the specification). *See* Wi-LAN's NI Opp. at 20-21. Mr. Tanner's assertion is

entirely supported by the claim language and the patent specification. *Id.* While LG may

CONFIDENTIAL – ATTORNEYS' EYES ONLY

disagree with this construction, Mr. Tanner's statement is directly supported by the patent

specification and recent Federal Circuit precedent, and therefore inherently reliable.

- "Mr. Tanner defines the term 'video signal' in several different ways: (1) 'ATSC transport stream,' (2) 'audible component and display component together,' and 'display component only' (Ex. 4, Tanner Dep. at 150; 152, 15–19.) If 'video signal' can mean any and all of these proffered definitions, then it means nothing. Mr. Tanner's interpretation violates fundamental tenets of patent law and renders the Asserted Claims indefinite."

LG takes Mr. Tanner's statements out of context in a meager effort to create the illusion

of inconsistency.  Mr. Tanner's analysis is consistent in asserting that the "video signal" means

"the entire modulated signal, which may include video, audio and data components," and that the

ATSC Transport Stream, which carries audio, video, and administrative data, satisfies the "video

signal" claim element in the context of DTV technology.  *See* Holohan Dec. Ex. 2 ¶ 105;

Holohan Dec. Ex. 3 at 36 n.6; Holohan Dec. Ex. 6 at 150:6-9. Mr. Tanner did not use varying

definitions of "video signal."  Rather, he testified that in certain implementations, *i.e.* analog

implementations, a signal carrying only video data, or only audio and video data, would also

satisfy the "video signal" claim element.  Holohan Dec. Ex. 6 at 152:15-153:2 (responding to the

question "What would be the definition of video signal in the analog?") (emphasis added).  Mr.

Tanner's testimony concerning varying implementations of the technology of the '402 patent

does not render his opinions unreliable.

- "In his deposition Mr. Tanner stated: 'No. I was really referring to what one of ordinary skill might implement. If you follow the plain meaning of claim steps 7 (h) and (i), there's no mention of audio. So, it's not my opinion that the claim requires it. I was only saying that it's a choice one might make.' (Ex. 4, Tanner Dep. at 245-46.) So, the question becomes, what plain meaning is Mr. Tanner employing and why is that different from what one of ordinary skill would employ. This statement alone demonstrates that Mr. Tanner's opinions should be precluded."

Again, LG attacks Mr. Tanner for discussing "what one of ordinary skill might

implement," not the basic construction of claim terms (which is a determination to be made by

CONFIDENTIAL – ATTORNEYS' EYES ONLY

the Court, if at all). LG deliberately ignores the difference between the overall scope of a claim

term and a particular implementation of a claimed invention. Mr. Tanner, however, does

understand this distinction, and his testimony concerning implementations is reliable.

- "Mr. Tanner opined that the 'informational schemes' discussed in Step (g) of Claim 7 finds antecedent basis in the 'informational schemes' of element (f), but not in the 'informational schemes' of Steps (a) and (c). (Ex. 4, Tanner Dep. at 237:8-238:10 ('The antecedent from the word "said" in (g) only goes back to (f)',) If the informational schemes of Steps (g) are different than those mentioned in Steps (a) and (c), then the inventor would have used a different word to describe them. Mr. Tanner's interpretation violates fundamental tenets of patent law."

In criticizing Mr. Tanner's assertion that "[t]he antecedent from the word 'said' in (g)

only goes back to (f)," it is LG, not Mr. Tanner, who espouses a misunderstanding of patent law.

Even a cursory review of the claim steps reveals that Mr. Tanner's analysis is entirely correct:

> f) receiving a first video signal comprising embedded information specifying at least, either one of said first or second informational schemes, and current levels in each of said one or more categories in said specified informational scheme;
>
> g) extracting said embedded information and comparing said extracted information with said stored preference information for said specified informational scheme;

(emphasis added).  Thus, while "said first or second informational schemes" refers to the

informational schemes described in earlier steps, there is no "specified informational scheme"

until an informational scheme is specified in step (f).  Thus, the term "said specified

informational scheme" refers only to the specified informational scheme in step (f).  Mr.

Tanner's claim analysis in this instant is not only reliable, but unassailable.

- "In a direct contradiction of the claim language included in Steps (a) and (c): 'receiving [first, second] configuration information,' Mr. Tanner opined that 'configuration information is not limited to something that can be received over-the-air. Configuration information can be built at the factory…Configuration information can be placed into a TV at the time of manufacture without receiving it off air…Configuration is something that can be either received, per claim step (a) and (c), or inserted in some other manner at the time of manufacture.' (Ex. 4, Tanner Dep. at 156-57.) In response to the question, '…reception of configuration

CONFIDENTIAL – ATTORNEYS' EYES ONLY

information is not necessary to perform claim 7?' Mr. Tanner stated 'No. There's no prescribed use of it necessary to practice the invention.' (Ex. 4, Tanner Dep. at 238.)"

LG's argument regarding Mr. Tanner's assertion that configuration information can be supplied to a receiver in various ways <u>as long as it is also received</u> is simply the latest example of LG's ongoing misinterpretation of the claim requirements concerning "configuration information." LG has repeatedly asserted that the asserted claims cannot cover devices with pre-configured configuration information <u>even if they also receive and store configuration information</u>. As explained in Wi-LAN's NI Opposition, this interpretation of Claim 7 is entirely false. *See* Wi-LAN's NI Opp. at 22-24. The specification contains explicit descriptions of implementations of the patented technology in which configuration information is pre-configured in the device. *Id.* The patent teaches and the asserted claims undeniably cover devices with pre-configured informational schemes, and LG has fought tooth and nail to deny this inconvenient truth to preserve its non-infringement positions. To do so, LG must not only misrepresent the prosecution history, but ignore the numerous instances in the patent specification in which pre-configured informational schemes are discussed. *See id.* Mr. Tanner's assessment that configuration information can be present in the device in ways other than via receipt through a broadcast signal is fully supported by the claims.

Furthermore, Mr. Tanner's statement "No. There's no prescribed <u>use</u> of it necessary to practice the invention" in response to the question "reception of configuration information is not necessary to perform claim 7?" is entirely accurate. In fact, no use of configuration information is required in the claims. Wi-LAN's NI Opp. at 24 n.15, 26-27. What is required is the receipt of configuration, as Mr. Tanner made clear in his testimony. *See, e.g.*, Holohan Dec. Ex. 6 at 156:12-17.

- "Likewise, Mr. Tanner has taken contradictory positions regarding the claim term

CONFIDENTIAL – ATTORNEYS' EYES ONLY

'receiving,' effectively reading the limitation out of the Claim. Mr. Tanner first defined 'receiving' as 'receiving from a transmitted signal.' (Ex. 4, Tanner Dep. at 155:16–17.) Yet, Mr. Tanner also believes that an LG receiver placed inside a Faraday cage (an apparatus that perfectly blocks incoming signals) can still infringe Claim 7 of the '402 Patent. (Ex. 4, Tanner Dep. at 174:1–175:3.) Mr. Tanner's positions are irreconcilable. Mr. Tanner has read out the 'receiving' element of Claim 7."

LG again misrepresents and misinterprets Mr. Tanner's testimony, and focuses on an irrelevant hypothetical implementation in an effort to manufacture inconsistencies in Mr. Tanner's analysis. When first questioned about LG's fanciful "Faraday cage" hypothetical, Mr. Tanner made it clear that "It's not something I dealt with in this matter." Holohan Dec. Ex. 6 at 174:1-7. Mr. Tanner then opined that he could "think of cases where it would be possible" for a device to infringe inside a Faraday cage, but further testified: "It's hard for me to even say. I mean, it's such a fragment of a question, I'm not sure I know how to fill in the rest because I don't know what the intent is, even." *Id.* 175:2-12. Thus, the very premise with which Mr. Tanner was presented was incomplete, irrelevant, and deeply flawed. In any case, LG has not shown that infringement inside a Faraday cage is <u>not</u> possible. The '402 patent envisions numerous means of transmitting a signal to a receiver (*see, e.g.*, '402 patent at 3:32-44), and it is certainly possible for a transmitter to be placed inside the Faraday cage with the receiver.

- "On a related issue, Mr. Tanner either could not or refused to answer questioning on whether the Accused Products can infringe if they are in a location where they cannot receive broadcast signals. (Ex. 4, Tanner Dep. at 129-30.)"

In the passage LG cites, LG asked Mr. Tanner an incomplete hypothetical question that was beyond the scope of his expert report. Holohan Dec. Ex. 6 at 129:14-19 ("I haven't opined on that issue."). Mr. Tanner therefore stated that he would require additional information to provide a response. *Id.* 130:6-14. LG declined to provide additional information or press the issue with Mr. Tanner. Accordingly, the fact that Mr. Tanner was unable to provide a response based on incomplete facts is not an indication that his opinions are unreliable.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- "Mr. Tanner has read out the 'each' limitation of element (e) of Claim 7. Step (e) of Claim 7 states: 'storing in said memory user preference information for each of said categories in each of said first and second informational schemes.' (emphasis added). Mr. Tanner reaches the opposite conclusion, namely that Step (e) of Claim seven does not require that user preference information be stored for each category in both the first and second informational schemes for infringement. (Ex. 4, Tanner Dep. at 106–107.)"

Again, LG's criticism of Mr. Tanner's response has more to do with LG's flawed questions than with Mr. Tanner's analysis. Beginning several pages before the challenged response, LG's counsel began attempting to construct an incomplete and irrelevant hypothetical on which to question Mr. Tanner. Holohan Dec. Ex. 6 at 99:4-9. Mr. Tanner was unable to provide a response because LG's counsel repeatedly misrepresented, rearranged, or excised portions of the claim language. *See, e.g., id.* 99:12-13 ("you've left out any reference to the simple description in claim (e)"), 100:14-15 ("Well, I believe you changed the wording there."), 105:9-10 ("I just feel like what you've said is unclear or indefinite in some way."). Further, LG's counsel repeatedly altered the hypothetical as to the number of hypothetical dimensions. *See id.* 99:6-7 ("five of seven categories"), 100:10 ("five of six categories"), 101:18 ("six of seven categories"). LG's counsel's inconsistency led Mr. Tanner repeatedly to ask for clarification to ensure he was answering the correct question, which caused LG's counsel to lose composure and yell at Mr. Tanner. *Id.* 103:4-6, 103:20-22. When LG's counsel finally got his question straight and Mr. Tanner was able to answer, LG's counsel cut off Mr. Tanner before he could provide an explanation. *Id.* 107:8-10.

In light of this muddled record, it is not clear what question Mr. Tanner was even attempting to answer, let alone whether his answer was inconsistent with any reading of the asserted claims. Thus, LG's argument in this regard is without merit and should be rejected.

- "Mr. Tanner also opined that the stored user preference information need not be for a received informational scheme in direct contravention of the claim language

CONFIDENTIAL – ATTORNEYS' EYES ONLY

> (Step (e): 'storing in said memory user preference information for of said categories in each of said first and second informational schemes.' (Ex. 4, Tanner Dep. at 233-34.)"

Once again, LG fundamentally misinterprets the language of Claim 7 and clings to claim limitations that simply do not exist. LG's use of the phrase "received informational scheme" confirms conclusively that LG does not understand Claim 7, or seeks intentionally to mislead the Court. Any arguments related to this phrase should be rejected out of hand. Simply put: informational schemes are never received when practicing Claim 7. Again, a cursory reading of the claim language confirms this:

> a) receiving first configuration information embedded in a first television channel, said first configuration information describing a first informational scheme, said first configuration information specifying, at least, numbers of levels in a first group of one or more multi-level categories of labels, in said first informational scheme;
>
> [. . .]
>
> c) receiving second configuration information embedded in a second television channel, said second configuration information describing a second informational scheme, said second configuration information specifying, at least, numbers of levels in a second group of one or more multi-level categories of labels, in said second informational scheme;

(emphasis added). Thus, the only thing "receiv[ed]" in steps (a) and (c) is configuration information. Configuration information describes informational schemes. Informational schemes are not themselves received, but can be pre-configured in the device. *See* Wi-LAN's NI Opp. at 42-43. In other words, received configuration information may describe informational schemes that are already configured in the device. *Id.* LG rests its non-infringement theory in large part on an insistence on conflating "configuration information" and "informational scheme" such that they mean the same thing. This approach, however, is nonsensical. When one thing describes a second thing, the first thing does not become the second thing. That LG

CONFIDENTIAL – ATTORNEYS' EYES ONLY

refuses to recognize the clear language of Claim 7 has no bearing on Mr. Tanner's reliability, but only serves to confirm that LG's claim construction and non-infringement positions are untenable. To attack Mr. Tanner for refusing to accept the notion of a "received informational scheme," which appears nowhere in the claims, is baseless.

- "Mr. Tanner opined that the comparison in Step (g) is not necessary for Steps (h) and (i) to be performed according to Claim 7. (Ex. 4, Tanner Dep. at 42-43.) Mr. Tanner's opinion reads out Step (g) of Claim 7."

LG appears to imply that Mr. Tanner does not believe the performance of step (g) is necessary for infringement. However, that was not Mr. Tanner's testimony at all. Rather, Mr. Tanner simply testified, consistent with the structure of the claims, that the specific "comparing" operation is not part of step (h)/(i). Shortly before the challenged answer, Mr. Tanner stated that the comparison step <u>is</u> required for infringement:

Q      Does element (g) require that a comparison be performed?

[. . .]

A      I'm not a legal expert, but it would appear that it requires comparing said extracted information with said stored preference information.

Holohan Dec. Ex. 6 at 42:13-20. Once step (h)/(i) is reached, the comparison has already taken place. Mr. Tanner's testimony is consistent and reliable.

- "Mr. Tanner states that a 'user' is 'somebody who is operating the television' and 'the main purpose of the invention is to allow a parent, an individual user, to set user preferences.' (Ex. 4, Tanner Dep. at 223, 285.) Yet, Mr. Tanner does not rely on any evidence of a user performing the steps of the Asserted Claims. (Ex. 4, Tanner Dep. at 183, 218, 285.)"

Finally, LG once again relies upon its incorrect claim interpretation to levy a baseless attack on Mr. Tanner's reliability. The word "user" as a noun does not appear anywhere in the asserted claims. Rather, the relevant noun is "user preference information." As explained in Wi-LAN's NI Opposition, Claim 7 does not require any particular action by a "user." *See* Wi-

CONFIDENTIAL – ATTORNEYS' EYES ONLY

LAN's NI Opp. at 30-31. Mr. Tanner's testimony is therefore fully consistent with the claim language. Additionally, the "purpose" of a claim is not a limitation. *Cohesive Technologies, Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008) ("To be clear, it is the purpose of the limitation in the claimed invention – not the purpose of the invention itself – that is relevant.") (emphasis in original). Mr. Tanner's testimony concerning the "main purpose" of the invention is therefore of no relevance to his infringement analysis.

Furthermore, contrary to LG's assertion, Mr. Tanner's report does discuss individual users operating LG devices in an infringing manner, including LG's own direct infringement through ████████████████████████ Holohan Dec. Ex. 2 ¶¶ 177-183, 190.

In sum, LG's attacks on Mr. Tanner, which are premised on misrepresentations of Mr. Tanner's testimony and LG's flawed claim construction, completely fail to show that Mr. Tanner's opinions are in any way unreliable. LG's motion should therefore be denied.

      **(b)     LG Has Not Shown that Mr. Dolan's Opinions Are Unreliable.**

LG has taken a similarly blunderbuss approach to attacking Mr. Dolan's reliability, simply listing a handful of allegedly harmful statements without providing any analysis. LG fares no better in its attacks on Mr. Dolan than it does in its attacks on Mr. Tanner.

- "Mr. Dolan never reviewed the prosecution history in forming his opinions. (Ex. 5, Dolan Dep. at 54.) Mr. Dolan's opinion violates fundamental tenets of patent law."

As discussed above, Mr. Dolan applied the ordinary meaning of the claim language consistent with the principles of claim construction. Mr. Dolan also relied upon Mr. Tanner's analysis as necessary in forming his opinions. Finally, LG has pointed to nothing in the prosecution history that would have affected Mr. Dolan's analysis had he reviewed it. LG's prosecution history argument therefore fails.

- "Mr. Dolan states that 'selectively blocking a video signal' means "the video

CONFIDENTIAL – ATTORNEYS' EYES ONLY

signal would be blocked based on some selection criteria" (Ex. 5, Dolan Dep. at
91), but admits that he did not rely on any evidence of an actual user selecting and
storing his or her user preferences. (Ex.5, Dolan Dep. at 170.)"

LG's focus on Mr. Dolan's definition of "selectively blocking a video signal" relies upon

LG's improper effort to read the preamble as limiting the claim.  As explained in Wi-LAN's NI

Opposition at 15-17, the preamble is not limiting, and therefore the term "selectively blocking a

video signal" simply has no relevance to infringement analysis.

Furthermore, the claim does not require "an actual user selecting and storing his or her

user preferences."  As explained above, Claim 7 does not require any specific action by a user at

all, let alone "selecting . . . user preferences" as LG asserts.  Wi-LAN's NI Opposition makes it

clear that LG's factory default settings qualify as "user preference information."  *See* Wi-LAN's

NI Opp. at 39-41.  In any case, Mr. Dolan supplied ample evidence of users performing the steps

of the claimed method.  LG's argument in this regard is simply irrelevant.

- "Mr. Dolan admitted that he never used the parental control features of an
  Accused Product in forming his opinion. (Ex. 5, Dolan Dep. at 119; *See also id.* at
  156-57 ('I don't know. I've never operated the device').)"

LG completely fails to explain why an expert's personal operation of an Accused Product

is necessary to form an infringement analysis.  As set forth in the Dolan Report, Mr. Dolan

applied his expertise to (1) LG's source code, and (2) certain receiver chip components.  No

personal use of any Accused Product was necessary for Mr. Dolan to perform his analysis of

these materials.  LG has not shown that the operation of an Accused Product is necessary for

analysis of source code and receiver chip materials (it is not), and therefore this argument fails.

- "Mr. Dolan admitted that the Accused Products have CEA-766 hardcoded and do
  not process RRT1. (Ex. 5, Dolan Dep. at 140.)"

Wi-LAN does not dispute that LG's Accused Products ███████████████████████

███████████████████ and therefore ███████████████████████████████████

**CONFIDENTIAL – ATTORNEYS' EYES ONLY**

███████ However, configuration information in the form of RRT1 data is nonetheless

indisputably received and stored by the Accused Products. Wi-LAN's NI Opp. at 9-10.

Furthermore, the '402 patent clearly teaches embodiments of the claimed invention with pre-

programmed configuration information describing informational schemes. *Id.* at 22-23. LG's

improper claim construction and baseless efforts to exclude devices with pre-programmed

configuration information do not render Wi-LAN's experts unreliable.

- "Mr. Dolan's opinion is 'that when the manufacturer LG manufactures its products in ████ and before they're even shipped, they already have stored user preferences.'" (Ex. 5, Dolan Dep. at 168.)"

Again, LG offers no explanation as to why Mr. Dolan's testimony is unreliable. As

explained in Wi-LAN's NI Opposition, "user preference information" refers to any data that may

be compared with extracted programming information for the purposes of making a block/allow

determination, and need not be selected or inputted by a user. *See* Wi-LAN's NI Opp. at 30-31.

The factory default settings satisfy this claim element, and Mr. Dolan's testimony is reliable.

- "Mr. Dolan stated that the definition of 'video signal' is 'context-dependent' and that 'depending on where it's used in the patent, it means different things.' (Ex. 5, Dolan Dep. at 181-82.) Mr. Dolan then defines the term 'video signal' in two different ways: (1) 'audible component and display component together,' and (2) 'display component only.' (Ex. 5, Dolan Dep. at 181-83.) Mr. Dolan's opinion violates fundamental tenets of patent law and renders the Asserted Claims indefinite[.]"

As with Mr. Tanner's testimony concerning this issue, Mr. Dolan was referring to the fact

that different underlined implementations of the claimed invention may involve different types of data

satisfying the "video signal" element. Nothing in Mr. Dolan's testimony is inconsistent with the

meaning of "video signal" in the patent, nor with Wi-LAN's well-established position that the

ATSC Transport Stream satisfies the broad definition of "video signal," which refers to the entire

modulated signal, and may include video, audio and data components. The fact that a claim can

be implemented in numerous ways does not render the claim indefinite.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

- "Mr. Dolan opines that the factory installed default settings do not permit any comparison of any received informational schemes or the blocking of any programs whatsoever. (Ex. 5, Dolan Dep. at 154-56.) Mr. Dolan's opinion violates fundamental tenets of patent law."

LG again misrepresents Mr. Dolan's testimony.  Mr. Dolan's report states that ▮▮▮▮



▮▮▮▮  Mr. Dolan then explicitly rejected the contention that the CAD is never compared to the user preferences if the default settings are in place:

> Q        . . . I think my follow-up question would be, therefore, the CAD is never compared to the user preferences.
>
> [. . .]
>
> THE WITNESS:  No, I disagree. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Id.* 156:8-16 (emphasis added).  Thus, Mr. Dolan testified that a comparison always takes place, and therefore Claim 7 is always infringed, including under the factory default settings.

**C.    LG's Non-Infringement Arguments Do Not Show that Wi-LAN's Expert Opinions Are Unreliable.**

LG recasts a handful of its baseless non-infringement arguments as further attacks on Wi-LAN's experts, again asserting that these experts should be excluded because LG disagrees with them.  The substance of these arguments is thoroughly refuted in Wi-LAN's NI Opposition.  Wi-LAN addresses LG's specific arguments regarding Messrs. Tanner and Dolan below.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

1.      **Wi-LAN's Experts Have Demonstrated Direct Infringement.**

To prove direct infringement, Wi-LAN need only produce evidence of "one instance of

the claimed method being performed during the pertinent time period." *Lucent Techs., Inc. v.*

*Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).  "Direct infringement can be proven by

circumstantial evidence." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1326 (Fed. Cir.

2009).  Mr. Tanner has provided evidence showing much more than a single instance of direct

infringement during the infringement period.

As explained by Mr. Tanner, LG directly infringes the asserted claims at least through its

████████████████████████  Holohan Dec. Ex. 2 ¶ 190.  Mr. Tanner discusses this direct

infringement by LG in his Opening Infringement Report.  *Id.*  This, alone, constitutes evidence

of at least "one instance of the claimed method being performed during the pertinent time

period." *Lucent Techs.*, 580 F.3d at 1317.  Furthermore, Mr. Tanner personally operated an LG

Accused Product, including testing the V-Chip functionality of the device. *Id.* ¶¶ 184-189.  Mr.

Tanner also analyzed several pieces of data concerning the use of DTV devices and V-Chip

technology, and concluded that a significant number of individuals operate LG's Accused

Products in an infringing manner. *Id.* ¶¶ 177-183.  Thus, Mr. Tanner's infringement conclusions

are supported by the necessary showing of direct acts of infringement.

2.      **LG's Default Factory Settings Demonstrate Infringement.**

As explained in Wi-LAN's NI Opposition, LG inputs user preference information in all

of its Accused Products before they are sold to customers.  Wi-LAN's NI Opp. at 10-11.  Under

the default settings, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████  *Id.* at 12.  All programming is displayed under the default

settings, *i.e.* no programming is blocked. *Id.* at 13.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

While LG is free to disagree with this analysis, LG is not entitled to exclude Wi-LAN's experts for taking positions contrary to what LG would prefer. None of LG's non-infringement theories concerning the default settings have any substantive merit at all, let alone justify excluding Wi-LAN's experts. First, LG's contention that Claim 7 requires blocking to occur is clearly incorrect. Claim 7 concludes with a paragraph that recites a composite step (h), which includes step (i). Step (h) involves blocking a video signal from being displayed, whereas step (i) involves allowing the signal to be displayed. The two steps are mutually exclusive alternatives, and both cannot occur in a single performance of the claimed method. Only a single performance of a method is required to infringe a claim. *Lucent Techs.*, 580 F.3d at 1317. Because it is impossible to perform <u>both</u> steps (h) and (i) in a single performance of the claimed method, interpreting the claim to require blocking would improperly render the claim inoperable. *Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1174 (Fed. Cir. 2008) ("[A] construction that renders the claimed invention inoperable should be viewed with extreme skepticism.") (internal quotations omitted). Thus, the method of Claim 7 can be performed <u>without</u> blocking.[1]

Further, the default setting analysis set forth by Wi-LAN's experts does not require extraterritorial application of patent law. While the default user preference information is <u>input</u> in ██████ the claim requires <u>storing</u> that user preference information. Because "storing" is a continuous act, the Accused Products continue "storing" the user preference information throughout the life of the device, including during their use within the United States. In any

---

[1] The heading of the section beginning on page 13 of LG's brief suggests "noninfringement of the preamble" as another purported basis for excluding the testimony of Wi-LAN's experts. While LG has declined to actually explain this position in its brief, there can be no "infringement of the preamble" because the preamble is not limiting. *American Medical Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010). Mr. Tanner made this clear in his deposition. Holohan Dec. Ex. 6 at 148:6-8. However, even if the preamble is limiting, LG's Accused Products perform selective blocking. *See* Wi-LAN's NI Opp. at 41-42.

CONFIDENTIAL – ATTORNEYS' EYES ONLY

case, the default user preference information is not the only basis on which Wi-LAN's experts rely to find infringement. They also rely on the evidence of direct infringement by LG through its product testing, and the use of V-Chip technology by individual purchasers of DTVs. LG's arguments concerning default user preference information fail to demonstrate non-infringement, let alone unreliability of Wi-LAN's experts.

### 3. LG Fails to Cite Any "Limitations and Concessions Made During Prosecution History."

In a final effort to improperly exclude Wi-LAN's experts, LG asserts that Wi-LAN's experts did not "consider the effects of the inventor's disclaimer during prosecution." LG Mot. at 14. Notably, LG does not identify the specific "disclaimer" that Wi-LAN's experts should have considered.[2] Accordingly, this last argument fails entirely.

### V.    CONCLUSION

For the foregoing reasons, Wi-LAN respectfully requests that the Court DENY LG's Motion to Strike the Reports of Wi-LAN's Opinion Witnesses Mssrs. [sic] Tanner and Dolan and to Preclude Their Opinion Testimony.

---

[2] To the extent that LG meant to include an argument concerning the patentee's alleged disclaimer of devices with pre-configured configuration information, Wi-LAN has shown numerous times that no such disclaimer was made. *See, e.g.*, Wi-LAN's NI Opp. at 23-24. Thus, this portion of the prosecution history is of no importance to Wi-LAN's experts' analyses.

Dated: April 22, 2011                    KILPATRICK TOWNSEND & STOCKTON LLP

                                         _____

                                         David E. Sipiora
                                         Matthew C. Holohan (admitted *pro hac vice*)
                                         1400 Wewatta Street, Suite 600
                                         Denver, CO 80202
                                         Telephone: (303) 571-4000
                                         Facsimile: (303) 571-4321

                                         David A. Koenigsberg
                                         MENZ BONNER & KOMAR LLP
                                         444 Madison Ave., 39th Floor
                                         New York, New York 10022
                                         (212) 223-2100

                                         Attorneys for Plaintiff
                                         Wi-LAN Inc.